# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE HON. JOHN R. ADAMS )
Two South Main Street, Room 510 )
Akron, Ohio 44308-1813, )
)
          Plaintiff, )
)
v. )      Civil Action No.
)
THE JUDICIAL COUNCIL OF THE )
SIXTH CIRCUIT, )
c/o Circuit Executive )
503 Potter Stewart U.S. Courthouse )
100 East Fifth Street )
Cincinnati, Ohio 45202, )
)
and )
)
THE HON. R. GUY COLE, in his )
official capacity as chair of the )
Judicial Council of the Sixth Circuit. )
100 East Fifth Street )
Cincinnati, Ohio 45202, )
)
and )
)
COMMITTEE ON JUDICIAL )
CONDUCT AND DISABILITY )
OF THE JUDICIAL CONFERENCE )
OF THE UNITED STATES, )
Attn:   Office of the General Counsel )
One Columbus Circle, NE )
Washington, DC 20544, )
)
and )

THE HON. ANTHONY J. SCIRICA,        )
in his official capacity as chair of       )
the Committee on Judicial Conduct     )
and Disability of the Judicial          )
Conference of the United States,        )
601 Market Street                    )
Philadelphia, PA 19106,               )
                                    )
                    Defendants.       )
_____ )

## COMPLAINT FOR DECLARATORY AND INJUNCTION RELIEF

Plaintiff, The Honorable John R. Adams, brings this action for declaratory and injunctive relief against Defendants Judicial Council of the Sixth Circuit, the Hon. R. Guy Cole, in his official capacity as chair of the Judicial Council of the Sixth Circuit, the Committee on Judicial Conduct and Disability of the Judicial Conference of the United States, and the Hon. Anthony J. Scirica, in his official capacity as chair of the Committee on Judicial Conduct and Disability of the Judicial Conference of the United States.   As grounds therefor, Plaintiff alleges as follows:

### JURISDICTION AND VENUE

1.        The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

2.        Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

### PARTIES

3.        Plaintiff John R. Adams is a federal judge of the U.S. District Court for the Northern District of Ohio.   The Northern District of Ohio lies within the territorial jurisdiction of the U.S. Court of Appeals for the Sixth Circuit ("Sixth Circuit").

4.        Defendant Judicial Council of the Sixth Circuit ("Judicial Council") oversees the administration of the federal courts in the Sixth Circuit, including receiving and reviewing reports by special committees charged with investigating complaints of judicial misconduct

and/or disability filed under the Judicial Conduct and Disability Act of 1980, 28 U.S.C. §§ 351-364 ("the Act").   The Judicial Council derives its authority from sections 332 and 352-354 of the Act and Rules 18-20 of the Rules for Judicial-Conduct and Judicial-Disability Proceedings.

5.     Defendant R. Guy Cole, Jr. serves as Chief Judge of the Sixth Circuit and, in that capacity, is chair of the Sixth Circuit's Judicial Council.   Chief Judge Cole is being sued in his official capacity as chair of the Judicial Council.

6.     Defendant Committee on Judicial Conduct and Disability of the Judicial Conference of the United States ("the Review Committee") is a standing committee established by the Judicial Conference of the United States ("the Judicial Conference") to review orders and actions of the Judicial Councils of the U.S. Circuit Courts of Appeal regarding complaints against judges and judicial discipline under the Act.   The Review Committee derives its authority from sections 331 and 357 of the Act, and from Rule 21 of the Rules for Judicial-Conduct and Judicial-Disability Proceedings.

7.     Defendant Anthony J. Scirica serves as the chair of the Review Committee. Judge Scirica is being sued in his official capacity as chair of the Review Committee.

## STATEMENT OF FACTS

8.     Judge Adams was nominated by President George W. Bush to a judgeship on the United States District Court for the Northern District of Ohio ("the District Court") on January 7, 2003.   He was confirmed by the United States Senate on February 10, 2003 and received his commission on February 12, 2003.   Judge Adams' chambers are in Akron, Ohio.

9.     At all relevant times, Judge Adams has been and is in sound physical and mental health.   He competently manages a full docket of cases and has sat by designation on the Sixth

Circuit on numerous occasions, including on at least 24 occasions since 2012 and at least 77 occasions since approximately July 2008.

10.     The District Court has seen a dramatic increase in Social Security disability appeals during Judge Adams' tenure.   Claimants seeking Social Security benefits have been plagued by long delays at every step of the disability application process, and the District Court took no steps to address the problem.   Because the District Court automatically assigns Social Security disability appeals to magistrate judges for a recommended decision, Judge Adams attempted to address these delays by creating deadlines for magistrates – first informally and later by the issuance of scheduling orders, as permitted under the District Court's rules.   Unlike other judges on the District Court, Judge Adams typically does not assign other duties to the magistrate judges.   He asked only that the magistrate judges timely address the appeals of Social Security disability applicants.   The magistrate judges resisted Judge Adams' efforts to require timely decisions, preferring no deadlines at all.   Due to Judge Adams' efforts, the Court subsequently set goals for decisions in Social Security disability appeals.

11.     Judge Adams also firmly believes that, like all employees of the federal government, judges should be good stewards of taxpayer dollars.   He spoke out numerous times about the District Court's wasteful and inefficient use of resources.   For example, he spoke out about the fact that the District Court was spending thousands of dollars to purchase iPads for judges and other court staff while simultaneously threatening cutbacks and furloughs for essential staff, such as probation officers.   He questioned the need for a magistrate judge in Akron, a position costing hundreds of thousands of dollars annually.   He also questioned reimbursing judges for travel expenses incurred attending ceremonial portrait unveilings of their colleagues.

12.     Judge Adams' concerns regarding the use of court resources and finances were ignored.   While Judge Adams believes court governance is important, he concluded that his participation in formal court governance was not useful or productive because his views on governance were routinely cast aside.   He still provided his views on topics he felt deserved his attention, however, and also remained involved in the legal community by participating in the United States Sentencing Commission's Annual National Seminar and teaching at the University of Akron School of Law.   He continues to serve routinely as the District Court's miscellaneous judge and presides over naturalization ceremonies.   He presently sits on the Akron School of Law Alumni Board.

13.     On February 1, 2013, Judge Adams issued a show cause order asking a magistrate judge to explain his failure to issue a timely decision in a Social Security appeal assigned to Judge Adams.   The timeliness of decisions in Social Security cases had been a recurrent problem, and, as a result, it was Judge Adams' practice to issue scheduling orders for Social Security appeals.   In the particular case at hand, the claimant had waited nearly 5.5 years from the date of her administrative claim for a final decision.   When the magistrate judge indicated the next business day that human error caused a miscalculation of the deadline, Judge Adams deemed the order satisfied and sealed the filings that same day, which meant the magistrate judge faced no further consequences and no one would be able to see the initial order or the response. The matter was resolved and placed under seal within a span of 48 hours.   Because the case was a Social Security appeal, the show cause order and response were not publicly available before they were sealed, but were only available to the parties.

14.     On or about February 15, 2013, four judges of the District Court filed a judicial complaint against Judge Adams.   The complaint alleged that Judge Adams lacked authority to

issue the order and further alleged that the order constituted "an extreme, unwarranted, and unjustified abuse of judicial discretion."   The complaint also alleged that Judge Adams had a "strained relationship with the other judges of the court" and had "withdrawn from participation in the governance and social life of the Court."   The complaint did not attribute the show cause order or alleged strained relationship and withdrawal to any alleged disability or other condition.

15.     Sixth Circuit Chief Judge Alice M. Batchelder recused herself from the complaint, on information and belief because her daughter had clerked for Judge Adams.   On February 22, 2013, Judge Danny J. Boggs, acting in place of Chief Judge Batchelder, appointed a special committee ("the Special Committee") to investigate the complaint.

16.     Judge Adams filed a timely response to the complaint in March 2013.   He did not deny issuing the show cause order, but explained why he had done so and how he discharged the order and placed both the order and response under seal within 48 hours of its issuance.   He also addressed the complainants' concerns about his alleged strained relationship and withdrawal.

17.     When requested by the Special Committee to appear for an interview in August 2013, Judge Adams appeared and answered the Special Committee's questions.   He also attempted to resolve the complaint informally by offering to withdraw the then-sealed order and related filings and by agreeing to attend judges' meetings and any court committee meetings to which the District Court's chief judge might appoint him, among other measures.

18.     In the Fall of 2013, the Special Committee demanded that Judge Adams undergo a psychiatric evaluation as part of its investigation.   The Special Committee identified no specific reason for the request.

19.     Judge Adams objected in good faith to the Special Committee's demand, but nonetheless tried to accommodate the Special Committee.   In November 2013, he voluntarily

underwent an examination by a local, board certified psychiatrist, and in January 2014, he

submitted a report of the examination to the Special Committee.   The report concluded that

Judge Adams did not suffer from any diagnosable mental disorder.

20.     When the Special Committee persisted in its demand, Judge Adams agreed to

undergo a further examination provided certain reasonable conditions were met.   These included

being provided specific information about the reasons for the examination, having input into the

selection of the mental health professional chosen to perform the examination and the parameters

of the examination, and agreed-upon limitations on any materials provided to the mental health

professional selected to perform the examination.   The Special Committee rejected every one of

Judge Adams' conditions.

21.     In January and again in February 2014, the Special Committee advised Judge

Adams that, if he continued to object to undergoing an examination, it would seek to expand the

scope of its investigation to include whether he suffered from a disability and would order him to

submit to a compelled examination.

22.     Judge Adams continued to object to undergoing a compelled examination

because, not only did the Special Committee refuse to identify any specific reason for demanding

a compelled examination, it also refused to allow Judge Adams any input into the scope of the

examination or the materials provided to the mental health professional selected to perform the

examination.   The Special Committee also rejected the report of the examination Judge Adams

underwent voluntarily.

23.     On May 24, 2014, the Special Committee made good on its threat and asked

Judge Boggs to expand the scope of the Special Committee's investigation to include whether

Judge Adams suffers from a mental disability. On May 27, 2014, Judge Boggs granted the Special Committee's request.

24. In August 2014, the Special Committee directed Judge Adams to provide "[a]ll records pertaining to any mental or emotional treatment, counseling, evaluation or diagnosis" "through the present" and "all records regarding any psychotropic medications (such as mood stabilizers, anti-depressants, or tranquilizers)." Judge Adams objected to the demand initially, citing personal privacy and the confidentiality of medical information, but subsequently advised the Special Committee that he had no such records.

25. In September 2014, the Special Committee directed Judge Adams to travel approximately thirty miles from his Akron, Ohio chambers to undergo a three-hour battery of psychological tests as part of an evaluation to be performed by an unidentified forensic psychiatrist. Judge Adams again objected, citing medical privacy, the Special Committee's refusal to provide the basis for a compelled examination, and the previously produced report by the local, board certified psychiatrist concluding that Judge Adams did not suffer from any diagnosable mental disorder, among other objections.

26. On December 5, 2014, the Special Committee asked Judge Boggs to expand the scope of the Special Committee's investigation a second time to include whether Judge Adams committed misconduct by declining to undergo the compelled examination. On December 9, 2014, Judge Boggs granted the Special Committee's request.

27. It was not until Judge Boggs expanded the scope of the Special Committee's investigation a second time that Judge Adams was provided the identity of the psychiatrist engaged by the Special Committee to perform the compelled psychiatric evaluation. The psychiatrist, Dr. Philip J. Resnick, was well-known to Judge Adams as he had appointed Dr.

Resnick to serve as an expert in at least one case pending before him and Dr. Resnick served frequently as a court-appointed expert in the District Court.

28.     Unbeknownst to Judge Adams, on November 11, 2014, Dr. Resnick opined in a letter to the Special Committee that materials provided to him by the Special Committee "suggest significant personality traits . . . may have contributed to the current concerns" about Judge Adams.   Dr. Resnick's letter did not assert that there was any basis to suspect Judge Adams suffered from a disability that rendered him "unable to discharge all of the duties of office," and the Special Committee later stipulated that it never provided Dr. Resnick with the report of the local, board certified psychiatrist who had evaluated Judge Adams in November 2013.

29.     A hearing on the complaint against Judge Adams, as subsequently expanded, was scheduled for April 20-22, 2015.

30.     In the interim, Judge Adams voluntarily underwent a second psychiatric examination, performed by a nationally-renowned psychiatrist and leading expert on legal and ethical issues in medicine and psychiatry.   As part of this second examination, Judge Adams also underwent extensive psychological testing performed by a preeminent psychologist.   This second examination led to another conclusion that Judge Adams does not suffer from a temporary or permanent condition rendering him unable to discharge the duties of his office.

31.     Under both the Act and the governing rules, Judge Adams had the right to proper notice of the charges against him, to call witnesses at any hearing, and to request the issuance of subpoenas.   Both the Act and the governing rules also required the Special Committee's proceedings to be investigative, not adversarial.

32.     The April 2015 hearing was anything but investigative.   It was adversarial, if not accusatorial and antagonistic towards Judge Adams.   It also was unfair.

33.     On the eve of the hearing, the Special Committee produced exhibits and witness statements to Judge Adams that sought to introduce new, previously undisclosed allegations from as long as five and a half years earlier.   It also rejected all eleven, pre-hearing document subpoenas and the single witness subpoena requested by Judge Adams.

34.     The Special Committee also did not identify the "duties of office" allegedly affected by the unidentified mental disability about which it purportedly was concerned until after the April 2015 hearing began.   While Judge Adams' counsel was questioning a witness on the first day of the hearing, the Special Committee informed him that the relevant duties for purposes of the hearing were the duties referenced in the Special Committee's March 23, 2014 request to Judge Boggs to expand the scope of the investigation to include whether Judge Adams suffers from a mental disability.   The Special Committee had not provided Judge Adams with a copy of the March 23, 2014 request until exhibits and witness statements were exchanged on the eve of trial, and the Special Committee failed to inform Judge Adams at the time that the duties at issue were the duties cited in the request.   The alleged duties included: (a) "maintaining a professional relationship" with colleagues; (b) "shouldering [] responsibilities as a member of th[e] court;" and (c) refraining from "making unfounded and destructive attacks" on colleagues. The Special Committee has never identified the alleged mental disability about which it purportedly is concerned.

35.     The Special Committee also excluded evidence from the two psychiatrists who examined Judge Adams and concluded that he does not suffer from any type of disability that renders him unable to discharge the duties of his office.   Judge Adams had submitted two

witness statements and reports of examination from the local, board certified psychiatrist who had examined him initially in late 2013. Judge Adams also submitted a summary of expected testimony and the 70-page *curriculum vitae* of the nationally renowned psychiatrist and leading expert on legal and ethical issues in medicine and psychiatry who examined him before the hearing. Judge Adams intended for the nationally renowned psychiatrist and expert to testify and be cross-examined at the hearing.

36.     The witness statements and reports, witness summary, and *curriculum vitae* were submitted within the Special Committee's deadline for pre-hearing submissions, yet late in the day of the first day of the three-day hearing, the Special Committee demanded Judge Adams to provide, by 4:00 p.m. the following day, "information regarding any mental health evaluation Judge Adams may have received," including "any and all information, reports, notes, communications, drafts, authorizations, invoices, and other information, whether in digital form, computers, phones, or portable devices" of the two psychiatrists and "any other mental health experts that may have seen or treated Judge Adams at any time." As a practical matter, the mid-hearing demand was impossible to satisfy.

37.     When Judge Adams did not produce the records, the Special Committee excluded the witness statements and reports, witness summary, and live testimony. It even went so far as to state, "[T]he Committee will ignore any statements made by Judge Adams or any statements made by [counsel] that are suggestive that some mental health professional has suggested that there is not a serious psychological or mental issue with him."

38.     The conclusion of the local, board certified psychiatrist as set forth in the excluded, initial report, which was already known to the Special Committee because Judge Adams had produced it to the Special Committee in early 2014, was as follows:

It is my opinion that Judge Adams does not suffer from a diagnosable mental disorder.   The Diagnostic and Statistical Manual of the American Psychiatric Association states that a disorder may not be diagnosed unless there is evidence of "clinically significant distress or impairment in social, occupational or other important areas of functioning." . . . [T]he behavior described in court documents [the judicial complaint] while vexing to other members of the Court, does not constitute mental illness.

The second, later report concluded:

[Judge Adams] shows no evidence of a disturbance in mood, and he says he is interested in pursuing a reconciliation process, but finds being compelled to undergo psychological evaluation as unacceptable in the absence of demonstrated inability to perform assigned duties.   His cognition is intact and he is of high intelligence.   Insight and judgment are intact.

At this time, I do not feel that Judge Adams suffers from a psychiatric disorder. Some individuals' temperament may prove vexing to those around them and cause some degree of interpersonal estrangement but not be the result of mental illness.   Indeed, the very traits that prove irritating to others (a focus on rules, procedure, and precedent; an aloofness from others) are those that may be essential in an officer of the District Court.   These traits however, do not interfere with Judge Adams' reason, intellect, or grasp of reality and do not constitute mental illness.

39.     The excluded witness summary from the nationally renowned psychiatrist and expert on legal and ethical issues in medicine and psychiatry stated, to a reasonable degree of medical certainty, "Judge Adams does not suffer from a temporary or permanent condition rendering him unable to discharge the duties of his office" and "Judge Adams had principled reasons for declining to sit for psychological testing and psychiatric evaluation, as directed by the Special Committee."   On information and belief, he would have testified to this same effect had he not been excluded.

40.     The Special Committee also excluded on the same ground the witness statement of a personal friend of Judge Adams who also is a board certified psychiatrist.   The excluded statement asserted:

As a board certified psychiatrist, having known Judge Adams in many settings for greater than twelve years, I can say that I have never witnessed nor had reliable knowledge of any interaction that suggests Judge Adams has any psychological pathology.   I can say with confidence that there is no evidence of diagnosable DSM disorder.   There is no evidence that he has any form of temporary or permanent mental or emotional condition that renders him unable to perform the duties of his judicial office.

Exclusion of this particular witness statement was especially egregious because, as the witness had never formally evaluated or treated Judge Adams, there were no records to produce.   The witness could not have been excluded for any failure to produce records.

41.    Judge Adams also sought to introduce witness statements from more than thirty individuals who have interacted with him on a daily basis for years, including court personnel and attorneys who have appeared before him regularly, and the live testimony of at least one judicial official.   The Special Committee threatened at the hearing that, if Judge Adams submitted these individuals' witness statements or had them give live testimony, it would call an unspecified number of unidentified witnesses to testify against Judge Adams in rebuttal. Neither the identities of any such rebuttal witnesses nor the subject matter of their testimony had been disclosed to Judge Adams before or after the April 2015 hearing or since.   Faced with the Special Committee's threat, Judge Adams felt compelled not to call these additional witnesses.

42.    In addition, the Special Committee's questioning of its own witnesses at the April 2015 hearing was suggestive, often leading, and one-sided.   By contrast, its questioning of Judge Adams was hostile and prosecutorial.   One member of the Special Committee even asked whether impeachment should be considered.   The Special Committee's actions both before and during the hearing were not those of a neutral investigator.

43.    Nonetheless, no claim or concern was made or raised at the April 2015 hearing that Judge Adams does not or cannot maintain his full docket of cases or is unable to make

rulings.   As one of the complainants acknowledged in his testimony at the hearing, "That's not involved here . . . his handling of his docket has been appropriate."   Another judge testified that Judge Adams is "a very bright judge.   He writes very good opinions."

44.     On July 10, 2015, the Special Committee issued its report and recommendations to the Judicial Council.   It found Judge Adams committed misconduct by issuing the February 1, 2013 show cause order and by refusing to cooperate with the Special Committee's investigation by declining to undergo the compelled psychiatric evaluation demanded by the Special Committee.   The Special Committee also found it could not determine whether Judge Adams suffers from a disability.   It recommended that Judge Adams be publicly reprimanded, ordered to undergo a psychiatric examination by a psychiatrist selected by the Special Committee, not be assigned any new cases for period of two years, and have his entire docket of current cases transferred to other judges, among other sanctions.   It also ordered that Judge Adams "shall submit to any treatment or counseling deemed necessary by the psychiatrist."   Further, it asserted that, should Judge Adams continue to refuse to undergo a psychiatric examination, he be requested to voluntarily retire.

45.     On August 17, 2017, Judge Adams filed a timely response to the Special Committee's report and recommendations at the Judicial Conference, and a hearing on the report and Judge Adams' response was held on September 10, 2015.

46.     On February 22, 2016, the Judicial Council issued an Order and Memorandum that largely adopted the Special Committee's recommendations.

47.     The Judicial Council's Order and Memorandum ordered that "no new cases shall be assigned to Judge Adams for a period of two years, and his present docket shall be transferred to other judges."

- 14 -

48.     The Judicial Council's Order and Memorandum ordered that "[t]he Special Investigating Committee shall maintain jurisdiction for two years to ensure that Judge Adams does not engage in additional inappropriate behavior involving magistrate judges, whether in his official functions or otherwise."

49.     On April 4, 2016, Judge Adams filed a timely petition for review of the Judicial Council's February 22, 2016 Order and Memorandum.

50.     In a Memorandum of Decision issued on August 14, 2017, the Review Committee largely upheld the Judicial Council's Order and Memorandum.  It affirmed the Judicial Council's finding that Judge Adams' actions relating to the February 1, 2013 show cause order constituted misconduct and upheld the Judicial Council's public reprimand.  It also affirmed the Judicial Council's finding that Judge Adams' objection to undergoing a compelled psychiatric examination by a psychiatrist selected by the Special Committee constituted misconduct, although in so ruling, it acknowledged that it was a matter of first impression under the Act.  It likewise affirmed the Judicial Council's order that Judge Adams undergo the compelled examination and further ordered that he "shall submit to any treatment or counseling deemed necessary by the psychiatrist."  It left untouched the Judicial Council statement that, "[s]hould Judge Adams refuse to undergo a mental-health evaluation by a psychiatrist chosen by the Special Investigating Committee, the Judicial Council intends to request that Judge Adams voluntarily retire."

51.     The Review Committee's Memorandum of Decision vacated the Judicial Counsel's Order and Memorandum that "no new cases shall be assigned to Judge Adams for a period of two years, and his present docket shall be transferred to other judges," finding that the "Judicial Council did not include in its Order any specific findings regarding whether Judge

Adams's conduct has adversely affected his ability to discharge the adjudicative duties." But the Review Committee did not contest the legal propriety of the Judicial Council's order if accompanied by appropriate findings, holding that, while "curtailment of Judge Adams's docket is not supported by the record as it exists at this time . . . [w]e cannot rule out the appropriateness of such a sanction should sufficient evidence establish Judge Adams's incapacity."

52.     The Review Committee also held that, "should Judge Adams refuse to submit to the mental health examination ordered by the Judicial Council and affirmed by this Committee, sanctions for Judge Adams's continued failure to cooperate – including the prohibition of the assignment of new cases on a temporary basis for a time certain – may be warranted subject to the Judicial Council's sound discretion."

53.     The Review Committee's Memorandum of Decision also affirmed "the Judicial Council's Order that the Special Committee retain jurisdiction for a reasonable period of time, not to exceed two years, to ensure Judge Adams's ability to discharge the duties of office as a federal district court judge."

54.     Although neither the Special Committee, nor the Judicial Council, nor the Review Committee ever made a finding that Judge Adams' show cause order was unlawful, as opposed to inappropriate or unwarranted under the circumstances, the Judicial Council issued a blanket order "that no such order be issued by Judge Adams with respect to the work of any of the court's judges."

55.     The Review Committee also ordered that, "[i]n addition to its consideration of any examination results, the Special Committee may conduct further investigation into Judge Adams's conduct on the bench, including interviews with litigants, lawyers, and court staff." In

so ruling, the Review Committee effectively expanded the scope of the investigation of Judge

Adams yet again.

56.     Both the Judicial Council's Order and Memorandum and the Review Committee's

Memorandum of Decision were published on August 14, 2017 on the Review Committee's

website, resulting in adverse news reports about Judge Adams and harming Judge Adams'

professional reputation.

## COUNT I
### (Fifth Amendment – Unconstitutional Vagueness
### of the Act's Disability Provision)

57.     Plaintiff realleges paragraphs 1 through 56 as if fully stated herein.

58.     Plaintiff has an obvious liberty interest in the outcome of any misconduct or

disability proceeding against him.   He also has an obvious liberty interest in not being subjected

to an involuntary psychiatric examination and a further liberty interest in not being stigmatized

as having committed misconduct and having his mental health questioned, as well as having his

status as an Article III judge altered by ordering him to undergo a compelled psychiatric

evaluation and subjecting him to the continuing oversight of the Special Committee, among the

other provisions of the Judicial Council's Order and Memorandum.   Under the Fifth

Amendment to the United States Constitution, Plaintiff cannot be deprived of his liberty interests

without due process of law.

59.     The Act is unconstitutionally vague and violates the Due Process Clause of the

Fifth Amendment because, *inter alia*, it fails to provide adequate notice of what constitutes a

mental disability that renders a judge "unable to discharge all the duties of office."   It also is

unconstitutionally vague and violates the Due Process Clause because it lacks minimal

enforcement guidelines identifying when an Article III judge may be subject to a disability

investigation, and, accordingly, when an Article III judge may be disciplined for objecting in good faith to undergoing a compelled psychiatric examination as part of an investigation into whether he suffers from a disability rendering him unable to discharge his duties.

60.     Defendants' enforcement of the Act's unconstitutionally vague disability provisions against Plaintiff has caused Plaintiff irreparable harm and will continue to cause Plaintiff irreparable harm unless and until the Act is declared unconstitutional and Defendants are enjoined from requiring Plaintiff to undergo a compelled psychiatric examination and disciplining Plaintiff for objecting in good faith to a compelled psychiatric examination.

61.     Plaintiff has no adequate remedy at law.

## COUNT II
### (*Ultra Vires*, Unconstitutional Examinations)

62.     Plaintiff realleges paragraphs 1 through 61 as if fully stated herein.

63.     Neither the Act nor the U.S. Constitution authorizes compelling an Article III judge to undergo a psychiatric examination in furtherance of an investigation into whether the judge suffers from a mental or physical disability that renders him unable to discharge all the duties of office.

64.     As Defendants have neither statutory nor constitutional power to compel Plaintiff to undergo an involuntary psychiatric examination, the compelled examination of Plaintiff is *ultra vires* and unconstitutional, as is disciplining Plaintiff for objecting to the examination.

65.     Defendants' *ultra vires* and unconstitutional acts have caused Plaintiff irreparable harm and will continue to cause Plaintiff irreparable harm unless and until they are declared unconstitutional and Defendants are enjoined from requiring Plaintiff to undergo a compelled psychiatric examination and disciplining Plaintiff for objecting in good faith to undergoing a compelled psychiatric examination.

66.     Plaintiff has no adequate remedy at law.

## COUNT III
### (Fifth Amendment – Unconstitutional Vagueness
of the Act's Investigative Authority)

67.     Plaintiff realleges paragraphs 1 through 66 as if fully stated herein.

68.     The Act is unconstitutionally vague to the extent it purports to authorize compelled psychiatric examinations of Article III judges.   Section 353(c) of the Act, which authorizes a special committee to conduct an investigation "as extensive as it considers necessary," lacks minimal enforcement guidelines identifying the circumstances under which an Article III judge may be compelled to undergo a psychiatric examination and vests virtually complete discretion in the hands of a special committee to determine when an examination may be compelled.   Consequently, the Act violates the due process protections of the Fifth Amendment and impermissibly intrudes on judicial independence.

69.     Defendants' enforcement of the Act's unconstitutionally vague investigative provision against Plaintiff has caused Plaintiff irreparable harm and will continue to cause Plaintiff irreparable harm unless and until the Act is declared unconstitutional and Defendants are enjoined from requiring Plaintiff to undergo a compelled psychiatric examination and disciplining Plaintiff for objecting in good faith to undergoing a compelled psychiatric examination.

70.     Plaintiff has no adequate remedy at law.

## COUNT IV
### (Fourth Amendment – Unconstitutional Search)

71.     Plaintiff realleges paragraphs 1 through 70 as if fully stated herein.

72.     Plaintiff enjoys the right to be secure in his person and effects against unreasonable search and seizures, as guaranteed by the Fourth Amendment to the U.S. Constitution.

73.     A compelled psychiatric examination constitutes a search and seizure for purposes of the Fourth Amendment and therefore must satisfy minimum standards of constitutional reasonableness to be lawful.

74.     The Act violates the Fourth Amendment to the extent it authorizes a compelled psychiatric examination of an Article III judge without a warrant based on probable cause and issued by a neutral judicial official or a demonstration of constitutional reasonableness.

75.     Defendants' enforcement of the unconstitutional Act against Plaintiff has caused Plaintiff irreparable harm and will continue to cause Plaintiff irreparable harm unless and until the Act is declared unconstitutional and Defendants are enjoined from requiring Plaintiff to undergo a compelled psychiatric examination and disciplining Plaintiff for objecting in good faith to undergoing a compelled examination.

76.     Plaintiff has no adequate remedy at law.

## COUNT V
### (Fourth Amendment – As Applied Challenge)

77.     Plaintiff realleges paragraphs 1 through 76 as if fully stated herein.

78.     Defendants lack either a warrant issued on probable cause by a neutral judicial official or a constitutionally reasonable basis for requiring Plaintiff to submit to an involuntary psychiatric examination.   Accordingly, compelling Plaintiff to undergo an involuntary psychiatric examination violates Plaintiff's Fourth Amendment rights.

79.     Plaintiff has been and will continue to be irreparably harmed unless and until Defendants' violation of his Fourth Amendment rights is declared unconstitutional and

Defendants are enjoined from requiring Plaintiff to undergo a compelled psychiatric evaluation and disciplining Plaintiff for objecting in good faith to undergoing a compelled examination.

80.    Plaintiff has no adequate remedy at law.

## COUNT VI
### (Fifth Amendment – As Applied Due Process Violation)

81.    Plaintiff realleges paragraphs 1 through 80 as if fully stated herein.

82.    Defendants' determination that Plaintiff committed misconduct by objecting in good faith to undergoing an involuntary psychiatric examination and Defendants' order requiring Plaintiff to undergo a compelled psychiatric examination violate Plaintiff's Fifth Amendment right to due process because, *inter alia*, (a) Plaintiff was not given proper notice of the charges against him, including but not limited to notice of the duties of office he is allegedly unable to perform as a result of the unidentified mental disability from which he is suspected of suffering and the new allegations raised for the first time on the eve of the April 2015 hearing; (b) Plaintiff was denied the right to call medical and lay witnesses at the April 2015 hearing; and (c) the hearing was conducted as an adverse, accusatorial proceeding, if not a prosecution, not the investigative proceeding required by the Act.

83.    Plaintiff has been and will continue to be irreparably harmed unless and until Defendants' violation of his Fifth Amendment right to due process is declared unconstitutional and Defendants are enjoined from requiring Plaintiff to undergo a compelled psychiatric evaluation and disciplining Plaintiff for objecting in good faith to undergoing a compelled examination.

84.    Plaintiff has no adequate remedy at law.

## COUNT VII
### (Improper Removal, Violation of Separation of Powers)

85.     Plaintiff realleges paragraphs 1 through 84 as if fully stated herein.

86.     The Constitution provides that "Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." U.S. Const. art. III, § 1.   The Constitution also provides that "[t]he House of Representatives . . . shall have the sole Power of Impeachment," and that "[t]he Senate shall have the sole Power to try all Impeachments."   U.S. Const. art. I, §§ 2, 3.   In light of these provisions, no executive or judicial agency or body may exercise, in form or in substance, the impeachment power reserved by the Constitution to the House and Senate.   Nor may any executive or judicial agency or body be delegated the impeachment power reserved by the Constitution to the House and Senate.

87.     Defendants' orders and threats constitute an attempt to remove Plaintiff from office, without impeachment and in violation of the Constitution, in substance if not form, by, *inter alia*, (a) threatening to transfer Plaintiff's current cases and threatening to forbid the assignment of new cases to him; (b) ordering Plaintiff to endure an unprecedented, unwarranted, and unconstitutional probationary period of two years, during which the Special Committee's authority over Plaintiff is completely undefined and apparently unlimited; (c) forbidding Plaintiff, alone among all federal judges, from issuing a particular kind of order that has not been found to be unlawful, regardless of any future or unforeseen circumstances; (d) ordering Plaintiff to undergo an involuntary mental health examination and to submit to any required treatment, without a sufficient basis for doing so, as set forth in this Complaint; and (e) ordering that the scope of the investigation into Plaintiff's conduct be expanded, years after the initial complaint, to include his "conduct on the bench," which was never questioned at the hearing in this matter, and to encompass "interviews with litigants, lawyers, and court staff."

88.     Defendants' orders and threats, both individually and in combination, were intended to substantially burden and do substantially burden Plaintiff's ability to serve as an Article III judge and to carry out the constitutional duties of his office and were intended to compel Plaintiff to retire.

89.     The foregoing orders and threats constitute constructive impeachment in violation of the Constitution.

90.     Plaintiff has been and will continue to be irreparably harmed unless and until the identified provisions are declared unconstitutional and Defendants are enjoined from any and all acts carrying out, giving effect to, or in furtherance of these provisions.

WHEREFORE, Plaintiff respectfully requests that the Court: (1) declare the Act to be unconstitutional, either in whole or in part; (2) declare any provisions in the Judicial Council's Order and Memorandum, or in the Review Committee's Memorandum of Decision, requiring Plaintiff to undergo a compelled psychiatric examination, to be disciplined for objecting in good faith to undergoing a compelled examination, or to accept any compelled medical treatment, to be unconstitutional; (3) declare any provisions in the Judicial Council's Order and Memorandum, or in the Review Committee's Memorandum of Decision, authorizing a limitation of Plaintiff's docket, a further investigation into Plaintiff's conduct on the bench, monitoring of Plaintiff's conduct for two years, or other special restrictions on his actions as a federal judge, to be unconstitutional; (4) enjoin enforcement of the foregoing unconstitutional provisions; (5) order the termination of any further investigation of Plaintiff; (6) award Plaintiff reasonable

attorney's fees and costs; and (7) grant Plaintiff such other relief as the Court deems just and proper.

Dated:   September 14, 2017

Respectfully submitted,

JUDICIAL WATCH, INC.

*/s/ Paul J. Orfanedes*
Paul J. Orfanedes
D.C. Bar No. 429716

*/s/ Robert D. Popper*
Robert D. Popper
D.C. Bar No. 1023592
425 Third Street SW, Suite 800
Washington, DC 20024
(202) 646-5172

*Counsel for Plaintiff*