# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE HON. JOHN R. ADAMS,

      Plaintiff,

  v.

JUDICIAL COUNCIL OF THE SIXTH
CIRCUIT, *et al.*,

      Defendants.

Case No. 1:17-cv-01894-ABJ

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

CHAD A. READLER
Acting Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Director, Federal Programs Branch

MATTHEW J. BERNS
Trial Attorney (D.C. Bar No. 998094)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC  20530
Telephone: (202) 616-8016
Matthew.J.Berns@usdoj.gov

December 21, 2017

*Counsel for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

LEGAL BACKGROUND ...................................................................................................... 2

FACTUAL AND PROCEDURAL BACKGROUND.................................................................. 6

    A.    The Special Committee.................................................................................. 6

           1.    Misconduct Related To The Show Cause Order......................................... 8

           2.    Misconduct And Potential Disability In Refusing To Cooperate With The Investigation ..................................................................................... 10

    B.    The Sixth Circuit Judicial Council.............................................................. 12

    C.    The Judicial Conference Committee On Judicial Conduct And Disability .......... 15

    D.    This Lawsuit................................................................................................ 17

LEGAL STANDARD............................................................................................................ 18

ARGUMENT ........................................................................................................................ 19

I.    The Claims Raising As-Applied Challenges Should Be Dismissed For Lack Of Jurisdiction........................................................................................................ 19

II.    The Claims Raising Facial Challenges Should Be Dismissed For Failure To State A Claim Upon Which Relief Can Be Granted.................................................... 25

    A.    The Complaint's Void-For-Vagueness Claims (Counts I and III) Fail As A Matter Of Law............................................................................................. 25

           1.    The Void-For-Vagueness Doctrine Is Categorically Inapplicable Here... 26

           2.    In Any Event, The Challenged Provisions Are Not Unconstitutionally Vague. ..................................................................................................... 28

    B.    The Complaint's Fourth Amendment Claim (Count IV) Fails As A Matter Of Law. ....................................................................................................... 33

    C.    The Complaint's Statutory and Constitutional Authority Claim (Count II) Fails As A Matter Of Law. .......................................................................... 36

    D.    The Complaint's Constructive Impeachment Claim (Count VII) Fails As A Matter Of Law............................................................................................. 38

CONCLUSION...................................................................................................................... 39

# TABLE OF AUTHORITIES[*]

**Page(s)**

**CASES**

\* *Arnett v. Kennedy,*
    416 U.S. 134 (1974)...................................................................................... 29, 30, 31

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).............................................................................................. 18

*Beckles v. United States,*
    137 S. Ct. 886 (2017)........................................................................................... 27

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).............................................................................................. 18

*Boutilier v. INS,*
    387 U.S. 118 (1967).............................................................................................. 26

*Camden & Suburban Ry. Co. v. Stetson,*
    177 U.S. 172 (1900).............................................................................................. 36

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991)................................................................................................ 37

*Chandler v. Judicial Council of the Tenth Circuit,*
    398 U.S. 74 (1970)....................................................................................... 3, 4, 38

*City of Los Angeles v. Patel,*
    135 S. Ct. 2443 (2015).......................................................................................... 33

*Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers,*
    413 U.S. 548 (1973)........................................................................................ 28, 31

*Countee v. United States,*
    112 F.2d 447 (7th Cir. 1940) ............................................................................... 36

*Crooks v. Mabus,*
    845 F.3d 412 (D.C. Cir. 2016).......................................................................... 28, 29

*Daniel v. City of Tampa, Fla.,*
    843 F. Supp. 1445 (M.D. Fla. 1993).................................................................... 27

---

[*] Asterisks indicate those cases or authorities on which counsel chiefly relies.

*Down v. Ann Arbor Pub. Sch.*,
   29 F. Supp. 3d 1030 (E.D. Mich. 2014) ................................................................. 33

*FCC v. Fox Television Stations, Inc.*,
   132 S. Ct. 2307 (2012) ......................................................................... 26, 28

*FTC v. Wyndham Worldwide Corp.*,
   799 F.3d 236 (3d Cir. 2015) ........................................................................ 28

*Grant v. Dep't of Treasury*,
   194 F. Supp. 3d 25 (D.D.C. 2016) ................................................................... 6

*Greenawalt v. Indiana Dep't of Corr.*,
   397 F.3d 587 (7th Cir. 2005) ...................................................................... 33

*Gustave-Schmidt v. Chao*,
   226 F. Supp. 2d 191 (D.D.C. 2002) ................................................................. 19

*Hastings v. Judicial Conf. of the U.S.*,
   593 F. Supp. 1371 (D.D.C. 1984) ................................................................... 29

*Hastings v. Judicial Conf. of the U.S.*,
   829 F.2d 91 (D.C. Cir. 1987) .................................................................... 29, 32

*Hohri v. United States*,
   782 F.2d 227 (D.C. Cir. 1986) ...................................................................... 18

*In re Certain Complaints*,
   783 F.2d 1488 (11th Cir. 1986) .................................................................... 29

*In re Petition To Inspect & Copy Grand Jury Materials*,
   576 F. Supp. 1275 (S.D. Fla. 1983) ................................................................. 37

*John Doe Co. v. CFPB*,
   849 F.3d 1129 (D.C. Cir. 2017) (*per curiam*) ...................................................... 25

*Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*,
   845 F. Supp. 2d 288 (D.D.C. 2012) .............................................................. 18, 19

* Kincaid v. District of Columbia,
   854 F.3d 721 (D.C. Cir. 2017) ................................................................ 27, 31, 32

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ............................................................................... 18

* McBryde v.
   Comm. to Review Circuit Council Conduct & Disability Orders of the Judicial Conf.,
   264 F.3d 52 (D.C. Cir. 2001) ................................... 1, 2, 19, 20, 21, 22, 23, 24, 33, 39

*McBryde v.*
   *Comm. to Review Circuit Council Conduct & Disability Orders of the Judicial Conf.,*
   83 F. Supp. 2d 135 (D.D.C. 1999) .................................................................................. 22, 39

*McComb v. Comm'n on Judicial Performance,*
   564 P.2d 1 (Cal. 1977) .................................................................................................... 30

*O'Connor v. Ortega,*
   480 U.S. 709 (1987) ........................................................................................................ 35

*Ohio State Bar Ass'n v. Mayer,*
   377 N.E.2d 770 (Ohio 1978) .......................................................................................... 30

*Schlagenhauf v. Holder,*
   379 U.S. 104 (1964) ........................................................................................................ 36

*Sibbach v. Wilson & Co.,*
   312 U.S. 1 (1941) ............................................................................................................ 36

*Tyson v. Brennan,*
   No. 16-cv-2087-KBJ, 2017 WL 4402387 (D.D.C. Sept. 30, 2017) ................................ 6

*U.S. Telecom Ass'n v. FCC,*
   825 F.3d 674 (D.C. Cir. 2016) .................................................................................. 26, 28

*United States ex. rel. Fitzgerald v. Jordan,*
   747 F.2d 1120 (7th Cir. 1984) ........................................................................................ 27

*United States v. David H.,*
   29 F.3d 489 (9th Cir. 1994) ............................................................................................ 26

*United States v. Salerno,*
   481 U.S. 739 (1987) .................................................................................................. 25, 33

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
   455 U.S. 489 (1982) .................................................................................................. 28, 30

## CONSTITUTIONS, STATUTES, AND RULES

28 U.S.C. § 331 .................................................................................................................... 6

28 U.S.C. § 332 .................................................................................................................... 3

28 U.S.C. § 351 ................................................................................................................. 1, 7

28 U.S.C. § 351(a) ...................................................................................................... 4, 26, 29

28 U.S.C. § 351(b) ............................................................................................................... 4

28 U.S.C. § 352 ............................................................................................ 1, 20

28 U.S.C. § 352(b) ............................................................................................... 5

28 U.S.C. § 352(b)(1) .......................................................................................... 5

28 U.S.C. § 352(b)(2) .......................................................................................... 5

28 U.S.C. § 352(c) ...................................................................................... 5, 6, 19

28 U.S.C. § 353 ...................................................................................................... 1

28 U.S.C. § 353(a) ................................................................................................ 5

28 U.S.C. § 353(a)(3) ........................................................................................... 5

28 U.S.C. § 353(c) .......................................................................... 5, 14, 27, 31, 36

28 U.S.C. § 354 ...................................................................................................... 1

28 U.S.C. § 354(a)(1)(A) ..................................................................................... 5

28 U.S.C. § 354(a)(1)(B) ..................................................................................... 5

28 U.S.C. § 354(a)(1)(C) ..................................................................................... 5

28 U.S.C. § 354(a)(2) ......................................................................................... 16

28 U.S.C. § 354(a)(2)(A)(i) ....................................................................... 5, 14, 39

28 U.S.C. § 354(a)(2)(A)(ii)-(iii) ........................................................................ 5

28 U.S.C. § 354(a)(2)(B)(ii) ...................................................................... 6, 15, 39

28 U.S.C. § 354(a)(3) ........................................................................................... 6

28 U.S.C. § 354(b) ................................................................................................ 1

28 U.S.C. § 355 ...................................................................................................... 1

28 U.S.C. § 357 ........................................................................................... 1, 6, 20

28 U.S.C. § 357(a) ........................................................................................... 6, 34

* 28 U.S.C. § 357(c) ...................................... 1, 6, 19, 20, 23, 24, 25, 34, 36, 38

28 U.S.C. § 360(a) .............................................................................................. 35

28 U.S.C. § 372 .................................................................................................... 20

28 U.S.C. § 372(b) .................................................................................................... 30

28 U.S.C. § 372(c) .............................................................................................. 20, 21

28 U.S.C. § 372(c)(10) ........................................................................................ 19, 20

28 U.S.C. §§ 351-364 .................................................................................................. 1

6th Cir. JC&D Rule 14(b) ......................................................................................... 14

Cal. Const. art. VI, § 18(d) ....................................................................................... 30

Fed. R. Civ. P. 12(b)(1) ................................................................................. 6, 18, 19

Fed. R. Civ. P. 12(b)(6) ................................................................................. 6, 18, 25

Fed. R. Civ. P. 35(a)(1) ............................................................................................ 36

JC&D Rule 1 ............................................................................................................. 14

JC&D Rule 3(e) .................................................................................................. 13, 31

JC&D Rule 3(h) .......................................................................................................... 7

JC&D Rule 3(h)(1) .................................................................................................... 13

JC&D Rule 13(a) ....................................................................................................... 14

JC&D Rule 20(b)(1)(D) ............................................................................................ 16

JC&D Rule 20(b)(1)(D)(ii) ....................................................................................... 14

JC&D Rule 20(b)(1)(D)(v) ....................................................................................... 15

JC&D Rule 20(c) ....................................................................................................... 14

JC&D Rule 23(a) ....................................................................................................... 35

JC&D Rule 23(c) ....................................................................................................... 35

JC&D Rule 24 ........................................................................................................... 35

Ohio Rev. Code Ann. § 2701.12(B) ......................................................................... 30

Act of Feb. 25, 1919,
      Pub. L. No. 265, 40 Stat. 1156 ......................................................................... 30

Act of Aug. 7, 1939,
      Pub. L. No. 299, 53 Stat. 1223 ........................................................................... 3

Act of June 25, 1948,
   Pub. L. No. 773, 62 Stat. 869 .................................................................................... 3

Judicial Conduct and Disability Act of 1980,
   Pub. L. No. 96-458, 94 Stat. 2035 ........................................................................... 4

U.S. Const. art. I, § 8, cl. 18 ..................................................................................... 38

U.S. Const. art. I, § 8, cl. 9 ....................................................................................... 38

U.S. Const. art. III, § 1 ........................................................................................ 2, 37

## Miscellaneous

*Administration of United States Courts:*
   *Hearing on S. 188 Before a Subcomm. of the S. Comm. on the Judiciary,*
   76th Cong., 1st Sess. (1939) ................................................................................ 3, 4

H.R. Rep. No. 96-1313 (1980) .................................................................................... 4

Kastenmeier, Robert W., et al.,
   *Report of the National Commission on Judicial Discipline & Removal,*
   152 F.R.D. 265 (Aug. 1993) ...................................................................................... 4

S. Rep. No. 95-1035 (1978) ...................................................................................... 30

S. Rep. No. 96-362 (1980) .................................................................................. 1, 21, 30

## INTRODUCTION

This case involves the Federal Judiciary's authority, as an independent and coequal branch of government, "to 'keep its own house in order' by conducting its own investigations of misconduct" and disability involving federal judges. *McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of the Judicial Conf.*, 264 F.3d 52, 61 (D.C. Cir. 2001) (quoting S. Rep. No. 96-362, at 11 (1980)). Congress has confirmed that judicial authority through legislation, including, as relevant here, the Judicial Conduct and Disability Act of 1980, 28 U.S.C. §§ 351-364. The Act establishes a detailed scheme governing judicial conduct and disability proceedings, from the filing of a complaint with the clerk of the relevant court of appeals, *see id.* § 351, to review by the chief judge of that court, *see id.* § 352, to possible review by a special investigatory committee, *see id.* § 353, to review by the judicial council of the circuit, *see id.* § 354, to possible review by a standing committee of the Judicial Conference of the United States*, see id.* § 357, to possible review by the Judicial Conference itself, *see id.* §§ 354(b), 355, 357. After authorizing all those layers of review—each conducted by Article III judges—the Act draws the line: it specifically precludes any *other* form of judicial review of such proceedings. *See id.* § 357(c) ("Except as expressly provided in [the Act], all orders and determinations ... shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise.").

This lawsuit attempts to circumvent this comprehensive statutory scheme. The plaintiff, Judge John R. Adams of the U.S. District Court for the Northern District of Ohio, is the subject of a judicial misconduct complaint stemming from his inappropriate treatment of that Court's magistrate judges. That complaint proceeded through each layer of review to which the Act entitles Judge Adams, from review by the acting Chief Judge of the Sixth Circuit, to review by a Special Committee, to review by the Judicial Council of the Sixth Circuit (one of the two defendants here), and finally to review by the Judicial Conference Committee on Judicial Conduct and Disability

(the "JC&D Committee," the other defendant here). While that process remains ongoing, the result to date—most recently affirmed by the JC&D Committee—has been a public reprimand of Judge Adams for his mistreatment of magistrate judges and his refusal to cooperate with the investigation by submitting to a mental health evaluation by an independent psychiatrist. The JC&D Committee further affirmed the Sixth Circuit Judicial Council's authority to require Judge Adams to undergo such an evaluation as part of its ongoing investigation into his ability to perform his judicial duties. Thus, the JC&D Committee "anticipated that Judge Adams will expeditiously comply" with the order to undergo an independent mental health evaluation, and noted that "[o]nce the examination is completed, the Judicial Council should consider the results, along with any records or other examination results submitted by Judge Adams, to determine whether additional action by the Judicial Council is appropriate." JC&D Comm. Mem. 39.

Judge Adams, however, dashed that expectation. Rather than submit to the requisite mental health evaluation, Judge Adams filed this lawsuit as a collateral attack on the entire process. In essence, he invites this Court to sit in review of the JC&D Committee (comprising seven Article III judges—four from the courts of appeals and three from the district courts), which in turn sat in review of the Sixth Circuit Judicial Council (comprising seventeen Article III judges—ten from the Sixth Circuit and seven from the district courts within that Circuit). This Court should decline that invitation. Judge Adams has had all the process that the Act provides, and all the process that the Constitution requires. His current claims are either beyond this Court's jurisdiction or fail to state a claim upon which relief can be granted. Accordingly, this Court should dismiss the entire Complaint with prejudice.

## LEGAL BACKGROUND

The Constitution protects judicial independence through its guarantees of life tenure and undiminished salary during good behavior. *See* U.S. Const. art. III, § 1; *McBryde*, 264 F.3d at 64.

At the same time, though, all three branches of the Federal Government have long appreciated that judicial independence must be accompanied by some means of ensuring judicial accountability. *See generally Administration of United States Courts: Hearing on S. 188 Before a Subcomm. of the S. Comm. on the Judiciary*, 76th Cong., 1st Sess. (1939). Recognizing that judicial independence and accountability are not mutually exclusive, Congress has sought to further both goals by empowering federal judges to "put their own house in order." *Chandler v. Judicial Council of the Tenth Circuit*, 398 U.S. 74, 85 (1970).

In 1939, at the urging of Chief Justice Hughes and others, Congress provided for the creation of a judicial council for each circuit. *See* Act of Aug. 7, 1939, Pub. L. No. 299, ch. 501, 53 Stat. 1223, 1224. The judicial councils were instructed to take "such action ... as may be necessary" "[t]o the end that the work of the district courts shall be effectively and expeditiously transacted." *Id*. For their part, district judges were required "promptly to carry out the directions of the council as to the administration of the business of their respective courts." *Id.*

Congress recodified these provisions in 1948, providing that "[e]ach judicial council shall make all necessary orders for the effective and expeditious administration of the business of the courts within its circuit," which "[t]he district judges shall promptly carry into effect." Act of June 25, 1948, Pub. L. No. 773, ch. 646, § 332, 62 Stat. 869, 902 (now codified at 28 U.S.C. § 332); *see Chandler*, 398 U.S. at 99 (Harlan, J., concurring) (describing the 1948 amendment "as merely a change in 'phraseology,' embodying in new words the original understanding of the powers of the councils").

In *Chandler*, the Supreme Court confronted questions concerning "the scope and constitutionality of the powers of the Judicial Councils." 398 U.S. at 75-76. Though the Court ultimately disposed of *Chandler* on other grounds, its decision established that the Constitution

vests the judicial councils with the authority to effect the goals of the 1939 Act (as recodified in 1948). *See id.* at 86 n.7 ("We see no constitutional obstacle preventing Congress from vesting in the Circuit Judicial Councils, as administrative bodies, authority to make 'all necessary orders for the effective and expeditious administration of the business of the courts within [each] circuit.'") (alteration in original). Meanwhile, the Court observed that the 1939 Act was "not a model of clarity in terms of the scope of the judicial council's powers or the procedures to give effect to [judicial council orders]" and called for "[l]egislative clarification." *Id.* at 85 n.6.

Congress ultimately responded to *Chandler* with the Judicial Conduct and Disability Act of 1980, Pub. L. No. 96-458, § 3, 94 Stat. 2035, 2036-40; *see* H.R. Rep. No. 96-1313, at 7 (1980) (citing *Chandler*, 398 U.S. at 85). Aiming "to improve judicial accountability and ethics, ... and, at the same time, to maintain the independence and autonomy of the judicial branch," the Act "create[d] a mechanism and procedures within the judicial branch of government to consider and respond to complaints against Federal judges." H.R. Rep. No. 96-1313, at 1. The formal complaint-resolution mechanism established under the Act would supplement and reinforce existing informal means of addressing judicial conduct and disability. *See, e.g.*, Robert W. Kastenmeier et al., *Report of the National Commission on Judicial Discipline & Removal*, 152 F.R.D. 265, 280 (Aug. 1993).

To that end, the Act permits any person to file a complaint with the clerk of a court of appeals alleging that a federal judge in the circuit "has engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts" or "is unable to discharge all the duties of office by reason of mental or physical disability." 28 U.S.C. § 351(a). Alternatively, the chief judge of the circuit may "identify a complaint" on the basis of available information. *Id.* § 351(b). Any complaint must be transmitted to the subject judge, *id.* § 351(c), and "expeditiously review[ed]" by the chief judge, *id.* § 352(a).

After reviewing a complaint, the chief judge has two options: (1) the chief judge may dismiss the complaint or conclude the proceeding where there are no issues of fact or where corrective action has been taken or intervening events make further action unnecessary, *id.* § 352(b)(1), (b)(2); or (2) the chief judge may appoint a "special committee" comprising himself and an equal number of circuit and district judges "to investigate the facts and allegations contained in the complaint," *id.* § 353(a). The chief judge must provide notice of his action to the complainant and the subject judge. *See id.* §§ 352(b), 353(a)(3). If the chief judge dismisses the complaint or concludes the proceeding, an aggrieved complainant or subject judge may file a petition for review with the circuit's judicial council. *Id.* § 352(c). The denial of such a petition "shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise." *Id.*

If the chief judge concludes that additional factfinding is necessary, the chief judge must appoint a special committee to "conduct an investigation as extensive as it considers necessary." *Id.* § 353(c). The special committee then "shall expeditiously file a comprehensive written report thereon with the judicial council of the circuit," setting forth the committee's findings and recommendations for "necessary and appropriate action" by the judicial council. *Id.*

Upon receiving the special committee's report, the judicial council "may conduct any additional investigation which it considers to be necessary," *id.* § 354(a)(1)(A), and either dismiss the complaint, *id.* § 354(a)(1)(B), or "take such action as is appropriate to assure the effective and expeditious administration of the business of the courts within the circuit," *id.* § 354(a)(1)(C). Judicial council action may include censuring or reprimanding the subject judge, *id.* § 354(a)(2)(A)(ii)-(iii), or ordering that no further cases be assigned to the subject judge "on a temporary basis for a time certain," *id.* § 354(a)(2)(A)(i). The judicial council may request the

– 5 –

subject judge voluntarily to take early retirement, *id.* § 354(a)(2)(B)(ii), but may not "order removal from office" of an Article III judge, *id.* § 354(a)(3)(A).

Where a judicial council has acted following receipt of a special committee report, Section 357 of the Act authorizes a complainant or a subject judge to file a petition for review with the Judicial Conference of the United States through its Committee on Judicial Conduct and Disability (the JC&D Committee). *Id.* §§ 331, 357(a). Section 357(c) provides: "Except as expressly provided in this section and section 352(c), all orders and determinations, including denials of petitions for review, shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise." *Id.* § 357(c).

## FACTUAL AND PROCEDURAL BACKGROUND

The facts and procedural history of this case are described in the Order and Memorandum of the Judicial Council of the Sixth Circuit, *In re Complaint of Judicial Misconduct*, No. 06-13-90009 (Feb. 22, 2016) ("JC Mem."), and the Memorandum of Decision of the Committee on Judicial Conduct and Disability of the Judicial Conference of the United States, *In re Complaint of Judicial Misconduct*, C.C.D. No. 17-01 (Aug. 14, 2017) ("JC&D Comm. Mem.").[1]

### A.    The Special Committee

On February 15, 2013, four judges of the U.S. District Court for the Northern District of Ohio filed a judicial misconduct complaint against their colleague, Judge Adams. *See* JC Mem. 2. Their complaint focused primarily on Judge Adams's decision to issue an order directing a magistrate judge to show cause why the magistrate judge should not be held in contempt for

---

[1] Both decisions are subject to judicial notice and incorporated into the Complaint, and therefore may be considered by the Court in connection with Defendants' Rule 12(b)(6) arguments, as well as their Rule 12(b)(1) arguments. *See, e.g.*, *Tyson v. Brennan*, No. 16-cv-2087-KBJ, 2017 WL 4402387, at *4 (D.D.C. Sept. 30, 2017); *Grant v. Dep't of Treasury*, 194 F. Supp. 3d 25, 28 n.2 (D.D.C. 2016).

missing a deadline set by Judge Adams in a social security case. *See* Compl. ¶¶ 13-14. The complainants "allege[d] that Judge Adams's issuance of the Show Cause Order, in combination with other ongoing disruptive behavior directed at the judges of the district, constituted 'conduct prejudicial to the effective and expeditious administration of the business of the courts.'" JC Mem. 2-3 (quoting 28 U.S.C. § 351; JC&D Rule 3(h)).[2]

In response to the complaint, the acting Chief Judge of the Sixth Circuit appointed a Special Committee of three circuit judges and three district judges to investigate the complaint. *See id.* at 3 & n.3. During an initial evidence-gathering period, from May to August 2013, that Committee reviewed documents and interviewed fourteen witnesses. *Id.* at 4.

Based on information uncovered by the Special Committee, the acting Chief Judge, at the Special Committee's request, expanded the investigation to include whether Judge Adams suffers from a mental or emotional disability affecting his ability to discharge his judicial duties. *Id.* at 1, 3. After Judge Adams persisted in refusing to undergo a requested mental health evaluation, the acting Chief Judge again expanded the scope of the investigation, this time to include whether Judge Adams engaged in misconduct by refusing to cooperate with the investigation into his mental health. *Id.* at 1-2, 3.

After a three-day fact-finding hearing, the Special Committee issued a unanimous report to the Sixth Circuit Judicial Council on July 10, 2015. *See id.* at 4-5. The Special Committee's report included detailed findings of fact, upon which the Judicial Council later relied. *See id.* at 6-22. (These findings are summarized below.) As relevant here, the Special Committee rejected

---

[2] The Judicial Conference amended its Rules for Judicial-Conduct and Judicial-Disability Proceedings ("JC&D Rules") on September 17, 2015. Citations are to the pre-amendment Rules except where indicated.

Judge Adams's argument that the Fourth Amendment barred the Special Committee's request that he undergo a mental health evaluation. *See id.* at 23-25.

### 1.      Misconduct Related To The Show Cause Order

According to the Special Committee, Judge Adams's "behavior changed sharply" in 2008, when his preferred candidate for a magistrate judge position was not selected. "From then on, Judge Adams ceased interacting collegially with other members of the court and ceased virtually all involvement in court administrative matters." *Id.* at 7. In particular, after 2008, Judge Adams repeatedly expressed hostility and contempt for the court's magistrate judges, refusing to meet with some of them, and requiring all communications with them to go through his staff. *See id.* at 8-9. During the same period, Judge Adams withdrew more generally from collegial or collaborative relations with his colleagues. *See id.* at 9-11. He stopped attending court events, resigned from the three district court committees on which he previously served, and rebuffed colleagues' efforts to engage him, even refusing on one occasion to allow another district judge and his staff to enter Judge Adams's chambers to introduce themselves. *See id.* at 7-11. And Judge Adams has not been receptive to his colleagues' expressions of concern for him, instead suggesting they seek only to "impugn [his] character" as part of a "smear campaign" against him. JC&D Comm. Mem. 10.[3]

---

[3] The Special Committee also identified two "troubling" incidents that "deepened" its "concern about how Judge Adams's mental and emotional state might affect the administration of judicial business." JC Mem. 20. In one incident, the Special Committee was informed Judge Adams "'bumped' a magistrate judge hard on a running path near the Akron courthouse and then sprinted away without apologizing or seeing if the judge needed assistance." *Id.* The Special Committee found Judge Adams's denial not credible. *Id.* In the other incident, Judge Adams reportedly blocked an intern's car with his own when the intern inadvertently parked in Judge Adams's space, then ordered court security personnel to ticket or tow the intern's car. *Id.*

Judge Adams issued the Show Cause Order that triggered his colleagues' misconduct complaint after a magistrate judge missed a deadline set by Judge Adams in a social security case. JC Mem. 16. On Friday, February 1, 2013, Judge Adams learned that the magistrate judge had not filed a report and recommendation within 270 days of the complaint's filing, as required by Judge Adams's standard scheduling order for social security cases. *Id.* Judge Adams thereupon issued the Show Cause Order, requiring the magistrate judge to show cause by 4:00 p.m. on Monday, February 4, 2013, why the magistrate judge should not be held in contempt or otherwise sanctioned for failing to comply with the scheduling order. *Id.* Judge Adams did not notify the magistrate judge of the Show Cause Order or the imminent response deadline it imposed other than by filing the Order on the docket. *Id.*

After learning of the Show Cause Order on Saturday, February 2, 2013, the magistrate judge e-mailed Judge Adams to explain that a clerical error had resulted in a miscalculation of the deadline and to take responsibility for the mistake. *See id.* The magistrate judge spent the weekend completing the report and recommendation and began arranging legal representation for a potential contempt hearing. *Id.* On Monday, February 4, 2013, Judge Adams's law clerk called the magistrate judge to say that Judge Adams accepted the magistrate judge's explanation, and Judge Adams issued another order deeming the Show Cause Order satisfied. *Id.* at 17.

"The court's district judges expressed immediate concern with regard to the effects of the Show Cause Order on the magistrate judge and its impact on the administration of justice within the court." JC&D Comm. Mem. 6. "Following a unanimous vote, the Chief Judge of the Northern District of Ohio sent a letter to Judge Adams stating that Judge Adams's issuance of the Show Cause Order was unwarranted and improper, and requesting that Judge Adams vacate the Show Cause Order and strike it from the docket." *Id.* at 6-7. Judge Adams refused, suggesting that his

order delivered a "message that needed to be sent" in light of what Judge Adams perceived as the "history of defiance from the Magistrate Judges" and the failure of the Chief Judge to "discipline" magistrate judges who had been "disrespectful" and "defiant" towards Judge Adams. JC Mem. 9, 17.

Ultimately, in the course of the Special Committee investigation, "every witness—including Judge Adams—agreed that it was inappropriate for Judge Adams to have issued the Show Cause Order." JC&D Comm. Mem. 7. The record developed by the Special Committee reflects that the Court's magistrate judges "had to prioritize Judge Adams's Social Security cases above all other cases on their dockets for fear of provoking Judge Adams's ire," which "has harmed other district judges' ability to supervise and general work with the magistrate judges" and "has hindered the overall administration of the court." JC Mem. 18; *see also* JC&D Comm. Mem. 6-7.

### 2. Misconduct And Potential Disability In Refusing To Cooperate With The Investigation

In the course of its investigation, the Special Committee encountered evidence that led its members to be concerned that "a reasonable person [would have] cause to question whether Judge Adams has a [mental or emotional] disability." JC Mem. 19. "Specifically, the evidence suggested that Judge Adams may have a disability that '(1) prevents him from maintaining a professional relationship with his colleagues, (2) prevents him from shouldering his responsibilities as a member of the District Court, and (3) causes him to make unfounded and destructive attacks against his colleagues.'" *Id.* at 19-20.

Based on this information, the Special Committee proposed in the Fall of 2013 that Judge Adams be evaluated by an independent mental health professional. *See* Compl. ¶ 18. After Judge Adams objected to undergoing such an evaluation, the Special Committee spent months attempting to secure a mental health evaluation of Judge Adams, while Judge Adams provided various reasons

for persisting in his objection. *See id.* ¶¶ 18-22. In the midst of those discussions, in January 2014, Judge Adams revealed that he had in fact already undergone an evaluation by a psychiatrist of his own choosing months earlier and that this psychiatrist had opined that the Judge suffered from no "diagnosable mental disorder." *Id.* ¶ 19.

Unsatisfied with the information offered by Judge Adams, the Special Committee advised Judge Adams that it might request that the investigation be expanded to include whether he suffers from a disability. The Committee eventually made that request, which the acting Chief Judge granted on May 27, 2014. *See id.* ¶¶ 21-23; JC Mem. 3, 20.

The Special Committee subsequently retained the services of a forensic psychiatrist to opine on whether Judge Adams might have an emotional or mental issue that amounts to a disability. *See* JC Mem. 20. The Committee requested that the forensic psychiatrist "perform the necessary evaluations of Judge Adams that would allow [him] to reach an opinion as to [Judge Adams's] emotional and mental state" and to "provide a report of [his] findings to the [Committee]." *Id.* To facilitate the forensic psychiatrist's efforts, the Committee asked Judge Adams in August 2014 to provide any records available to him pertaining to any mental or emotional health treatment or testing he had undergone. *Id.* The Committee also asked Judge Adams to submit to psychological testing by an expert in neuropsychology and neuroforensics, the results of which would be used by the forensic psychiatrist in Judge Adams's mental health evaluation. *See id.* at 21; JC&D Comm. Mem. 11.

Judge Adams refused to undergo the requested independent psychological testing or to provide the requested documents, even after the Special Committee advised his counsel that a refusal to cooperate might constitute misconduct. *See* JC Mem. 21. Judge Adams's non-cooperation left the Committee's forensic psychiatrist unable to render an expert opinion or

diagnosis regarding Judge Adams's mental or emotional state. *Id.* Based on materials provided to him by the Committee, however, the expert concluded that there is "a reasonable basis for concern as to Judge Adams'[s] mental or emotional state. The data available so far do not suggest a mental state of psychotic proportions, but do suggest significant personality traits that may have contributed to the current concerns." *Id.* (alteration in original).

On December 5, 2014, in light of Judge Adams's continued refusal to undergo the mental health evaluation and to produce records requested by the Special Committee, the Committee asked the acting Chief Judge to further expand the scope of the investigation to include whether Judge Adams had engaged in misconduct by refusing to cooperate. *See* Compl. ¶ 26. On December 9, 2014, the acting Chief Judge granted that request. *See id.*; JC Mem. 21-22. Nonetheless, Judge Adams continued to refuse to undergo the testing or to produce the records requested by the Committee. JC Mem. 21-22.

At the Special Committee's fact-finding hearing on April 20-22, 2015, Judge Adams sought to introduce the testimony of a second psychiatrist who apparently had recently evaluated Judge Adams's mental health at his request. *Id.* at 5; *see* Compl. ¶¶ 30, 35. The Committee excluded the proposed testimony after Judge Adams failed to produce the records underlying the psychiatrist's evaluation. *See* JC Mem. 5, 22; Compl. ¶¶ 35-37.

### B.   The Sixth Circuit Judicial Council

On September 10, 2015, the Sixth Circuit Judicial Council conducted a meeting to consider the complaint against Judge Adams. JC Mem. 6. Before the meeting, Judge Adams submitted a written response to the Special Committee's report. *Id.* At the meeting, Judge Adams's counsel presented oral argument contesting the Committee's findings and recommendations. *Id.*

On February 22, 2016, the Judicial Council issued an Order and Memorandum containing its findings and remedial actions. The seventeen circuit and district judges voting in the matter were unanimous in their decision. *See id.* at 1 & n.1.

With respect to the initial misconduct complaint against Judge Adams, the Judicial Council found that Judge Adams's issuance of the Show Cause Order constituted "conduct prejudicial to the effective and expeditious administration of the business of the courts," JC&D Rule 3(h)(1), "because it had prejudicial effects on the District Court as a whole; had prejudicial effects on the ways in which the magistrate judges of the Northern District of Ohio performed their work generally; and had prejudicial effects on the magistrate judge it targeted." JC Mem. 27. The Judicial Council also held that Judge Adams engaged in misconduct by refusing to cooperate with the Committee's request that he undergo a mental health evaluation by an independent psychiatrist, "as it prejudiced the effective and expeditious investigation of this matter, which is an integral part of the business of the courts." *Id.* (citing JC&D Rule 3(h)(1)). With respect to Judge Adams's potential disability, the Judicial Council found itself unable to "determine whether Judge Adams has a 'temporary or permanent condition' that renders him 'unable to discharge the duties' of his office, because Judge Adams refused to undergo an evaluation by the forensic psychiatrist the [Committee] retained." *Id.* (citing JC&D Rule 3(e)).

In light of its findings, the Judicial Council issued a public reprimand of Judge Adams for his issuance of the Show Cause Order and its prejudicial effects on the administration of the business of the District Court. *See id.* at 28-29 (¶ 1). The Judicial Council further directed that Judge Adams issue no such order with respect to the work of any of the court's judges in the future, *id.* at 29 (¶ 1.d), and specified that the Special Committee "shall maintain jurisdiction for two years

to ensure that Judge Adams does not engage in additional inappropriate behavior involving magistrate judges, whether in his official functions or otherwise." *Id.* (¶ 3).

Although the Judicial Council was unable to determine on the existing record whether Judge Adams suffers from a mental disability that renders him unable to discharge the duties of his office, the Judicial Council determined that "[s]ufficient evidence exists to merit further investigation." *Id.* (¶ 2). The Judicial Council ordered that Judge Adams "shall undergo a mental-health evaluation by a psychiatrist selected by the Special Investigating Committee"; that the psychiatrist "shall be provided with any material from the Special Investigating Committee and Judge Adams that the psychiatrist deems appropriate"; and that "[a]ny report(s) prepared by the psychiatrist shall be made available for the Judicial Council's confidential review." *Id.* at 29-30 (¶ 4) (citing 28 U.S.C. § 353(c); JC&D Rules 1, 13(a), 20(c); 6th Cir. JC&D Rule 14(b)).

The Judicial Council stated that it would "retain jurisdiction to order further remedies depending on the results of the evaluation." *Id.* at 30 (¶ 6). And "to protect the public and the judiciary from the possibility of Judge Adams engaging in inappropriate or embarrassing behavior while the investigation continues," the Judicial Council ordered that Judge Adams's "present docket shall be transferred to other judges" and that "no new cases shall be assigned to Judge Adams for a period of two years." *Id.* (¶ 2) (citing 28 U.S.C. § 354(a)(2)(A)(i); JC&D Rule 20(b)(1)(D)(ii)). It also ordered that "Judge Adams shall submit to any treatment or counseling deemed necessary by the psychiatrist." *Id.* (¶ 5). If the mental health evaluation "demonstrates that Judge Adams does not suffer from a disability that renders him unable to discharge the duties of his office, or if he receives treatment after the evaluation that remedies any disability," the Judicial Council explained, it "may suspend the Order that no new cases be assigned to him for two years,"

– 14 –

but "Judge Adams would nevertheless remain subject to the Special Investigating Committee's continued jurisdiction" for up to two years. *Id.* at 30 (¶ 6).

Finally, the Judicial Council indicated its intent to "request that Judge Adams voluntarily retire, waiving the ordinary length-of-service requirements," should he continue to "refuse to undergo a mental-health evaluation by a psychiatrist chosen by the Special Investigating Committee." *Id.* (¶ 7) (citing 28 U.S.C. § 354(a)(2)(B)(ii); JC&D Rule 20(b)(1)(D)(v)).

### C.    The Judicial Conference Committee On Judicial Conduct And Disability

Judge Adams petitioned the JC&D Committee for review of the Judicial Council's order. *See* JC&D Comm. Mem. 1. In his petition, Judge Adams challenged the Judicial Council's determinations that he had engaged in misconduct in his issuance of the Show Cause Order and related actions and in his refusal to submit to a mental health evaluation. Judge Adams also challenged the Judicial Council's choice of sanctions.

On August 14, 2017, the seven-member JC&D Committee issued an order denying in part and granting in part Judge Adams's petition for review. *See id.* at 2. The Committee affirmed the Judicial Council's determination that Judge Adams had engaged in misconduct when he issued the Show Cause Order, rejecting Judge Adams's arguments that the Judicial Council had clearly erred in its factual findings and had impermissibly sanctioned him based on the merits of the Order. *See id.* at 17-23. The Committee likewise sustained the Judicial Council's determination that Judge Adams had engaged in misconduct by refusing to undergo the mental health evaluation requested by the Special Committee, concluding that "Judge Adams's objections to the evaluation do not justify his failure to cooperate in the investigation." *Id.* at 39; *see also id.* at 23-34. The JC&D Committee upheld the Judicial Council's decision to issue a public reprimand, *id.* at 34-35; its directive that Judge Adams undergo the requested mental health evaluation, *id.* at 35-36; and its order that the Special Committee retain jurisdiction "for a reasonable period of time, not to exceed

two years, to ensure Judge Adams's ability to discharge the duties of office as a federal district court judge," *id.* at 38.

Concerning the mental health evaluation, the JC&D Committee held that the Act clearly authorizes a judicial council or special committee to seek a mental health evaluation where the "judicial council or its special committee has a reasonable basis for concluding that a judicial colleague might suffer from a disability rendering him or her unable to perform the duties and responsibilities of the judicial office." *Id.* at 29; *see also id.* at 24-30. Applying that standard to the record before it, the Committee ruled that "[t]he Judicial Council and the Special Committee had a reasonable basis to believe that such evaluation was warranted based on their factual findings" in Judge Adams's case. *Id.* at 17; *see also id.* at 32-34.

Noting the lack of "evidence in the record" and "specific findings" concerning Judge Adams's ability to perform his adjudicative duties, however, the JC&D Committee vacated the Judicial Council's order temporarily reassigning Judge Adams's cases and suspending the assignment of new cases to him. *Id.* at 36-37. The Committee acknowledged that the Judicial Council's "ability to make such a determination was impeded by Judge Adams's refusal to submit to a mental health examination" and that the appropriateness of such a sanction cannot be "rule[d] out." *Id.* at 37.

 "Having rejected Judge Adams's objections," the JC&D Committee indicated that it "anticipate[s] that Judge Adams will expeditiously comply with the Judicial Council's Order, as affirmed by this Committee, that he submit to a mental health examination by a psychiatrist selected by the Special Committee." *Id.* at 39. "[S]hould Judge Adams refuse to submit to the mental health examination ordered by the Judicial Council and affirmed by this Committee, sanctions for Judge Adams's continued failure to cooperate—including the prohibition of the

assignment of new cases on a temporary basis for a time certain—may be warranted subject to the Judicial Council's sound discretion." *Id.* (citing 28 U.S.C. § 354(a)(2) and JC&D Rule 20(b)(1)(D)).

### D.      This Lawsuit

Rather than "expeditiously comply with the Judicial Council's Order, as affirmed by [the JC&D Committee]," *id.*, Judge Adams filed this Complaint for Declaratory and Injunctive Relief on September 14, 2017. The Complaint named as defendants the Judicial Council, the JC&D Committee, and the chair of each in his official capacity. *See* Compl. ¶¶ 4-7. (On November 17, 2017, the parties stipulated to dismissal of the official-capacity defendants. *See* ECF No. 9.)

The Complaint seeks, among other relief, (1) a declaration that the Act is unconstitutional in whole or in part; (2) a declaration that "any provisions in the Judicial Council's Order and Memorandum, or in the Review Committee's Memorandum of Decision, requiring [Judge Adams] to undergo a compelled psychiatric examination, to be disciplined for objecting in good faith to undergoing a compelled examination, or to accept any compelled medical treatment, to be unconstitutional"; (3) a declaration that "any provisions in the Judicial Council's Order and Memorandum, or in the [JC&D Committee's] Memorandum of Decision, authorizing a limitation of [Judge Adams's] docket, a further investigation into [Judge Adams's] conduct on the bench, monitoring of [Judge Adams's] conduct for two years, or other special restrictions on his actions as a federal judge, to be unconstitutional"; and (4) an injunction prohibiting "enforcement of the foregoing unconstitutional provisions" and "any further investigation" of Judge Adams. Compl. at 23. The Complaint does not challenge the Judicial Council's determination, affirmed by the JC&D Committee, that Judge Adams engaged in misconduct in his issuance of the Show Cause Order.

As the bases for the requested relief, Judge Adams alleges that the Act is unconstitutionally vague in violation of the Due Process Clause (Counts I and III); that the Judicial Council exceeded

its statutory and constitutional authority in directing him to undergo a mental health evaluation (Count II); that the mental health evaluation would violate the Fourth Amendment (Counts IV and V); that the Judicial Council violated his due process rights in determining that he engaged in misconduct by objecting to the mental health evaluation requested by the Special Committee (Count VI); and that Defendants have issued "orders and threats" that "constitute an attempt to remove Plaintiff from office, without impeachment and in violation of the Constitution, in substance if not form" (Count VII).

Defendants now move to dismiss the Complaint.

## LEGAL STANDARD

Defendants seek dismissal of the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). "When considering a motion to dismiss for lack of jurisdiction, ... the court 'is not limited to the allegations of the complaint.'" *Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*, 845 F. Supp. 2d 288, 294 (D.D.C. 2012) (quoting *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987)). "Rather, [the] court may consider such materials outside the pleadings as it deems appropriate to resolve the question of whether it has jurisdiction in the case." *Id.* (internal quotations omitted). The plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

"To survive a [Fed. R. Civ. P. 12(b)(6)] motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 US. at

555). "In ruling upon a [Fed. R. Civ. P. 12(b)(6)] motion to dismiss, a court may ordinarily consider only 'the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice.'" *Judicial Watch*, 845 F. Supp. 2d at 294 (quoting *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002)).

## ARGUMENT

### I.   The Claims Raising As-Applied Challenges Should Be Dismissed For Lack Of Jurisdiction.

As a threshold matter, this Court lacks subject-matter jurisdiction over the Complaint's as-applied constitutional challenges. *See* Fed. R. Civ. P. 12(b)(1). The Act could scarcely be any clearer on this score. Section 357(c)—entitled "No judicial review"—provides: "Except as expressly provided in this section and section 352(c), all orders and determinations, including denials of petitions for review, shall be final and conclusive and *shall not be judicially reviewable on appeal or otherwise*." 28 U.S.C. § 357(c) (emphasis added). The exception in the first clause of Section 357(c) authorizes judicial review only *within* the Act's framework for judicial conduct and disability proceedings (the judicial council of the circuit reviews orders of the circuit chief judge, *see id.* § 352(c), and the Judicial Conference of the United States or its standing committee reviews orders of the circuit judicial council, *see id.* § 357(a)). Under no circumstances does the Act permit a single Article III judge to review the determinations of multiple Article III judges under the Act.

Although the statutory prohibition on review of judicial conduct and disability proceedings by judges outside the framework of those proceedings appears categorical on its face, the D.C. Circuit has construed the Act to allow one (and just one) narrow category of claims: those

challenging the *facial* constitutionality of the Act itself. *See McBryde*, 264 F.3d at 58-59.[4] Such a facial challenge, the D.C. Circuit explained, is a challenge to Congress's handiwork, not to any particular "orders" or "determinations" made in a given judicial conduct or disability proceeding. *See McBryde*, 264 F.3d at 58-64. An *as-applied* constitutional challenge, or a challenge to the statutory authority for a particular order or decision, in sharp contrast, falls squarely within the broad preclusive language of Section 357(c). *See id.* Such challenges, even when framed in terms of constitutional or statutory authority, remain challenges to particular orders or decisions that must be resolved within the comprehensive statutory framework for judicial conduct and disability proceedings.

It is worth noting that the Act (unlike the other statutes cited by the D.C. Circuit in *McBryde*) does not eliminate the involvement of Article III judges in the judicial conduct or disability process, even if it were construed to preclude facial challenges. To the contrary, the Act places the process "exclusively in the hands of Article III judges, providing for initial action by one group of such judges and then for review by another group." *McBryde*, 264 F.3d at 60. "Having

---

[4] At the time of *McBryde*, the Act's judicial review provisions were codified as follows at 28 U.S.C. § 372(c)(10):

> A complainant, judge, or magistrate judge aggrieved by a final order of the chief judge under paragraph (3) of this subsection may petition the judicial council for review thereof. A complainant, judge, or magistrate judge aggrieved by an action of the judicial council under paragraph (6) of this subsection may petition the Judicial Conference of the United States for review thereof. The Judicial Conference, or the standing committee established under section 331 of this title, may grant a petition filed by a complainant, judge, or magistrate judge under this paragraph. Except as expressly provided in this paragraph, all orders and determinations, including denials of petitions for review, shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise.

28 U.S.C. § 372(c)(10) (2000). Congress recodified the statute in 2002, redistributing the substance of old Section 372 (without material changes) between current Section 352, concerning judicial council review of final orders of chief circuit judges, and current Section 357, concerning Judicial Conference review of actions by judicial councils.

done so, Congress clearly meant to be understood quite literally when it said … that orders of the Judicial Conference or relevant standing committee 'shall not be judicially reviewable on appeal.'" *Id.* (quoting 28 U.S.C. § 372(c)(10) (2000)).

Given that the Act already provides for the involvement of Article III judges *within* the judicial conduct and disability process, it makes sense that Congress precluded review by additional Article III judges *outside* that process. *See id.* at 61 (noting that the "appellate procedure" created by the Act "*culminates* in the Judicial Conference of the United States.") (emphasis added; internal quotation omitted); *id.* at 62 ("Congress ... enabled a sanctioned judge to seek review by Article III judges of the Judicial Conference of all claims except (presumably) facial attacks on the statute. As a result, to read [Section 372(c)] to allow review of constitutional as-applied claims by conventional courts *as well* would generate substantial redundancy.") (emphasis in original).

"Defending against ... claims [challenging judicial conduct and disability decisions] is disruptive and potentially expensive" for the federal judiciary. *Id.* at 61. Indeed, Congress considered and rejected the option of creating a special Article III court to review judicial conduct and disability determinations. *See id.* at 60. Instead, "Congress sought in the Act to give the judiciary the power to 'keep its own house in order' by conducting its own investigations of misconduct." *Id.* (quoting S. Rep. No. 96-362, at 11). "By adding review preclusion, they limited the potential disruption, while providing for adequate review in those few cases that might require it." *Id.* at 61-62; *see also id.* at 63 ("[R]eserving to the Judicial Conference committee *exclusive* authority over as applied constitutional challenges ... prevents undue prolongation of the disciplinary process.") (emphasis in original).

– 21 –

*McBryde* squarely governs this case. That case involved a district judge sanctioned by the Judicial Council of the Fifth Circuit after a Special Committee found that he had engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts. *See id.* at 54. The Judicial Council issued a public reprimand, directed that no new cases be assigned to the judge for a year, and directed that he not be allowed for three years to preside over cases involving lawyers who participated in the investigation. *Id.* After the JC&D Committee substantially affirmed the Fifth Circuit Judicial Council's order, the judge filed suit in this Court, *see id.* at 55, which entered judgment against him. *See McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of the Judicial Conf.*, 83 F. Supp. 2d 135 (D.D.C. 1999), *aff'd in part, vacated in part*, 264 F.3d 52 (D.C. Cir. 2001).

On appeal, the D.C. Circuit held that the judicial review provisions of the Act deprived the district court of jurisdiction over most of the judge's claims. *See McBryde*, 264 F.3d at 58-64. The only claims that survived the statutory prohibition on judicial review were the judge's facial challenges to the constitutionality of the Act itself, *see id.* at 58, although those claims ultimately failed on the merits, *id.* at 64-68. In contrast, the Act "reserv[ed] to the Judicial Conference committee *exclusive* authority over as applied constitutional challenges," and thus barred "review of [the judge's] claim of unconstitutional application of the Act." *Id.* at 63. Likewise, the court concluded that the Act precluded the judge's "two claims that defendants exceeded their statutory authority—the objections that the investigation impermissibly swelled beyond the scope of the initial complaints and that the Judicial Council sanctioned [the judge] for the merits of his decisions." *Id.* at 63; *see id.* at 63-64.

*McBryde* compels the conclusion that this Court lacks jurisdiction over at least Counts II, V, VI, and VII of the Complaint, each of which focuses on particular determinations and orders in

Judge Adams's case, as opposed to presenting a broader facial challenge to the constitutionality of the Act. Each of these Counts is discussed below.

**Counts V and VI.** The Court can readily dismiss Counts V and VI as precluded by Section 357(c). On its face, the Complaint candidly identifies both Counts as presenting as-applied constitutional claims. *See* Compl. ¶¶ 77-80 ("Count V: Fourth Amendment - As Applied Challenge"); *id.* ¶¶ 81-84 ("Count VI: Fifth Amendment - As Applied Due Process Violation"). Each of those Counts necessarily challenges "orders" and "determinations" made by defendants in addressing the complaint against Judge Adams. *McBryde* accordingly requires their dismissal. *See* 264 F.3d at 62-63 ("[W]e find the evidence clear and convincing that Congress intended [Section 372(c)] to preclude review in the courts for as applied constitutional claims."); *id.* at 63 ("Congress clearly and convincingly barred our review of [the judge's] claim of unconstitutional application of the Act.").

**Count II.** Section 357(c), as interpreted in *McBryde*, also requires dismissal of Count II, which challenges defendants' statutory and constitutional authority to compel an Article III judge to submit to a mental health evaluation by an independent psychiatrist. *See* Compl. ¶¶ 62-66 ("Count II: *Ultra Vires*, Unconstitutional Examinations"). Although framed in general, non-case-specific terms, Count II actually challenges a specific investigatory tool—a mental health evaluation—invoked to respond to the allegations in this particular case. However broadly it is framed, Count II thus necessarily challenges an "order" or "determination" in this case—the order that Judge Adams submit to a mental health evaluation by an independent psychiatrist.

A litigant cannot avoid the statutory prohibition on seeking judicial review of such an "order" or "determination" by simply challenging the disciplinary officials' "authority" to enter that order: that is nothing but artful pleading. Indeed, *McBryde* specifically recognized this point,

– 23 –

holding that Section 357(c) bars challenges to statutory authority. *See* 264 F.3d at 63-64. Challenges to constitutional authority are no different in kind, and can and should be raised before the relevant judicial disciplinary bodies. Indeed, Judge McBryde also claimed, like Judge Adams, "that the *methods* used by the Judicial Council and Judicial Conference"—specifically, "the Judicial Council's use of psychiatrists for advice on Judge McBryde's mental health" and the JC&D Committee's decision to permit his reinstatement if he modified his behavior—"were particularly invasive and therefore violated judicial independence," *id.* at 58-59 (emphasis in original), and the D.C. Circuit held that Section 357(c) barred jurisdiction over those claims.[5]

**Count VII.** Finally, Section 357(c), as interpreted in *McBryde*, requires dismissal of Count VII. *See* Compl. ¶¶ 85-90 ("Count VII: Improper Removal, Violation of Separation of Powers"). Once again, that Count challenges specific "orders" or "determinations" made in this case, rather than identifying any facial constitutional flaw in the statute. *See* Compl. ¶ 87 ("*Defendants' orders and threats* constitute an attempt to remove Plaintiff from office, without impeachment and in violation of the Constitution, in substance if not form ....") (emphasis added); *id.* ¶ 88 ("*Defendants' orders and threats*, both individually and in combination, were intended to substantially burden and do substantially burden Plaintiff's ability to serve as an Article III judge ....") (emphasis added); *id.* ¶ 89 ("*The foregoing orders and threats* constitute constructive impeachment in violation of the Constitution.") (emphasis added).[6]

---

[5] In the event this Court determines that Count II survives the Section 357(c) bar in whole or in part, that Count fails to state a plausible claim upon which relief can be granted on the merits for the reasons described below in Subsection II.C.

[6] In the event this Court determines that Count VII survives the Section 357(c) bar in whole or in part, that Count fails to state a plausible claim upon which relief can be granted on the merits for the reasons described below in Subsection II.D.

II.     **The Claims Raising Facial Challenges Should Be Dismissed For Failure To State A Claim Upon Which Relief Can Be Granted.**

Insofar as the Complaint alleges facial constitutional challenges that survive Section 357(c)'s preclusion of judicial review outside the judicial conduct and disability process, this Court should dismiss those challenges for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). The standard for stating a facial constitutional challenge to a statute is both familiar and demanding: the plaintiff must plausibly allege not only that the statute is unconstitutional as applied to him, but that "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also John Doe Co. v. CFPB*, 849 F.3d 1129, 1133 (D.C. Cir. 2017) (*per curiam*). "A facial challenge to a legislative Act is ... the most difficult challenge to mount successfully," because "[t]he fact that a statute might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *Salerno*, 481 U.S. at 745. Each of the Counts that conceivably could be characterized as presenting facial challenges fails for the reasons discussed below.[7]

A.     **The Complaint's Void-For-Vagueness Claims (Counts I and III) Fail As A Matter Of Law.**

The void-for-vagueness claims in Counts I and III fail to state a claim upon which relief can be granted. Count I alleges that the Act "is unconstitutionally vague and violates the Due Process Clause of the Fifth Amendment because ... it fails to provide adequate notice of what constitutes a mental disability that renders a judge 'unable to discharge all the duties of office.'" Compl. ¶ 59. Count III alleges that "[t]he Act is unconstitutionally vague to the extent it purports

---

[7] The ensuing subsections do not address Counts V and VI, which the Complaint itself characterizes as "as applied" challenges, and thus squarely within the preclusive scope of Section 357(c). *See* Compl. ¶¶ 77-80 ("Count V: Fourth Amendment - *As Applied Challenge*") (emphasis added); *id.* ¶¶ 81-84 ("Count VI: Fifth Amendment - *As Applied Due Process Violation*") (emphasis added).

to authorize compelled psychiatric examinations of Article III judges." *Id.* ¶ 68. Both Counts I and III assert that the statute "lacks minimal enforcement guidelines" identifying, respectively, the circumstances in which an Article III judge "may be subject to a disability investigation," *id.* ¶ 59, and "may be compelled to undergo a psychiatric examination," *id.* ¶ 68. These counts fail as a matter of law because the void-for-vagueness doctrine does not apply to these provisions, and because in any event neither provision is unconstitutionally vague.

### 1.     The Void-For-Vagueness Doctrine Is Categorically Inapplicable Here.

As an initial matter, the void-for-vagueness doctrine does not apply to either of the challenged statutory provisions. That doctrine "addresses two concerns: 'first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 736 (D.C. Cir. 2016) (quoting *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012)). These concerns are not implicated where, as here, the challenged provisions of a statute do not regulate a party's underlying conduct.

In Count I, Judge Adams does not challenge the Act's provision addressing a judge's *conduct*. *See* 28 U.S.C. § 351(a) (authorizing a complaint "alleging that a judge has engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts"). Instead, Count I challenges only the Act's provision addressing a judge's *status or condition*. *See id.* (authorizing a complaint "alleging that such judge is unable to discharge all the duties of office by reason of mental or physical disability"). Because the challenged provision of the Act "imposes neither regulation of nor sanction for conduct," but rather is triggered by a judge's "characteristics," the void-for-vagueness doctrine is categorically inapplicable. *Boutilier v. INS*, 387 U.S. 118, 123 (1967); *cf. United States v. David H.*, 29 F.3d 489, 491 (9th Cir. 1994) (*per curiam*) (stating that the "void-for-vagueness doctrine is probably inapplicable" to a provision that

– 26 –

"does not prohibit or sanction conduct"); *United States ex rel. Fitzgerald v. Jordan*, 747 F.2d 1120, 1130 (7th Cir. 1984) ("[Void-for-vagueness] cases have one thing in common: a sanction, whether it be penal or a refusal to grant a license, for allegedly engaging in certain conduct proscribed by a statute. It is the definition of that proscribed or regulated conduct which gives rise to ... notice concerns ....").

Count III is similarly beyond the scope of the void-for-vagueness doctrine. Judge Adams argues that the Act is unconstitutionally vague insofar it authorizes a special committee to conduct an investigation "'as extensive as it considers necessary,'" and that this broad authorization crosses an impermissible constitutional line "to the extent it purports to authorize compelled psychiatric examinations of Article III judges." Compl. ¶ 68 (quoting 28 U.S.C. § 353(c)). That argument completely misses the point. A compelled mental health evaluation is not a sanction or punishment; rather, it is an investigatory tool to determine whether a given judge remains fit to serve.

As noted above, the vagueness doctrine is concerned with providing fair notice to allow citizens to tailor their conduct to the law and thereby avoid sanctions or punishment. Because the Act's provision allowing a special committee to conduct an investigation does not define an offense subject to sanction or fix a range of permissible sanctions, it does not trigger the void-for-vagueness doctrine. *See, e.g.*, *Kincaid v. District of Columbia*, 854 F.3d 721, 729 (D.C. Cir. 2017) ("The Supreme Court has applied the vagueness doctrine to two kinds of laws: those that 'define criminal offenses,' and those that 'fix the permissible sentences for criminal offenses.'") (quoting *Beckles v. United States*, 137 S. Ct. 886, 892 (2017)); *see also Daniel v. City of Tampa, Fla.*, 843 F. Supp. 1445, 1448 (M.D. Fla. 1993) (concluding that a plaintiff's "void-for-vagueness challenge is misdirected at the enforcement scheme," which "is to some extent subject to prosecutorial

discretion," because "only the statute itself need convey to the public a sufficiently definite warning as to the proscribed conduct"), *aff'd*, 38 F.3d 546 (11th Cir. 1994).

>    **2.      In Any Event, The Challenged Provisions Are Not Unconstitutionally Vague.**

In any event, even assuming for argument's sake that Counts I and III implicate the void-for-vagueness doctrine at all, they do not state a cognizable claim under that doctrine. To survive a motion to dismiss on vagueness grounds, a plaintiff must plausibly allege that a challenged statute "is impermissibly vague in *all* of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982) (emphasis added); *see also Crooks v. Mabus*, 845 F.3d 412, 417 (D.C. Cir. 2016). In particular, the plaintiff must plausibly allege that the statute "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Fox Television*, 132 S. Ct. at 2317 (internal quotations omitted). Under this standard, "regulations will be found to satisfy due process so long as they are sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require." *U.S. Telecom*, 825 F.3d at 736 (internal quotations omitted). In other words, the question is whether the statute is "so vague as to be no rule or standard at all." *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 250 (3d Cir. 2015) (internal quotations omitted). And "[l]esser degrees of specificity are allowed in civil cases because the consequences are smaller than in the criminal context." *Id.*

This standard is virtually impossible to satisfy outside the criminal and First Amendment contexts because there are "'limitations in the English language with respect to being both specific and manageably brief.'" *Crooks*, 845 F.3d at 417 (quoting *Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 578-79 (1973)). Thus, in *Arnett v. Kennedy*, the Supreme Court

rejected a former federal employee's vagueness challenge to a statute allowing removal or suspension of civil servants "for such cause as will promote the efficiency of the service." 416 U.S. 134, 159-60 (1974). "Justice Rehnquist's plurality opinion, whose reasoning was joined by a majority of the Court on this issue, rejected the notion that 'a detailed code of employee conduct,' rather than a more general standard was required ...." *Crooks*, 845 F.3d at 417 (quoting *Arnett*, 416 U.S. at 159). In particular, the *Arnett* plurality emphasized that the provision was non-criminal in nature, *see* 416 U.S. at 159; that its language could be interpreted in light of longstanding principles of employer-employee relationships, *id.* at 160; and that it would have been impracticable for Congress to delineate a more specific standard in light of the myriad factual situations that might arise, *id.* at 159-60, 161.

Since *Arnett*, courts have routinely rejected vagueness challenges to statutes, rules, and regulations relating to government employment, including the Act's standard for judicial misconduct. *See, e.g.*, *In re Certain Complaints*, 783 F.2d 1488, 1513 n.22 (11th Cir. 1986) (rejecting a vagueness challenge to the judicial misconduct standard); *Hastings v. Judicial Conf. of the U.S.*, 829 F.2d 91, 107 (D.C. Cir. 1987) (same); *Hastings v. Judicial Conf. of the U.S.*, 593 F. Supp. 1371, 1381-83 & n.25 (D.D.C. 1984) (same), *aff'd in part, vacated in part on jurisdictional grounds*, 770 F.2d 1093 (D.C. Cir. 1985); *see also Crooks*, 845 F.3d at 414-15, 416-18 (rejecting facial and as-applied vagueness challenges to a policy allowing the Navy to revoke the instructor certification of a Junior ROTC instructor if "continued certification ... is not in the best interests of the program") (internal quotations omitted).

Similarly here, this Court should reject Judge Adams's vagueness claims. As noted above, Count I contends that the Act is void for vagueness insofar as it provides for judicial council action if a "judge is unable to discharge all the duties of office by reason of a mental or physical

disability." 28 U.S.C. § 351(a). But this provision is not unconstitutionally vague "in all of its applications": *some* disabilities clearly would satisfy the statute's standard—imagine, for instance, a judge with advanced dementia. *Hoffman Estates*, 455 U.S. at 495.

In any event, like the conduct standard at issue in *Arnett*, the disability standard codified in the Act was not "written upon a clean slate." *Arnett*, 416 U.S. at 160. In drafting the Act's disability standard, Congress chose to "paraphrase ... existing statutory language found in section 372(b) of title 28," a decades-old provision providing for the appointment of an additional judge to a court with a sitting judge who becomes disabled but fails to retire. S. Rep. No. 96-362, at 9; *see* Act of Feb. 25, 1919, Pub. L. No. 265, ch. 29, § 6, 40 Stat. 1156, 1158. Existing state laws also informed the drafting of the Act's conduct and disability standards. Members of Congress recognized that the legislation incorporated "terms which have been in use in several states which have existing judicial disability and disciplinary systems," and that the "body of case law" addressing state laws with "the same or similar language" would "aid the judicial councils ... in applying federal law to specific cases as they arise." S. Rep. No. 96-362, at 9; *see also* S. Rep. No. 95-1035, at 45 (1978) (discussing state cases involving involuntary retirement of judges for disability).[8]

The Judicial Conference's Rules for Judicial-Conduct and Judicial-Disability Proceedings have provided additional guidance as to what may constitute a disability for purposes of the statute. The Rules make clear that a covered disability may be either temporary or permanent, and offer

---

[8] Most States have similar laws providing for the involuntary retirement, removal, or suspension of judges who become unable to perform their judicial duties due to a physical or mental disability. *See, e.g.*, Cal. Const. art. VI, § 18(d) (involuntary retirement for "disability that seriously interferes with the performance of the judge's duties and is or is likely to become permanent"); Ohio Rev. Code Ann. § 2701.12(B) ("Grounds for retirement of a judge from office for disability exist when he has a permanent physical or mental disability which prevents the proper discharge of the duties of his office"). Vagueness challenges to such provisions have failed. *See, e.g., Ohio State Bar Ass'n v. Mayer*, 377 N.E.2d 770, 775 (Ohio 1978) (*per curiam*); *McComb v. Comm'n on Judicial Performance*, 564 P.2d 1, 7-8 (Cal. 1977).

examples including substance abuse, the inability to stay awake during court proceedings, and certain impairments of cognitive abilities. JC&D Rule 3(e). And, in its Commentary on the Rules, the Judicial Conference has explained that "[a] mental disability could involve cognitive impairment or any psychiatric or psychological condition that renders the judge unable to discharge the duties of office," including duties "that are administrative." Commentary on JC&D Rule 3(e).

Indeed, as reflected in the Judicial Conference's Commentary, it is difficult to imagine what more specific standard Congress might have adopted. A wide variety of disabilities— diagnosable or not—might affect a judge's performance. Congress cannot practicably be expected to codify a list of medical conditions that warrant action by a judicial council. Nor is such specificity necessary to give "'the ordinary person exercising ordinary common sense'"—let alone a federal judge—fair notice of the provision's meaning, "'even though marginal cases could be put where doubts might arise.'" *Arnett*, 416 U.S. at 159 (quoting *Civil Serv. Comm'n*, 413 U.S. at 578-79). Codifying a general standard, to be applied to factual situations as they arise, is the only practicable approach. And it is constitutionally sufficient.

Similarly meritless is Count III's contention that the Act is void for vagueness insofar as it authorizes a special committee to "conduct an investigation as extensive as it considers necessary," 28 U.S.C. § 353(c). Even assuming that the vagueness doctrine applies to such investigatory authority in the first place, "[t]he presence of enforcement discretion alone does not render a statutory scheme unconstitutionally vague." *Kincaid*, 854 F.3d at 729. Thus, in *Kincaid*, the D.C. Circuit affirmed the dismissal of a void-for-vagueness challenge to the District of Columbia's post-and-forfeit statute, under which police officers may offer a misdemeanor arrestee the opportunity to pay ("post and forfeit") a small sum of money to resolve his or her criminal charge without

having to attend any criminal proceedings and without any admission of fault or record of conviction. *See id.* at 724. The court held that "[t]he fact that that the post-and-forfeit statute grants police 'discretion to select' whether to offer arrestees the opportunity to post and forfeit does not render the statute unconstitutionally vague." *Id.* at 730 (citation omitted). To the contrary, "[t]he Supreme Court has long allowed discretionary decisions by police, prosecutors, and regulators as part and parcel of the exercise of executive power." *Id.* Were the law otherwise, "a countless number of those discretionary decisions—from whether to make an arrest to whether to offer a plea to whether to enforce a statute against a regulated party—would run afoul of the vagueness doctrine." *Id.* That, the D.C. Circuit held, "is not the law." *Id.*

For essentially the same reasons, whatever discretion the Act allows a chief judge in deciding whether to initiate an investigation, and allows a special committee in determining its scope, does not render the statute unconstitutionally vague. And the multi-layered review process conducted by Article III judges suffices to address any concerns about arbitrary or discriminatory enforcement.

At all events, Judge Adams failed to preserve the void-for-vagueness claims in Counts I and III by neglecting to raise these vagueness arguments before either the Sixth Circuit Judicial Council or the JC&D Committee. Accordingly, he cannot raise them for the first time here. *See, e.g.*, *Hastings*, 829 F.2d at 103, 107 (refusing to consider judge's constitutional claim not previously presented in the challenged disciplinary proceedings). The Article III judges involved in the judicial conduct and disability process are perfectly capable of addressing both facial and as-applied constitutional challenges, *see, e.g.*, *McBryde*, 264 F.3d at 62, and should have the opportunity to do so in the first instance.

**B.     The Complaint's Fourth Amendment Claim (Count IV) Fails As A Matter Of Law.**

The Fourth Amendment claim in Count IV likewise fails to state a claim upon which relief can be granted. That Count alleges that "[a] compelled psychiatric examination constitutes a search and seizure for purposes of the Fourth Amendment and therefore must satisfy minimum standards of constitutional reasonableness to be lawful." Compl. ¶ 73. The Count then alleges that "[t]he Act violates the Fourth Amendment to the extent it authorizes a compelled psychiatric examination of an Article III judge without a warrant based on probable cause and issued by a neutral judicial official or a demonstration of constitutional reasonableness." *Id.* ¶ 74. Again, that claim is legally meritless.

Even assuming for argument's sake that a compulsory mental health evaluation as part of a judicial conduct and disability proceeding is a Fourth Amendment "search,"[9] there is nothing inherently unconstitutional about such a search. By its terms, the Fourth Amendment proscribes only "*unreasonable* searches." U.S. Const. amend. IV (emphasis added). Thus, in order to state a claim that the Act is facially unconstitutional, Judge Adams must plausibly allege, at a minimum, that it is *never*, under *any* circumstances, reasonable for a judicial council to require an Article III judge to undergo a mental health evaluation. *See, e.g.*, *Salerno*, 481 U.S. at 745; *see also*, *e.g.*, *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2451 (2015). He has not remotely carried that heavy burden.

_____

[9] The JC&D Committee decided the matter on this assumption, *see* JC&D Comm. Mem. 30, and this Court may do likewise. Courts have disagreed on this question. *Compare Greenawalt v. Indiana Dep't of Corr.*, 397 F.3d 587, 589 (7th Cir. 2005) ("[W]e do not think a psychological test is a search."), *with Down v. Ann Arbor Pub. Sch.*, 29 F. Supp. 3d 1030, 1043 (E.D. Mich. 2014) ("[The] Court predicts that the Sixth Circuit will find that a compelled psychological examination is a search for Fourth Amendment purposes.").

As noted above, a judicial disability can manifest in innumerable ways. A judge may engage in aggressive, impulsive, or inappropriate behavior towards litigants, colleagues, or others. Or a judge may simply become aged and infirm, raising concerns about mental acuity. In the context of a judicial conduct and disability investigation, a mental health evaluation by an independent professional is an obvious tool to assess a judge's continued fitness for office. Such an evaluation seeks to determine whether the judge can discharge all the duties of the office, not to generate evidence for a criminal trial or any other law-enforcement purpose. JC Mem. 29-30. There is nothing inherently unreasonable about requiring a mental health evaluation of an Article III judge in this context as long as it is warranted under the particular circumstances of the case. That simple point is the beginning and the end of Judge Adams's facial Fourth Amendment challenge; to the extent he alleges that a mental health evaluation is not warranted on the facts of *his* case (as he does in Count V), he is concededly bringing an as-applied challenge barred by 28 U.S.C. § 357(c).

In any event, the JC&D Committee's decision in this case makes clear that an Article III judge will not be required to undergo a mental health evaluation as part of a judicial conduct and disability proceeding unless "a judicial council or its special committee has a *reasonable basis* for concluding that a judicial colleague might suffer from a disability rendering him or her unable to perform the duties and responsibilities of the judicial office." JC&D Comm. Mem. 29 (emphasis added). That standard, of course, parallels the Fourth Amendment standard of reasonableness. Where, as here, a judge contests a reasonableness determination by a Special Committee or a Judicial Council, he may seek review by the JC&D Committee. *See* 28 U.S.C. § 357(a).

It is anomalous, to say the least, for Judge Adams to suggest that a warrant issued by a *single* magistrate judge provides greater Fourth Amendment protection than this statutory process

providing for *multiple* layers of review by *multiple* Article III judges. As an initial matter, a warrant or suspicion of wrongdoing fits poorly outside the criminal context. *Cf. O'Connor v. Ortega*, 480 U.S. 709, 723 (1987) (plurality) ("[I]t is difficult to give the concept of probable cause, rooted as it is in the criminal investigatory context, much meaning when the purpose of the search is to retrieve a file for work-related reasons. Similarly, the concept of probable cause has little meaning for a routine inventory conducted by public employers for the purpose of securing state property."). In addition, reasonableness review by the Article III judges on the Judicial Council and the JC&D Committee more than satisfies the constitutional standard. The Fourth Amendment, if it applies, requires nothing beyond "a reasonable basis for concluding that [the judge] might suffer from a disability rendering him or her unable to perform the duties and responsibilities of the judicial office." JC&D Comm. Mem. 29.[10]

Indeed, the "reasonable basis" standard applied to federal judges in this context is *more* protective than the standard applied to federal-court litigants. Under the Federal Rules of Civil Procedure, a district court "may order a party whose mental or physical condition ... is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner." Fed. R. Civ. P. 35(a)(1). The Rule contains no special requirement for a determination

---

[10] Additionally, "any intrusion upon [the subject judge's] privacy interests must be assessed in light of the medical nature, as well as the confidentiality, of the mental health examination." JC&D Comm. Mem. 31. An evaluation for the limited purpose of determining whether a judge suffers from a disability that renders him unable to discharge the duties of his judicial office "would not likely entail extensive, protracted psychological testing or excessively invasive procedures." *Id.* at 32. "The examination and its results would be confidential in accordance with the applicable provisions of the Act and the Rules [for Judicial-Conduct and Judicial-Disability Proceedings], which prohibit disclosure of information related to judicial conduct and disability proceedings," and with the psychologist's professional obligations to keep test results private. *Id.* (citing 28 U.S.C. § 360(a); JC&D Rule 23(a)) (internal citation omitted); *see also id.* at 32 n.16 (noting that certain information and exhibits to written decisions and opinions may be made public, but that the Committee on Conduct and Disability "anticipate[s] that such publication would not occur here absent extenuating circumstances") (citing JC&D Rules 23(c) and 24).

of reasonableness; rather, it is implicit that an Article III court would not order such an examination unless it were reasonable. Certainly, the Fourth Amendment has not given courts pause in ordering civil litigants to undergo such examinations. *See, e.g.*, *Schlagenhauf v. Holder*, 379 U.S. 104, 112-14 (1964); *Sibbach v. Wilson & Co.*, 312 U.S. 1, 14 (1941); *Countee v. United States*, 112 F.2d 447, 451 (7th Cir. 1940) (citing *Camden & Suburban Ry. Co. v. Stetson*, 177 U.S. 172, 175 (1900)). If that process does not facially violate the Fourth Amendment, it follows that the process for requiring an Article III judge to submit to a mental health evaluation in the context of a judicial conduct and disability proceeding does not facially violate the Fourth Amendment.

### C.  The Complaint's Statutory and Constitutional Authority Claim (Count II) Fails As A Matter Of Law.

Even if this Court could assert jurisdiction over the challenge in Count II to Defendants' "statutory [and] constitutional power" to compel Judge Adams to undergo a mental health evaluation by an independent psychiatrist, Compl. ¶ 64 (which appears to be a challenge to an "order[]" or "determination[]" proscribed by 28 U.S.C. § 357(c)), that Count also fails to state a claim upon which relief can be granted. Both the statute and the Constitution provide ample authority for judges to investigate claims of misconduct or disability involving other judges.

First, with respect to statutory authority, the Act specifically provides that a special investigatory committee "shall conduct an investigation as extensive as it considers necessary." 28 U.S.C. § 353(c). Whatever the outer limits of a special committee's investigatory authority under that provision, a mental health evaluation falls squarely within that authority. Nothing in the Complaint suggests any plausible basis for construing the broad authority conferred by Section 353(c) to exclude a mental health evaluation. Thus, the JC&D Committee had no difficulty in concluding that "[i]f a judicial council or its special committee has a reasonable basis for concluding that a judicial colleague might suffer from a disability rendering him or her unable to

perform the duties and responsibilities of the judicial office, the judicial council and its special committee *necessarily possess the authority* to request the subject judge undergo a mental health examination." JC&D Comm. Mem. 29 (emphasis added); *see also In re Petition To Inspect & Copy Grand Jury Materials*, 576 F. Supp. 1275, 1279 (S.D. Fla. 1983) ("Congress assigned and entrusted the duty and responsibility to committees of Federal Judges and intentionally gave them the wide latitude to investigate as they 'consider[] necessary.'"), *aff'd*, 735 F.2d 1261 (11th Cir. 1984).

The Act's legislative history, like its purposefully broad language, confirms that "Congress did not intend to restrict the investigatory methods a Special Committee might pursue." *Grand Jury Materials*, 576 F. Supp. at 1278. Rather, Congress meant to "provide[] the special committee with broad flexibility and general authority to investigate" judicial conduct and disability complaints, H.R. Rep. No. 96-1313, at 11, and to permit the judicial council to "become the active gatherer of evidence and ... control the objectives and nature of the inquiry," *id.* at 14.

Second, with respect to constitutional authority, federal judges' authority to investigate complaints against other federal judges stems from two separate and independent sources. Such authority stems in part from Article III's grant of "[t]he judicial Power of the United States," which vests the Federal Judiciary with certain inherent powers necessary to fulfill its constitutional function. U.S. Const. art. III, § 1; *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-44 (1991); *see also id.* at 58 (Scalia, J., dissenting) ("I agree with the Court that Article III courts, as an independent and coequal Branch of Government, derive from the Constitution itself, once they have been created and their jurisdiction established, the authority to do what courts have traditionally done in order to accomplish their assigned tasks."). In addition, such authority stems from Congress' enumerated power "[t]o constitute Tribunals inferior to the supreme Court" and

its corresponding power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers." U.S. Const. art. I, § 8, cl. 9; *id.* art. I, § 8, cl. 18. The specific grant of statutory authority in the Act, when coupled with the inherent judicial authority to address misconduct and disability within federal judicial ranks, means that the Judiciary's constitutional power in this context is at its apex. *See*, *e.g.*, *Chandler*, 398 U.S. at 85.

### D.     The Complaint's Constructive Impeachment Claim (Count VII) Fails As A Matter Of Law.

Finally, even if this Court could assert jurisdiction over Judge Adams's claim in Count VII that defendants' "orders and threats constitute constructive impeachment in violation of the Constitution," Compl. ¶ 89 (which again appears to be a challenge to an "order[]" or "determination[]" proscribed by 28 U.S.C. § 357(c)), that Count also fails to state a claim upon which relief can be granted. Count VII alleges that "Defendants' orders and threats, both individually and in combination, were intended to substantially burden and do substantially burden [Judge Adams's] ability to serve as an Article III judge and to carry out the constitutional duties of his office and were intended to compel [Judge Adams] to retire." Compl. ¶ 88; *see also id.* ¶ 87 ("Defendants' orders and threats constitute an *attempt* to remove [Judge Adams] from office, without impeachment and in violation of the Constitution, in substance if not form ....") (emphasis added). Once again, this claim fails as a matter of law.

Most obviously, Judge Adams has *not* been removed from office; he continues to serve as an Article III district judge. The JC&D Committee vacated the portion of the Judicial Council's order that would have prevented Judge Adams from hearing cases for up to two years, JC&D Comm. Mem. 37, 40, while noting that "[s]hould Judge Adams refuse to submit to the mental health examination ordered by the Judicial Council and affirmed by this Committee, sanctions for Judge Adams's continued failure to cooperate—including the prohibition of the assignment of new

cases on a temporary basis for a time certain—may be warranted subject to the Judicial Council's sound discretion," *id.* at 39.

So Count VII boils down to an allegation that Judge Adams has been "constructive[ly] impeach[ed]" because Defendants have "*threaten[ed]* to transfer Plaintiff's current cases and *threaten[ed]* to forbid the assignment of new cases to him." Compl. ¶ 87 (emphasis added). As a matter of law, however, an unrealized *threat* of docket control cannot be characterized as the "[i]mproper [r]emoval" of an Article III judge. Compl. p. 21. Indeed, even an order prohibiting the assignment of new cases to Judge Adams for a limited time would not amount to unconstitutional "constructive impeachment." To the contrary, the Act specifically authorizes the Judicial Council to "order[] that, on a temporary basis and for a time certain, no further cases be assigned to the judge whose conduct is the subject of a complaint," and to "request[] that the judge voluntarily retire." 28 U.S.C. §§ 354(a)(2)(A)(i), 354(a)(2)(B)(ii); *cf. McBryde*, 83 F. Supp. 2d at 164-65 & n.18 (holding that a judicial council order suspending the assignment of new cases to a judge for one year, in addition to other sanctions, "does not approximate removal"). Far from seeking to usurp Congress' impeachment power, the Federal Judiciary in this case has simply tried to fulfill its own constitutional function of "keep[ing] its own house in order." *McBryde*, 264 F.3d at 61 (internal quotation omitted). The existence of the drastic and extreme sanction of impeachment in no way detracts from the Federal Judiciary's authority to monitor and regulate misconduct and disability within its ranks.

## CONCLUSION

For all of these reasons, Defendants respectfully request this Court to dismiss the Complaint.

Dated:  December 21, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Director, Federal Programs Branch

  /s/ Matthew J. Berns
MATTHEW J. BERNS
Trial Attorney (D.C. Bar No. 998094)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC  20530
Telephone: (202) 616-8016
Matthew.J.Berns@usdoj.gov

*Counsel for Defendants*