COMMITTEE ON JUDICIAL CONDUCT AND DISABILITY
OF THE JUDICIAL CONFERENCE OF THE UNITED STATES

———————

C.C.D. No. 17-01

———————

IN RE: COMPLAINT OF JUDICIAL MISCONDUCT

———————

PROCEEDING IN REVIEW OF THE ORDER AND MEMORANDUM
OF THE JUDICIAL COUNCIL OF THE SIXTH CIRCUIT
J.C. No. 06-13-90009

———————

MEMORANDUM OF DECISION

———————

(Filed August 14, 2017)

Present:    Judges Anthony J. Scirica, Chair, Sarah Evans Barker, Edith Brown Clement, Joel F. Dubina, Joel M. Flaum, Thomas F. Hogan, and Kathryn H. Vratil.[1]

**MEMORANDUM OF DECISION**

This matter is before the Judicial Conduct and Disability Committee on a Petition for Review filed by Judge John R. Adams of the U.S. District Court for the Northern District of Ohio.[2] Judge Adams seeks review of an Order of the Judicial Council of the Sixth Circuit, attached herewith, finding Judge Adams committed misconduct under the Judicial Conduct and Disability Act of 1980 ("Act"), 28 U.S.C. §§ 351–64, and the Rules for Judicial-Conduct and Judicial-Disability Proceedings ("Rules") (amended Sept. 17, 2015). Specifically, the Sixth Circuit Judicial Council found Judge Adams committed misconduct when he issued a Show

———————

[1] *See* R. 21(c) of the Rules for Judicial-Conduct and Judicial-Disability Proceedings ("Those members hearing the petition for review should serve in that capacity until final disposition of the petition, whether or not their term of committee membership has ended.").

[2] Judge Adams is represented by Paul J. Orfanedes and Robert Popper, of Judicial Watch, Inc., and Steven McCool, of Mallon & McCool.

Cause Order to a magistrate judge on February 1, 2013, and when he refused to cooperate with the Special Committee investigating the Complaint against him by failing to undergo a mental health examination conducted by a psychiatrist selected by the Special Committee. The Judicial Council found Judge Adams's refusal to undergo the examination prevented the Judicial Council from being able to determine whether Judge Adams has a "temporary or permanent impairment . . . rendering [him] unable to discharge the duties of the particular judicial office." R. 3(e).

Judge Adams's Petition for Review challenges the Sixth Circuit Judicial Council's conclusion that his issuance of the Show Cause Order and his refusal to undergo a mental health examination conducted by a psychiatrist selected by the Special Committee constitute cognizable misconduct. In addition, Judge Adams's Petition for Review challenges the sanctions imposed by the Judicial Council. For the reasons we explain, we deny in part and grant in part Judge Adams's Petition for Review.

## BACKGROUND

**A.  Facts**[3]

### 1.  Judge Adams's Scheduling Order and Related Show Cause Order

Magistrate judges play an essential role in facilitating the expeditious administration of justice in federal courts throughout the country. In the Northern District of Ohio, seven magistrate judges support eleven district judges, and each magistrate judge works with multiple district judges. The magistrate judges hear some matters by consent of the parties, address discovery disputes, conduct preliminary proceedings in criminal cases and jury voir dire, and

---

[3] This section includes findings from the Special Committee's Report relied upon by the Sixth Circuit Judicial Council.

hold settlement and mediation conferences, among other matters. Magistrate judges are also responsible for certain matters automatically referred to them under the Local Rules for the Northern District of Ohio. These matters—pro se petitions for habeas corpus, administrative cases, and petitions for review of administrative decisions—are randomly assigned to a district judge and then automatically referred to a random magistrate judge for completion of a Report and Recommendation ("R&R") for submission to the assigned district judge. Among these automatically referred cases, which comprise a substantial portion of each magistrate judge's docket, are petitions for review of social security disability determinations.

The triggering incident for the underlying Complaint and subsequent investigation in this matter was Judge Adams's decision to issue a Show Cause Order to a magistrate judge within his district for the magistrate judge's failure to comply with Judge Adams's Scheduling Order in social security cases.

### a.  Judge Adams's Scheduling Order in Social Security Cases

Judge Adams began issuing a standard scheduling order in all social security cases in 2011. The Scheduling Order required the assigned magistrate judge to file an R&R within 270 days of the filing of the underlying complaint. If the assigned magistrate judge could not meet the deadline, Judge Adams required the magistrate judge to file an interim R&R before the expiration of this period. Briefing by the parties in social security cases typically is not completed until 240 days after the filing of the underlying complaint, which left magistrate judges limited time to complete an R&R within Judge Adams's 270-day deadline.

In 2012, two magistrate judges sent Judge Adams timely letters about particular cases explaining that they would not be able to complete the R&Rs before the 270-day deadline due to "other matters and responsibilities, including [their] consent docket[s] and referrals from other

judges." Jud. Council Order 14 (alterations in original). Judge Adams responded, noting the magistrate judges had failed to provide "specific reasons" explaining their inability to meet the deadline and directed them to respond within seven days. *Id.* He added, "If you continue to assert that other cases have become ripe for decision at an earlier date, please provide the specifics of those cases, including case numbers and the dates those matters became ripe for decision." *Id.*

The magistrate judges responded by letter, noting that "the timeliness of social security cases is dependent on the management of an entire docket." Jud. Council Order 14. They explained that magistrate judges must "balance workloads in a manner that is fair to all of the litigants and district court judges who refer cases." *Id.* at 15.

Judge Adams wrote back, arguing that the magistrate judges' explanations contained "several misstatements and omissions." Jud. Council Order 15. He wrote, "First, you begin by indicating that you are an 'independent judicial officer.' You are not. Magistrate Judges are subordinate judicial officers." *Id.* He continued:

> You take great pains to note that you work for the Court as a whole and not simply one Article III Judge. In so doing, you effectively establish a system in which you answer to no one. Your assertion that you cannot satisfy my deadline because of responsibilities to other Article III Judges is a response that you can provide to <u>any</u> inquiry from <u>any</u> Article III Judge. Instead, in matters on my docket, you are answerable solely to me, not the Court as a whole. The same would [be] true for any of my Article III colleagues.

*Id.* (alteration in original) (emphasis in original). Judge Adams's letter disputed the magistrate judges' claim that they had an obligation to manage their workloads in a manner that is fair to all litigants and district judges, calling it a "half-truth." He added, "you misplace your role by effectively elevating yourself to equal footing with Article III Judges." *Id.*

According to Judge Adams, the magistrate judges had identified no authority "for simply deciding the rest of [their] docket [was] sufficient reason to ignore [his] order." Jud. Council

Order 15 (alterations in original). He stated that their caseloads were "far from overwhelming" and that social security cases "rarely raise novel legal theories." *Id.* In response to the magistrate judges' contention that social security cases should not take priority over other cases on their dockets, Judge Adams wrote, "this is not your decision" and added, "I am vested with the authority to put in place my own scheduling orders, and while you may disagree with them, you are bound by them." He concluded that if a magistrate judge needed an extension in the future, he would require "*case specific* reasons to justify the extension, rather than vague references to other matters on [the magistrate judge's] docket and [the magistrate judge's] general disagreement with [Judge Adams's] binding order."

In response to Judge Adams's Scheduling Order and in an effort to create uniformity, as urged by the court's magistrate judges, the Northern District of Ohio adopted Local Rule 16.3.1, effective January 1, 2013, which directs that a magistrate judge "should issue a[n R&R] within two hundred and eighty-five (285) days of the filing of the answer and transcript" in a social security case. In response, Judge Adams modified his Scheduling Order to reflect the 285-day deadline, but he made the deadline mandatory, even though the text of the Rule is precatory. All other district judges treated the new deadline as advisory.

### b. Judge Adams's Show Cause Order for Failure to Comply with His Scheduling Order

On May 3, 2012, a social security case was assigned to Judge Adams and automatically referred under the local rules to a magistrate judge for an R&R. As this case arose prior to the adoption of Local Rule 16.3.1, Judge Adams issued his standard Scheduling Order, requiring the magistrate judge to file an R&R within 270 days of the filing of the complaint (by January 28, 2013). Due to a clerical error, the magistrate judge's chambers incorrectly calculated the due date

and therefore missed the 270-day deadline. The magistrate judge had never before missed one of Judge Adams's deadlines.

On Friday, February 1, 2013, Judge Adams learned the magistrate judge had not filed the R&R or an interim R&R explaining the delay. Instead of exploring informal resolution, Judge Adams issued a Show Cause Order requiring the magistrate judge to show cause by 4:00 p.m. on Monday, February 4, 2013, why the magistrate judge should not be held in contempt or otherwise sanctioned for failing to comply with Judge Adams's Scheduling Order. Neither Judge Adams nor his staff reached out to the magistrate judge to determine the cause for the delay. Nor did Judge Adams attempt to give notice to the magistrate judge of the Show Cause Order—and the imminent response deadline it imposed—other than by filing the Order on the docket.

The magistrate judge learned about the Show Cause Order on Saturday, February 2, 2013. That same evening, the magistrate judge emailed Judge Adams to take responsibility for the clerical mistake. Concerned about the threat of being held in contempt, the magistrate judge began arranging legal representation for a potential hearing and spent the weekend completing the R&R. Judge Adams's law clerk called the magistrate judge on Monday, February 4, 2013, to tell the magistrate judge that Judge Adams accepted the magistrate judge's explanation for missing the deadline. Later that day, Judge Adams issued another Order noting the clerical error and finding the Show Cause Order to be "satisfied." Jud. Council Order 17.

### c.    Reaction of District and Magistrate Judges

The court's district judges expressed immediate concern with regard to the effects of the Show Cause Order on the magistrate judge and its impact on the administration of justice within the court. Following a unanimous vote, the Chief Judge of the Northern District of Ohio sent a letter to Judge Adams stating that Judge Adams's issuance of the Show Cause Order was

unwarranted and improper, and requesting that Judge Adams vacate the Show Cause Order and strike it from the docket. Judge Adams refused.

Judge Adams suggested that his Show Cause Order was "precisely the message that needed to be sent" and lamented the "history of defiance from the Magistrate Judges" that required him to resort to the threat of contempt. Jud. Council Order 17. Judge Adams criticized the Chief Judge for failing to "discipline" the two magistrate judges, whom Judge Adams believed had "disrespectful[ly] and "defiant[ly]" suggested that their need to manage other cases was a valid reason not to comply with Judge Adams's Scheduling Order. *Id.*

During the Special Committee's investigation, testimony revealed that Judge Adams's Show Cause Order placed unwarranted and undue pressure on the court's magistrate judges. Six judges testified that the magistrate judges give higher priority to Judge Adams's matters as a result of his Show Cause Order. One magistrate judge specifically described concerns over being held in contempt—and, accordingly, reluctance to grant briefing extensions to parties in Judge Adams's cases.

In addition to influencing the manner in which magistrate judges handle their dockets, the Show Cause Order has strained relationships between magistrate and district judges. One district judge said it "dampen[ed] the spirit of the magistrate judges" and worried that the Order "put them under the gun in an inappropriate way." Another district judge expressed concern that magistrate judges may not trust district judges to treat them fairly in the wake of the Show Cause Order. Ultimately, every witness—including Judge Adams—agreed that it was inappropriate for Judge Adams to have issued the Show Cause Order. Pet. for Review 3 ("[Judge Adams] has acknowledged that he should not have issued the Show Cause Order.").

### 2.  Judge Adams's Further Obstruction of Court Administration

Judge Adams's issuance of the Show Cause Order was the culmination of an increasingly strained relationship between Judge Adams and his colleagues that began in 2008, when the court did not select Judge Adams's preferred candidate for a vacant magistrate judge position in the Akron courthouse. Judge Adams believed his colleagues would defer to his choice of appointee, but the district judges ultimately selected another candidate by majority vote, in accordance with the procedure established in the Federal Magistrates Act. *See* 28 U.S.C. § 631(a). Since that time, Judge Adams has repeatedly expressed hostility and contempt toward the court's magistrate judges, attempted to undermine his colleagues' administration of the court's business, and withdrawn from relations with his colleagues.

After the appointment of the magistrate judge in 2008, Judge Adams refused to interact with that judge or assign that judge any work from his docket. Despite numerous attempts by the magistrate judge to initiate contact with Judge Adams, Judge Adams repeatedly refused to meet with that judge. In addition, Judge Adams denied use of Akron's ceremonial courtroom for that magistrate judge's investiture ceremony, and Judge Adams declined to attend the investiture. Judge Adams's hostility has not been limited to this specific magistrate judge: he refused to meet with another magistrate judge appointed in 2011, instead sending a lone email explaining he expected "prompt decisions" in social security cases and criticizing the "work ethic" of the other magistrate judges. In fact, Judge Adams has rejected communications with any of the court's magistrate judges since 2008, requiring that all communications go through his staff.

In addition to his hostile treatment of the court's magistrate judges, Judge Adams has also "routinely attempted to undermine his colleagues as they administer the court's business," causing the court to "devote unnecessary additional time and resources to justifying simple

matters that could have more easily been handled internally." Jud. Council Order 11, 13. For example, in 2010, Judge Adams refused to participate in an internal meeting to request authorization to fill a soon-to-be vacant magistrate judge position, instead unilaterally writing a letter to the Chair of the Judicial Conference Committee on the Administration of the Magistrate Judges System, complaining that filling the position was "neither necessary, nor fiscally responsible." *Id.* at 12. When the district court's Chief Judge wrote to defend the court's request, Judge Adams accused the Chief Judge of making demeaning personal attacks against him. In 2011, when the court decided to purchase iPads for its judges, rather than raising his concerns internally, Judge Adams wrote separately to the Judicial Conference Committee on Audits and Administrative Office Accountability, complaining that the purchase constituted "waste and/or mismanagement of funds." *Id.* And in 2012, Judge Adams unilaterally complained to the same Committee about reimbursement given to judges who traveled to attend the unveiling of a senior district judge's portrait. In each of these instances, Judge Adams did not attempt to communicate directly with his colleagues about his concerns, hindering the expeditious resolution of such disputes.

Overall, after the court did not select Judge Adams's preferred candidate for the magistrate judge position in 2008, Judge Adams withdrew from any collegial or collaborative relations with his colleagues. In addition to refusing to meet with magistrate judges, Judge Adams stopped attending court events, including declining to attend court retreats and administrative meetings, and only occasionally participating by telephone. Judge Adams has also withdrawn from the three district court committees on which he previously served, and his overall participation in court governance has been limited to occasional conversations with a few colleagues regarding specific matters of particular interest to him. In addition, Judge Adams has

rebuffed his colleagues' efforts to engage him, directing all communications through his staff and even refusing in one instance in 2010 to allow another district judge and his staff to enter Judge Adams's chambers to introduce themselves. Judge Adams has not been receptive to his colleagues' expressions of concern for him, instead suggesting they seek only to "impugn [his] character" as part of a "smear campaign" against him.[4]

## B. Procedural History

On February 15, 2013, four district judges filed a Complaint of judicial misconduct against Judge Adams. The Complaint alleged that Judge Adams's issuance of the Show Cause Order, in combination with other ongoing disruptive behavior directed at other judges in the Northern District of Ohio, was "conduct prejudicial to the effective and expeditious administration of the business of the courts." 28 U.S.C. § 351(a); R. 3(h). Judge Adams responded to the Complaint with two letters to the then-Chief Judge of the U.S. Court of Appeals for the Sixth Circuit, disputing the allegations. The then-Chief Judge disqualified herself from acting as chief judge in the matter, and another Circuit judge was designated in her place. *See* R. 25(f).

The acting Chief Judge appointed a Special Committee on April 8, 2013. *See* 28 U.S.C. § 353(a)(1); R. 11(f). The acting Chief Judge notified Judge Adams that he had appointed a Special Committee and provided Judge Adams with information regarding his rights during the investigation. *See* 28 U.S.C. § 353(a)(3); R. 11(f), (g)(1), 15(a)(1)(A).

---

[4] The Judicial Council also determined that two incidents involving Judge Adams were "troubling." Jud. Council Order 20. In one incident, there were disputed accounts regarding whether Judge Adams bumped a magistrate judge on a running path near the courthouse. In the other incident, Judge Adams reportedly blocked an intern's car with his own when the intern inadvertently parked in Judge Adams's parking space.

Between May and August 2013, the Special Committee interviewed fourteen witnesses, including the four complainants, Judge Adams, and two witnesses suggested by Judge Adams. The Special Committee also reviewed documents obtained from the complainants, Judge Adams, various witnesses, and publicly available sources.

The acting Chief Judge expanded the scope of the investigation on May 27, 2014, to consider whether Judge Adams may be suffering from an emotional or mental disability and notified Judge Adams of the expansion. *See* R. 15(a)(1)(B). Following expansion of the investigation, the Special Committee retained the services of a forensic psychiatrist to provide an opinion regarding whether Judge Adams might have a mental or emotional disability rendering him unable to discharge the duties of his judicial office. The Special Committee requested that the forensic psychiatrist "perform the necessary evaluations of Judge Adams that would allow [him] to reach an opinion as to [Judge Adams's] emotional and mental state" and to "provide a report of [his] findings to the [Special Committee]." Jud. Council Order 20 (alterations in original). To support the psychiatrist's efforts, the Special Committee asked Judge Adams to provide any records available to him pertaining to any mental or emotional health treatment or testing he had undergone. The Special Committee also asked Judge Adams to submit to psychological testing by an expert in neuropsychology and neuroforensics, the results of which would be used by the forensic psychiatrist in conducting Judge Adams's mental health examination.

Judge Adams refused to undergo the requested psychological testing or to provide the requested documents. The Special Committee responded to Judge Adams, explaining that his refusal to cooperate by submitting to the requested psychological testing might constitute misconduct. In light of Judge Adams's refusal, the Special Committee's forensic psychiatrist

could not render an expert opinion or diagnosis regarding Judge Adams's mental or emotional state. Based on materials provided by the Special Committee, however, the Special Committee's forensic psychiatrist concluded that there is "a reasonable basis for concern as to Judge Adams'[s] mental or emotional state. The data available so far do not suggest a mental state of psychotic proportions, but do suggest significant personality traits that may have contributed to the current concerns." *Id.* at 21 (alteration in original).

The acting Chief Judge again expanded the scope of the investigation on December 9, 2014, to include an inquiry into whether Judge Adam's non-cooperation—by refusing to submit to an evaluation by the doctor selected by the Special Committee and by refusing to submit documents requested by the Committee—constituted misconduct. The acting Chief Judge notified Judge Adams of the expansion of the investigation. *See* R. 15(a)(1)(B). Throughout the Special Committee's investigation, Judge Adams continued to refuse to undergo testing by the Special Committee's expert and refused to provide the records requested by the Special Committee.

The Special Committee held a factfinding hearing from April 20 to April 22, 2015.[5] Eleven witnesses testified at the hearing. Judge Adams elected not to call any of his subpoenaed witnesses, but two other witnesses testified at Judge Adams's request. In addition, the Special Committee received hundreds of documents into evidence, including interview transcripts and

---

[5] In anticipation of a factfinding hearing, Judge Adams's counsel worked with the Special Committee to draft rules for the hearing. The Special Committee provided Judge Adams with formal notice of the hearing and a copy of the final rules, as well as disclosed to Judge Adams all potential exhibits, prior recorded statements of all scheduled witnesses, and summaries of additional expected testimony. *See* R. 15(a)(1)(C). The Special Committee also granted Judge Adams's request for certain witness subpoenas, although it rejected some others as unnecessary and overly broad. *See* 28 U.S.C. § 356(a); R. 15(c).

witness statements submitted by Judge Adams. Both Judge Adams's counsel and the Special Committee's counsel offered oral argument at the conclusion of the hearing. *See* R. 15(d). And both submitted post-hearing briefs and recommended actions after the hearing. *Id.* Judge Adams also submitted proposed findings of fact.

At the Special Committee's hearing, Judge Adams sought to introduce the testimony of a psychiatrist who had previously conducted a mental health evaluation of Judge Adams at his request, but the Special Committee excluded the psychiatrist from testifying because Judge Adams refused to produce any of the records underlying his psychiatrist's evaluation. The Special Committee's forensic psychiatrist also did not testify at the hearing, but rather provided an affidavit stipulating the content of his testimony. Judge Adams filed written objections to the affidavit of the Special Committee's forensic psychiatrist. Significantly, none of the evidence submitted at the hearing regarding Judge Adams's mental health specifically addressed Judge Adams's behavior with respect to litigants or in adjudicating cases.

The Special Committee issued its unanimous Report to the Sixth Circuit Judicial Council on July 10, 2015, which provided the Committee's factual findings and conclusions on legal issues raised by its investigation. The Special Committee found the evidence regarding Judge Adams's hostility and defensiveness toward the court's magistrate judges, his withdrawal from court administration, and his colleagues' serious concerns about his ongoing behavior suggested that Judge Adams may have a disability that "(1) prevents him from maintaining a professional relationship with his colleagues, (2) prevents him from shouldering his responsibilities as a member of the District Court, and (3) causes him to make unfounded and destructive attacks against his colleagues." Based on its review of the evidence, the Special Committee expressed concern that "a reasonable person [would have] cause to question whether Judge Adams has a

[mental or emotional] disability" and concluded the evidence provided a "reasonable basis" to expand the Special Committee's investigation.[6]

The Judicial Council met on September 10, 2015, and Judge Adams's counsel presented oral argument contesting the findings and recommendations set forth in the Special Committee's Report. *See* R. 20(a). The Judicial Council unanimously determined the Special Committee's Report and underlying record provided an adequate basis for deciding the merits of the Complaint.

On February 22, 2016, the Judicial Council issued its Order, finding (1) Judge Adams's issuance of the Show Cause Order constituted misconduct, R. 3(h)(1); (2) Judge Adams's refusal to cooperate with the Special Committee's request that he undergo a mental health examination with a psychiatrist selected by the Special Committee constituted misconduct, *id.*; and (3) it could not determine whether Judge Adams has a disability based on his refusal to undergo the requested mental health examination, R. 3(e). The Judicial Council ordered that (1) Judge Adams be publicly reprimanded for his actions related to and including his February 1, 2013, issuance of the Show Cause Order, 28 U.S.C. § 354(a)(2)(A)(iii); R. 20(b)(1)(D)(i); (2) Judge Adams undergo a mental health examination by a psychiatrist selected by the Special Committee and submit to any treatment or counseling deemed necessary by the psychiatrist, 28 U.S.C. § 353(c); R. 1, 13(a), 20(c); Sixth Circuit R. 14(b); (3) no new cases be assigned to Judge Adams for two years and his current cases be transferred to other judges (subject to suspension by the Judicial Council of the Order that no new cases be assigned to Judge Adams for two years should Judge Adams submit to a mental health examination demonstrating he does not suffer from a disability rendering him unable to discharge the duties of office or if Judge Adams receives treatment after

---

[6] Judge Adams submitted a written response to the Special Committee's Report.

the examination that remedies any disability), 28 U.S.C. § 354(a)(2)(A)(i); R. 20(b)(1)(D)(ii); (4) the Special Committee maintain jurisdiction for two years to ensure Judge Adams does not engage in additional inappropriate behavior involving magistrate judges and to order further remedies depending on the results of the mental health examination, 28 U.S.C. § 353(c); R. 1, 13(a); and (5) Judge Adams voluntarily retire, waiving the ordinary length-of-service requirements, if he continues to refuse to undergo a mental health examination by a psychiatrist chosen by the Special Committee, 28 U.S.C. § 354(a)(2)(B)(ii); R. 20(b)(1)(D)(v).

## DISCUSSION

We review circuit judicial council orders for errors of law, clear errors of fact, or abuse of discretion. R. 21(a); *see also In re Complaint of Judicial Misconduct*, 747 F.3d 869, 872 (U.S. Jud. Conf. 2014) (finding that circuit judicial council did not abuse its discretion); *In re Complaint of Judicial Misconduct*, 664 F.3d 332, 334–35 (U.S. Jud. Conf. 2011) (deferring to findings of circuit judicial council and overturning them only if clearly erroneous). Our review necessarily depends on the record before us and gives deference to the circuit judicial council's consideration of the special committee's review of the evidence. *See In re Memorandum of Decision of Judicial Conference Comm. on Judicial Conduct & Disability*, 517 F.3d 563, 569 (U.S. Jud. Conf. 2008) ("[W]e will defer to the findings of the Judicial Council and the special committee, and will overturn those findings only if, upon examination of the record, they are clearly erroneous.").

Judge Adams challenges the Sixth Circuit Judicial Council's findings and sanctions related to his issuance of and actions related to the Show Cause Order and his refusal to submit to a mental health examination. Judge Adams argues that his issuance of the Show Cause Order was not cognizable misconduct because it related to the merits of a decision or procedural ruling.

15

He also argues that his refusal to undergo the mental health examination was not cognizable misconduct because the Special Committee did not have the authority to request that he submit to such an examination. Pet. for Review 1.

We conclude both misconduct findings were reasonable based on the evidence and well within the Judicial Council's sound discretion. Judge Adams's issuance of and actions related to the Show Cause Order constituted "conduct prejudicial to the effective and expeditious administration of the business of the courts," 28 U.S.C. § 351(a), because they disrupted the orderly adjudication of social security cases in the Northern District of Ohio, negatively impacted the magistrate judges' ability to perform their judicial duties, and impeded management of the court's internal affairs. Furthermore, the Special Committee's request that Judge Adams undergo a mental health examination was warranted and permissible to facilitate the Special Committee's investigation of the Complaint against Judge Adams because there was a reasonable basis to believe that such an examination was necessary. Judge Adams's refusal to undergo the requested examination was a failure to cooperate with the Special Committee's investigation that constituted misconduct. *See* R. 3(h)(1)(H) (defining misconduct to include "refusing, without good cause shown, to cooperate in the investigation of a complaint under these Rules").

Based on the Judicial Council's findings of misconduct, we affirm that the Judicial Council's public reprimand of Judge Adams for his issuance of and actions related to the Show Cause Order was a warranted and permissible remedial action to ensure the "effective and expeditious administration of the business of the courts." 28 U.S.C. § 351(a); *see* R. 20(b)(1)(D)(i). In addition, we affirm the Judicial Council's Order directing Judge Adams to undergo a mental health examination as falling within the Judicial Council's and the Special

Committee's broad investigatory powers and discretion under the Judicial Conduct and Disability Act and the Rules for Judicial-Conduct and Judicial-Disability Proceedings, as well as the Judiciary's inherent authority to regulate its affairs. *See* 28 U.S.C. §§ 332(d)(1), 353(c), 354(a)(1)(A); R. 13(a). The Judicial Council and the Special Committee had a reasonable basis to believe that such examination was warranted based on their factual findings.

Judge Adams's refusal to submit to the requested mental health examination impeded the Judicial Council's and the Special Committee's ability to determine whether Judge Adams has a temporary or permanent condition that renders him unable to discharge all the duties of office, which necessarily includes his adjudicative duties. Nevertheless, for the reasons outlined below, we are unable at this time to uphold the Judicial Council's Order that no new cases be assigned to Judge Adams for two years and transferring his present docket to other judges. The Judicial Council's findings provide a reasonable basis for requiring a mental health examination as an investigatory tool to determine whether an impairment exists, but the record before us fails to support an order removing cases from Judge Adams's docket because the Judicial Council made no findings on Judge Adams's inability to discharge his adjudicative duties. We affirm the Judicial Council's Order that the Special Committee retain jurisdiction over this matter for a reasonable period of time, not to exceed two years, to ensure Judge Adams's ability to discharge the duties of office as a federal district court judge.[7]

## A. Judge Adams's Actions Related to and Involving the Show Cause Order Constituted Cognizable Misconduct.

Judge Adams argues that "[s]anctioning [him] for issuing the February 1, 2013 Show Cause Order violates the merits-related bar on reviewing judicial decisions." Pet. for Review 6

---

[7] In view of the pendency of this matter before this Committee, the two-year period will be deemed to run from the date of this Decision and Order.

(citing R. 3(h)(3)(A)). In addition, Judge Adams asserts that the Judicial Council's "findings of fact underlying its finding of prejudice [were] clearly erroneous." *Id.* at 8. We reject these contentions and affirm the Judicial Council's finding of misconduct related to Judge Adams's actions related to and involving the Show Cause Order.

### 1. Judge Adams's Misconduct Is Not Related to the Merits of a Judicial Ruling.

A complaint "directly related to the merits of a decision or procedural ruling" cannot be the basis for misconduct under the Act. 28 U.S.C. § 352(b)(1)(A)(ii). Rule 3(h)(3)(A) similarly provides that "an allegation that is directly related to the merits of a decision or procedural ruling" does not constitute cognizable misconduct. An "allegation that calls into question the correctness of a judge's ruling, . . . without more, is merits-related." *Id.*

The Commentary on Rule 3 explains the important rationale behind the exclusion of complaints related to the merits of a substantive or procedural ruling: "This exclusion preserves the independence of judges in the exercise of judicial power by ensuring that the complaint procedure is not used to collaterally attack the substance of a judge's ruling." This Committee has similarly recognized that "allowing judicial decisions to be questioned in misconduct proceedings would inevitably begin to affect the nature of those decisions and would raise serious constitutional issues regarding judicial independence under Article III of the Constitution." *In re Memorandum of Decision of Judicial Conference Comm. on Judicial Conduct & Disability*, 517 F.3d 558, 561 (U.S. Jud. Conf. 2008) ("Judges should render decisions according to their conscientiously held views of prevailing law without fear of provoking a misconduct investigation.").[8] For this reason, "[t]he judicial misconduct system is

---

[8] *See also In re Charge of Judicial Misconduct*, 685 F.2d 1226, 1227 (9th Cir. 1982) ("To determine whether a judge's rulings were so legally indefensible as to mandate intervention

emphatically not a forum for disappointed litigants to continue litigation already decided on the merits." *In re Complaint of Judicial Misconduct*, 579 F.3d 1062, 1064 (9th Cir. 2009).[9]

But the merits-related bar does not prevent the Judiciary from regulating conduct that is "prejudicial to the effective and expeditious administration of the business of the courts," 28 U.S.C. § 351(a), when that conduct is not directly related to the merits of a decision or procedural ruling. *See In re Complaint of Judicial Misconduct*, 37 F.3d 1511, 1515 (U.S. Jud. Conf. 1994) ("[T]he central thrust of the Act is to make judges accountable for precisely this sort of conduct: conduct not related to the merits of rulings that arises in the course of the performance of judicial duties."). This includes actions that affect the Judiciary's ability to manage and regulate itself, including conduct that impairs the ability of other judicial officers to perform their functions.

Misconduct that takes place while a judge is performing judicial duties is not inherently merits-related. For example, as noted in the Commentary on Rule 3, a misconduct complaint may properly challenge a judge's motives in reaching a particular decision:

> [A]n allegation — however unsupported — that a judge conspired with a prosecutor to make a particular ruling is not merits-related, even though it "relates" to a ruling in a colloquial sense. Such an allegation attacks the propriety of conspiring with the prosecutor and goes beyond a challenge to the correctness — "the merits" — of the ruling itself. An allegation that a judge ruled against the complainant because the complainant is a member of a particular racial or ethnic group, or because the judge dislikes the complainant personally, is also not merits-related. Such an allegation attacks the propriety of arriving at rulings with an illicit or improper motive. Similarly, an allegation that a judge used an

---

would require the same type of legal analysis as is afforded on appeal. More important, in such cases the gravamen of the complaint is not the fitness of the judge, but the merit of his decision. Disciplinary procedures must not be used to correct judicial mistakes.").

[9] *See also* S. Rep. No. 96-362, at 8 (1979) ("It is important to point out what [the Judicial Conduct and Disability Act] does not mean; it is not designed to assist the disgruntled litigant who is unhappy with the result of a particular case.").

> inappropriate term to refer to a class of people is not merits-related even if the judge used it on the bench or in an opinion; the correctness of the judge's rulings is not at stake. An allegation that a judge treated litigants or attorneys in a demonstrably egregious and hostile manner while on the bench is also not merits-related.

Thus, judicial councils have addressed complaints alleging judicial misconduct related to a judicial decision where the complainant alleges the judge acted as a result of bias, prejudice, or dislike of a litigant or other individual. *See, e.g.*, *In re Complaint of Judicial Misconduct*, 761 F.3d 1097, 1098 (9th Cir. 2014) ("[A] merits ruling may constitute misconduct if it is influenced by an invidious factor or an impermissible motive."); *In re Complaint of Judicial Misconduct*, 605 F.3d 1060, 1062 (9th Cir. 2010) ("Allegations of prejudice are the bread-and-butter of misconduct complaints and aren't normally dismissed as merits related.").

In this case, the Judicial Council found that Judge Adams's actions related to his issuance of the Show Cause Order constituted "conduct prejudicial to the effective and expeditious administration of the business of the courts" because those actions had prejudicial effects on (1) the specific magistrate judge targeted; (2) the ways in which the district's magistrate judges performed their work generally; and (3) the district as a whole. Jud. Council Order 28–29. In addition, the Judicial Council found that the Show Cause Order was motivated by non-merits-based considerations, taking "no position on the legality of the Show Cause Order." *Id.* at 18 n.5. Rather, the Judicial Council based its misconduct finding on "[t]he prejudicial impact of the Show Cause Order on the administration of the business of the court and Judge Adams's inability or refusal to recognize that harm." *Id.* at 23.[10]

---

[10] Similarly, the allegations in the underlying Complaint were not related to the merits of the Show Cause Order: "[T]he Complaint focuses on Judge Adams's hostile treatment of his fellow judicial officers and the severe damage brought about by that treatment rather than the legal

The Judicial Council and the Special Committee made numerous findings regarding the negative impact of the Show Cause Order on the administration of the business of the Northern District of Ohio. Specifically, the Show Cause Order caused magistrate judges to prioritize Judge Adams's cases over cases referred by other district judges. In addition, the threat of contempt sanctions impaired the magistrate judges' ability to manage their dockets as independent judicial officers. Further, the Judicial Council concluded—based on its consideration of extensive evidence—that Judge Adams's Show Cause Order was based, at least in part, on Judge Adams's hostility and animus toward the magistrate judges, beginning in 2008 when the court did not select his preferred candidate for an open magistrate judge position. Judge Adams's refusal to withdraw the Show Cause Order at the request of the Chief Judge and Judge Adams's fellow district court judges further supported the Judicial Council's conclusion.

For these reasons, the Judicial Council's misconduct finding regarding Judge Adams's actions related to the issuance of the Show Cause Order was not based on the merits of the Order, but rather on the Order's interference with the effective and expeditious administration of the business of the courts and Judge Adams's motives in issuing the Order (including his longstanding history of hostility toward the court's magistrate judges). The merits-related bar does not apply. Accordingly, Judge Adams's conduct in issuing the Show Cause Order is within the proper scope of the Judicial Council's misconduct finding.

### 2. The Judicial Council's Findings of Fact Related to the Prejudicial Effect of Judge Adams's Show Cause Order Are Not Clearly Erroneous.

Judge Adams challenges as clearly erroneous the Judicial Council's findings of fact regarding the prejudicial effect of his Show Cause Order. Specifically, he challenges the Judicial

---

correctness of his [S]how [C]ause [O]rder. Whether the [S]how [C]ause [O]rder was legally correct or not does not affect the analysis at all." Jud. Council Order 23 (alterations in original).

Council's findings that the Show Cause Order (1) "caused the court's magistrate judges to prioritize Judge Adams'[s] cases over other cases and harmed the ability of district judges to have their cases prioritized fairly"; (2) "eroded trust and harmed the relationships between the district court's judges and the magistrate judges"; and (3) "caused prejudice because it was placed on the docket." Pet. for Review 8–9. We disagree.

Judge Adams first challenges the Judicial Council's conclusion that the Show Cause Order caused the court's magistrate judges to prioritize his cases over other cases. In support of this argument, Judge Adams refers to an evaluation by an internal court committee that could not confirm any such prioritization. But the Special Committee credited testimony from six judges—three district judges and three magistrate judges—that the court's magistrate judges have placed Judge Adams's cases ahead of other matters on their dockets as a result of Judge Adams's Show Cause Order, and that they continue to do so. One magistrate judge testified that Judge Adams's Show Cause Order increased the magistrate judge's fears about missing one of Judge Adams's deadlines, explaining, "[F]rankly, to this day I place his social security R&R's ahead of stuff that I don't think they—if I were free to run my docket as I saw fit as a judicial officer, sometimes other things would come ahead of those." Another magistrate judge likewise testified that the magistrate judge fears contempt and fears granting briefing extensions to parties in Judge Adams's cases. Yet another magistrate judge testified that the magistrate judge would prioritize Judge Adams's social security cases over others if necessary to meet Judge Adams's deadline.

Judge Adams next challenges the Judicial Council's finding that the Show Cause Order eroded trust and harmed relationships between the court's magistrate and district judges, and cites one judge's testimony in support of this argument. Aside from Judge Adams, all other witnesses unanimously testified that it was inappropriate for Judge Adams to threaten to sanction

another judicial officer. One district judge expressed concern that magistrate judges may not trust district judges to treat them fairly in the wake of the Show Cause Order. Another district judge testified that the Show Cause Order "dampen[ed] the spirit of the magistrate judges" and "put them under the gun in an inappropriate way."

Finally, Judge Adams contends that the Show Cause Order could not have caused prejudice because social security appeals filings generally are not made public, Judge Adams discharged the Show Cause Order, and Judge Adams eventually placed the Show Cause Order under seal. Judge Adams's objection misses the point of the Judicial Council's finding. The Judicial Council's finding of prejudice was not based on whether the Show Cause Order was made public. Rather, it was based on Judge Adams's refusal to withdraw the Show Cause Order, despite the request of the Chief Judge and the other district court judges. The Judicial Council concluded this refusal demonstrated hostility and animus towards the magistrate judge involved, and by implication toward the other magistrate judges in the Northern District of Ohio.[11]

The Judicial Council's findings were based on its consideration of the Special Committee's lengthy investigation, which included testimony from numerous witnesses, and the Special Committee's assessment of the credibility of those witnesses. The Judicial Council's findings with respect to the Show Cause Order are not clearly erroneous.

## B.  Judge Adams's Failure to Cooperate Constituted Misconduct.

Judge Adams next argues that his refusal to undergo the mental health examination requested by the Special Committee does not constitute misconduct. Judge Adams contends the

---

[11] Judge Adams's statement that "perhaps my show cause [order] was precisely the message that needed to be sent," Jud. Council Order 17 (alteration in original), when he was asked to strike the Show Cause Order from the docket lends further support to this conclusion.

Act and the Rules do not authorize a special committee to request a mental health examination. Judge Adams argues that requiring that he submit to and disclose the results of the examination to the Judicial Council also violates his privacy rights. We conclude, based on the Judicial Council's evidentiary findings concerning Judge Adams's actions related to his Show Cause Order, as well as his obstruction of the court's internal administrative affairs, that the Special Committee was justified in requiring Judge Adams to undergo a mental health examination under the Act and the Rules, and that Judge Adams's refusal to cooperate with the Special Committee's request in this regard constituted misconduct.[12]

1. **The Act and the Rules Authorize the Special Committee's Request that Judge Adams Undergo a Mental Health Examination.**

Judge Adams contends the Act and Rules do not authorize a special committee to request and a judicial council to order a judge who is the subject of a conduct and disability complaint to undergo a mental health examination. The Rules, as amended in September 2015, expressly authorize a special committee to "request [a subject] judge to undergo a medical or psychological examination."[13] R. 13(a) cmt. Judge Adams nonetheless argues that when the Special Committee

---

[12] Amended Rule 3(h)(1)(H) provides that "refusing, without good cause shown, to cooperate in the investigation of a complaint under these Rules" constitutes cognizable misconduct.

[13] The complete text of the amendment to the Commentary to Rule 13 is as follows:

> Rule 13(a) includes a provision making clear that the special committee may choose to consult appropriate experts or other professionals if it determines that such a consultation is warranted. If, for example, the special committee has cause to believe that the subject judge may be unable to discharge all of the duties of office by reason of mental or physical disability, the committee could ask the subject judge to respond to inquiries and, if necessary, request the judge to undergo a medical or psychological examination. In advance of any such examination, the special committee may enter into an agreement with the subject judge as to the scope and use that may be made of the examination results. In

requested that he undergo a mental health examination in 2013 and 2014, prior to this amendment to the Rules, the Special Committee's authority was "not express" or was "at least uncertain." Pet. for Review 12 n.6. We disagree.

The Act and the pre-amendment Rules provided the Judicial Council with express authorization to conduct "any additional investigation which it consider[ed] to be necessary," 28 U.S.C. § 354(a)(1)(A); *see also* R. 20(c), and provided the Special Committee with express authorization to "conduct an investigation as extensive as it consider[ed] necessary," 28 U.S.C. § 353(c); *see also* R. 13(a). In addition, the Judicial Council and the Special Committee possess the inherent authority to regulate the administration of the courts. *See* 28 U.S.C. § 332(d)(1). Such authority clearly includes a request for a subject judge to undergo a mental health examination.

---

addition or in the alternative, the special committee may ask to review existing records, including medical records.

The extent of the subject judge's cooperation in the investigation may be taken into account in the consideration of the underlying complaint. If, for example, the subject judge impedes reasonable efforts to confirm or disconfirm the presence of a disability, the special committee may still consider whether the conduct alleged in the complaint and confirmed in the investigation constitutes disability. The same would be true of a complaint alleging misconduct.

The special committee may also consider whether such a judge might be in violation of his or her duty to cooperate in an investigation under these Rules, a duty rooted not only in the Act's definition of misconduct but also in the Code of Conduct for United States Judges, which emphasizes the need to maintain public confidence in the judiciary, *see* Canon 2(A) and Canon 1 cmt., and requires judges to "facilitate the performance of the administrative responsibilities of other judges and court personnel," Canon 3(B)(1). If the special committee finds a breach of the duty to cooperate and believes that the breach may amount to misconduct under Rule 3(h)(1)(H), it should determine, under the final sentence of Rule 13(a), whether that possibility should be referred to the chief judge for consideration of action under Rule 5 or Rule 11. *See also* Commentary on Rule 3.

The Judiciary has long been vested with the power to self-regulate the conduct and behavior of its judges to ensure "the effective and expeditious administration of the business of the courts." 28 U.S.C. § 351(a). Congress enacted legislation in 1939 creating judicial councils to oversee the administration of courts within each circuit, Administrative Office Act, Pub. L. No. 76–299, 53 Stat. 1223 (1939) (codified as amended at 28 U.S.C. §§ 331–335), and required the councils to "make all necessary and appropriate orders for the effective and expeditious administration of justice within [their] circuit[s]." 28 U.S.C. § 332; *see also Chandler v. Judicial Council of the Tenth Circuit*, 398 U.S 74, 129 (1970) (Harlan, J., concurring) (explaining that Congress "empower[ed] [the judicial councils] to supervise the work of the district courts, in order to ensure the effective and expeditious handling of their business."). "The Councils were deliberately given broad responsibilities to meet . . . problems as they arose," *Chandler*, 398 U.S. at 123 including "dealing with the business of the judiciary in its broader or institutional sense, such as the preventing of any stigma, disrepute, or other element of loss of public confidence occurring as to the Federal courts or to the administration of justice by them, from any nature of action by an individual judge or a person attached to the courts." *Id.* at 124–25 (citing H.R. Doc. No. 201, 87th Cong., 1st Sess., at 7 (1961)). Accordingly, in creating the judicial councils, Congress vested in them "considerable discretion . . . to choose how to regulate court business, whether by formal rules, standing orders, or other means." *Truesdale v. Moore*, 142 F.3d 749, 760 (4th Cir. 1998).

When Congress enacted the Judicial Conduct and Disability Act of 1980, it upheld this longstanding practice of self-regulation. *See* 28 U.S.C. §§ 351–364; *see also* H.R. Rep. No. 96-1313, at 4 (1980) (recognizing that "[i]n the context of judicial discipline and disability, it did not appear that there had been a showing of a serious, pervasive and recurrent problem that could

not be handled by administrative proceedings within the judiciary itself."). "[R]ather than creat[ing] luxurious mechanisms such as special courts and commissions—with all the trappings of the adversary process, including legal counsel, written transcripts, discovery and cross examination," Congress "plac[ed] primary administrative responsibility within the judicial branch of government." H.R. Rep. No. 96-1313, at 4. And Congress vested judicial councils with substantial power and discretion in conducting judicial conduct and disability proceedings under the Act: "[T]he judicial council is not to be thought of as a passive and impartial referee; rather, the council can become the active gatherer of evidence and can control the objectives and nature of the inquiry." *Id.* at 14.[14]

The Act therefore provides express authority to a special committee to "conduct an investigation as extensive as it considers necessary," 28 U.S.C. § 353(c), and to a judicial council to "conduct any additional investigation which it considers to be necessary," *id.* § 354(a)(1)(A). The Rules similarly authorize a special committee to "determine the appropriate extent and methods of its investigation in light of the allegations of the complaint and its preliminary inquiry," R. 13(a), and a judicial council to "conduct further investigation," R. 20(c). As one court aptly stated:

---

[14] In 2004, Chief Justice Rehnquist appointed the Judicial Conduct and Disability Act Study Committee ("Breyer Committee") to evaluate implementation of the Act. The Breyer Committee established interpretive standards and issued its findings in a 2006 report. Breyer Committee Report, 239 F.R.D. 116 (Sept. 2006). Based on the Breyer Committee's findings, the Committee on Judicial Conduct and Disability recommended to the Judicial Conference that it exercise its power under Section 358 of the Act to fashion standards guiding the various officers and bodies that exercise responsibility under the Act. Relying on this recommendation, the Judicial Conference promulgated national mandatory rules in 2008 governing the processing of complaints and strengthening of the role of the Committee on Judicial Conduct and Disability. The Judiciary's enactment of the Rules instituted significant improvements to the process and reflects ongoing efforts by the Judiciary to address and formulate policy enhancements regarding judicial conduct and discipline.

> [T]he scant legislative history . . . suggests that Congress did not intend to restrict the investigatory methods a Special Committee might pursue. . . . [T]he Act imposes a *duty* upon the Committee to "conduct an investigation as extensive as it considers necessary." Congress assigned and entrusted the duty and responsibility to committees of Federal Judges and intentionally gave them the wide latitude to investigate without limitation as they "consider [ ] necessary." Consistent with the desire to avoid an adversarial-disciplinary procedure, an "inquisitorial-administrative" approach was suggested and adopted for the conduct of such investigation, rather than an adversarial-trial concept. [The Act] was therefore seen to "provide[] the special committee with broad flexibility and general authority to investigate the facts and allegations contained in the complaint." Thus, it is for the Committee to "control the objectives and nature of the inquiry."

*In re Petition to Inspect & Copy Grand Jury Materials*, 576 F. Supp. 1275, 1278–79 (S.D. Fla. 1983) (alterations in original) (citations omitted).

The Judiciary's broad investigative powers in conduct and disability proceedings are necessary to uphold the integrity of the judicial process. As this Committee previously recognized, "there are serious constitutional doubts . . . whether Congress itself or some non-judicial branch agency could properly administer a disciplinary system short of impeachment." *In re Complaints of Judicial Misconduct*, 9 F.3d 1562, 1566–67 (U.S. Jud. Conf. 1993). "[T]hese doubts exist not because the task is inherently purely 'judicial'—it's not—but because of the potential for interference with the independence of a coordinate branch that such an arrangement would create." *Id.* at 1567. For similar reasons, Congress rejected the creation of a special court, noting that "a system in which complaints against federal judges could be so easily pressed to a formal adversary accusatorial proceeding raised the dangers of a substantial chilling effect on judicial independence, as well as the danger of infliction of harm and disruption of the administration of justice." H.R. Rep. No. 96-1313, at 18. "The inquisitorial nature of a misconduct proceeding is the direct result of the Act's adoption of a self-regulatory system in recognition of the need to maintain judicial independence, as opposed to a system in

which misconduct complaints are adjudicated by an external tribunal." *In re Memorandum of Decision*, 517 F.3d at 568.

It is axiomatic that the work of a lifetime appointed federal judge is demanding and requires the highest degree of functionality. If a judicial council or its special committee has a reasonable basis for concluding that a judicial colleague might suffer from a disability rendering him or her unable to perform the duties and responsibilities of the judicial office, the judicial council and its special committee necessarily possess the authority to request the subject judge undergo a mental health examination. In the case before us, over the course of a lengthy investigation, as well as direct observations of Judge Adams's behavior in the context of his performance of administrative duties, the Special Committee determined that "a reasonable person [would have] cause to question whether Judge Adams has a [mental or emotional] disability." Jud. Council Order 19 (alterations in original). On that basis, the Special Committee requested that Judge Adams undergo a mental health evaluation by a forensic psychiatrist retained by the Special Committee to allow the Committee to determine whether Judge Adams does, in fact, suffer from a mental or emotional disability and, if so, its nature and extent.

The authority underlying this request by the Judicial Council and the Special Committee that Judge Adams undergo a mental health examination stems from the Judiciary's inherent authority to regulate its affairs, 28 U.S.C. § 332(d)(1), including the conduct and fitness for duty of federal judges, and from its broad investigatory powers and decisional discretion under the Act and the Rules, *see* 28 U.S.C. §§ 353(c), 354(a)(1)(A); R. 13(a); R. 20(c). Judge Adams's failure to cooperate through his repeated refusals to undergo the mental health examination impeded the Judicial Council's ability to conduct a thorough and conclusive investigation. As

such, it was conduct "prejudicial to the effective and expeditious administration of the business of the courts."[15] 28 U.S.C. § 351(a).

### 2. The Requested Mental Health Examination Does Not Violate Judge Adams's Privacy Rights.

Judge Adams contends he had a good-faith basis for objecting to the mental health examination requested by the Special Committee on the ground that it violated his right to privacy. We disagree that his right to privacy was improperly infringed. The Judicial Council's Order requiring Judge Adams to undergo a mental health examination and disclose the results to the Special Committee and the Judicial Council was reasonable under the facts of this case and did not violate the Fourth Amendment or any protectable right to privacy Judge Adams might otherwise have had.

All parties agree that Judge Adams has a valid privacy interest in his mental health. Indeed, the Judicial Council acknowledged that "[a] mental-health evaluation would intrude on this interest to a nontrivial degree." Jud. Council Order 24. But this is not where a correct analysis should end. "As the text of the Fourth Amendment indicates, the ultimate measure of the

---

[15] The amendments to the Rules in September 2015 expressly authorizing a special committee to "request [a subject] judge to undergo a medical or psychological examination," defining "misconduct" to include "refusing, without good cause shown, to cooperate in the investigation of a complaint," and allowing a special committee to "consider whether . . . a judge [who impedes reasonable efforts to confirm or disconfirm the presence of a disability] might be in violation of his or her duty to cooperate in an investigation under these Rules" are immaterial to the outcome of this case. R. 3(h)(1)(H); R. 13 cmt. As previously noted, a judicial council and its special committee possessed the authority under the pre-amendment Rules to request such an examination and consider whether a refusal to comply with the request constitutes misconduct for failure to cooperate. The amendments to the Rules made explicit the procedures previously available to a judicial council and its special committee. *See, e.g.*, R. 13 cmt. (noting a judge's duty to cooperate is "rooted not only in the Act's definition of misconduct but also in the Code of Conduct for United States Judges, which emphasizes the need to maintain public confidence in the judiciary and requires judges to 'facilitate the performance of the administrative responsibilities of other judges and court personnel'") (citations omitted).

constitutionality of a government search is 'reasonableness.'" *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995). Determining whether a search is reasonable requires "balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Skinner v. Labor Ry. Execs.' Ass'n*, 489 U.S. 602, 619 (1989) (citations omitted). Here, balancing Judge Adams's privacy interest against the Judiciary's responsibility to litigants and the public leads us to conclude that the Judicial Council's Order was reasonable based on the evidence before the Judicial Council and the Special Committee.

Despite Judge Adams's indisputable privacy interest relating to his mental health, we evaluate that interest in the context of his role and responsibilities as a federal judge. Federal judges are subject to requirements and restrictions to which private citizens are not. For example, federal judges must file financial disclosure reports, *see* 5 U.S.C. app. 4 §§ 101–11, and must comply with a wide range of other ethical restrictions, *see* Code of Conduct for United States Judges. We offer these examples not to minimize the privacy interests of federal judges who are, of course, constitutional officers with decisional independence, but rather to illustrate that those privacy interests must be evaluated in light of the Judiciary's broader obligations.

This is particularly important because a federal judge's sound mental health is essential to his or her fulfillment of all judicial duties. Judges must fairly, justly, and expeditiously resolve the cases before them. Litigants depend on individual judges, like Judge Adams, to protect their interests. Public confidence in the Judiciary turns in major ways on the judges' ability to address and vindicate the parties' rights with fairness, efficiency, and sound decisionmaking.

Here, any intrusion on Judge Adams's privacy interests must be assessed in light of the medical nature, as well as the confidentiality, of the mental health examination. The requested examination is for the limited purpose of determining whether Judge Adams suffers from a

disability that renders him unable to discharge the duties of his judicial office. Such an examination would not likely entail extensive, protracted psychological testing or excessively invasive procedures. The examination and its results would be confidential in accordance with the applicable provisions of the Act and Rules, *see* 28 U.S.C. § 360(a); R. 23(a), which prohibit disclosure of information related to judicial conduct and disability proceedings.[16] And the psychiatrist selected to conduct the examination is bound by professional obligations to keep test results private. While Judge Adams has expressed a preference for being evaluated by an expert of his choosing and an opportunity to direct to some extent the nature of the examination, we conclude that the Special Committee and the Judicial Council appropriately exercised their discretion in determining that an examination by an independent expert is necessary to ensure the accuracy and reliability of the procedures and examination results.

Judge Adams argues that the evidence before the Special Committee and the Judicial Council is, in any event, not sufficient to warrant so limited an intrusion as this on his privacy interests. Again, we disagree. The record contains evidence of Judge Adams's demonstrated hostility and animus toward the court's magistrate judges, which has been ongoing for years. The evidence also reveals Judge Adams's unfounded suspicion of his colleagues and obstruction of effective court administration with respect to magistrate judges in the Northern District of Ohio.

---

[16] Although the Rules provide certain exhibits may be made public, we anticipate that such publication would not occur here absent extenuating circumstances. *See* R. 23(c) (providing "written decisions of a chief judge, a judicial council, or the Committee on Judicial Conduct and Disability, and dissenting opinions or separate statements of members of a council or the Committee may contain information and exhibits that the authors consider appropriate for inclusion, and the information and exhibits may be made public."); R. 24 (requiring "all orders entered by the chief judge and judicial council, including memoranda incorporated by reference in those orders and any dissenting opinions or separate statements by members of the judicial council" to be made public "[w]hen final action has been taken on a complaint and it is no longer subject to review," subject to specific exceptions).

The record further documents the unanimous concern evinced by the members of both the Special Committee and the Judicial Council that Judge Adams's behaviors indicate that he may be suffering from an impairment that renders him unable to discharge the duties of his judicial office. This evidence supports the reasonableness of their requiring him to undergo a mental health examination.

Judge Adams's insufficiency arguments are unpersuasive. Though the evidence developed in the record before us focuses on Judge Adams's behavior in the context of his handling of internal administrative matters as opposed to his adjudication of cases, that evidence is sufficient to justify the Judicial Council's request that Judge Adams undergo a mental health examination to determine if he suffers from a disability affecting his ability to fulfill his judicial function. The Special Committee and the Judicial Council need not specifically identify a particular mental disability afflicting Judge Adams before directing an appropriate examination. The Special Committee and the Judicial Council sufficiently documented their observations and findings on Judge Adams's behavior and the concerns justifying the required mental health examination.

Without minimizing the importance of Judge Adams's privacy interests, this Committee's endorsement of the Judicial Council's Order does not exceed the boundaries of our legitimate interest in ensuring Judge Adams's ability to appropriately discharge his duties. Based on the facts before us, we conclude that the evidence of Judge Adams's improper issuance of the Show Cause Order, as well as his behavior affecting "the effective and expeditious administration of the business of the courts," is sufficient to justify the reasonable requirement that he undergo a mental health examination. 28 U.S.C. § 351(a); R. 3(h)(1). Judge Adams's

objections to this procedure do not overcome its reasonableness or justify his failure to cooperate with the investigation.

## C. The Judicial Council's Sanctions

Judge Adams challenges the sanctions imposed by the Judicial Council. We address each sanction in turn.

### 1. Public Reprimand

Judge Adams first argues that the Judicial Council's public reprimand of him based on his issuance of the Show Cause Order is "excessive, potentially harmful, and an abuse of discretion." Pet. for Review 23. We disagree, and affirm the public reprimand as to Judge Adams's actions related to and involving the Show Cause Order.

The Act and the Rules vest significant discretion in a judicial council investigating and resolving a conduct and disability complaint, including through public censure or reprimand. *See* 28 U.S.C. § 354(a)(2)(A)(iii). The Rules similarly provide that a judicial council may publicly censure or reprimand a subject judge "to ensure the effective and expeditious administration of the business of the courts." R. 20(b)(1)(D)(i).[17]

Our Committee "generally defer[s] to a judicial council's judgment with respect to an appropriate sanction so long as the council has fully considered all the relevant options."[18] *In re*

---

[17] The list of sanctions provided in the Rules is not exhaustive. *See* R. 20(b)(1)(D); *see also* R. 20 cmt. ("Rule 20(b)(1)(D) recites the remedial actions enumerated in 28 U.S.C. § 354(a)(2) while making clear that this list is not exhaustive.").

[18] *See, e.g.*, *In re Complaint of Judicial Misconduct*, 751 F.3d 611, 618–19 (U.S. Jud. Conf. 2014) (upholding public reprimand for subject judge's use of court email account to forward race-related joke concerning the President and his mother and hundreds of other inappropriate electronic messages); *In re Complaint of Judicial Misconduct*, 664 F.3d at 339–40 (upholding public reprimand for subject judge's membership in organization that practiced invidious race- and sex-based discrimination where subject judge announced his forthcoming retirement

*Memorandum of Decision*, 517 F.3d at 569. Here, the Judicial Council concluded that the Show Cause Order prejudiced the effective and expeditious administration of the business of the courts by interfering with the orderly adjudication of social security cases. The Show Cause Order caused magistrate judges to prioritize Judge Adams's cases notwithstanding the merits of the case or the workloads of the magistrate judges. Moreover, the Show Cause Order was part of an ongoing, longstanding pattern of hostility and antagonism by Judge Adams towards magistrate judges. A public reprimand was an appropriate sanction.

### 2. Mental Health Examination

Judge Adams also argues that the Judicial Council's request that he undergo a mental health examination was "unlawful" because the Judicial Council lacked the authority to make such a request and was "unwarranted" in his particular case. Pet. for Review 24. Judge Adams further contends that the Judicial Council's directive violates his privacy rights under the Fourth Amendment. Again, we disagree, and affirm the Judicial Council's and the Special Committee's authority to request such an examination under these circumstances.

Based on the findings regarding Judge Adams's conduct in the context of the court's internal administrative matters, the Judicial Council determined that "[s]ufficient evidence exists to merit further investigation into whether Judge Adams suffers from a mental or emotional disability that renders him unable to discharge the duties of his office." Jud. Council Order 29. These findings were based on evidence that Judge Adams treated his magistrate judge colleagues with hostility and suspicion, withdrew from court governance, and undermined internal court

---

and where the decision represented the first enforcement of Canon 2C of the Code of Conduct for U.S. Judges); *In re Memorandum of Decision*, 517 F.3d at 569 (upholding public reprimand for subject judge's inaccurate and misleading responses to Judicial Council and Special Committee, and for taking action in litigation based on personal knowledge and information received *ex parte*).

operations. We note in particular that the forensic psychiatrist consulted by the Special Committee was able to determine, even on the basis of the limited information made available to him, that there was "a reasonable basis for concern as to Judge Adams'[s] mental or emotional state." *Id.* at 21 (alteration in original). The Judicial Council's request for the mental examination was both reasonable and warranted. We share the Judicial Council's view that input from an independent medical expert is necessary to fully and fairly assess Judge Adams's mental condition and fitness to continue to serve as a judge.

Judge Adams's objections are unpersuasive. As previously discussed, the Act and the Rules authorize a special committee to request a mental health examination in appropriate circumstances. The Judiciary has a responsibility to ensure that judges are fully capable of discharging the important duties entrusted to them. The evidence on which the Judicial Council and the Special Committee relied in reaching their unanimous decisions warrants our affirmance. We find no error in their determination that Judge Adams should be required to undergo a mental health examination.

### 3. Two-Year Ban on New Cases and Reassignment of Current Cases

Judge Adams challenges the Judicial Council's Order suspending the assignment of new cases to him for two years and transferring his current cases as "unwarranted, extraordinarily harsh, and grossly disproportionate" and "an abuse of discretion." Pet. for Review 28. We noted previously the lack of evidence in the record before us of Judge Adams's inability to adjudicate cases or his inability to perform the adjudicative duties of his office. Without such evidence, we cannot affirm these sanctions at this time.

The Complaint against Judge Adams relates to the Show Cause Order and to his interference with the internal functioning of the court. As discussed, Judge Adams's actions

related to and involving the Show Cause Order and his pattern of antagonism toward the court's magistrate judges prejudiced the effective and expeditious administration of the courts and thus constituted misconduct. The evidence on which the Judicial Council's findings were based was sufficient to warrant further investigation into his mental condition. Judge Adams's failure to cooperate with the Judicial Council and the Special Committee's investigation to determine whether he suffers from such a disability by refusing to voluntarily undergo a mental health examination impeded the ability of the Northern District of Ohio, the Sixth Circuit Judicial Council, and the Judiciary generally to meet their responsibilities in monitoring judicial conduct.

The Judicial Council's findings were limited to Judge Adams's conduct in the context of the court's internal administrative responsibilities, including his demonstrated hostility toward the court's magistrate judges and his obstruction of internal court governance procedures. The Judicial Council did not address or make specific findings with regard to Judge Adams's capability of discharging his adjudicative responsibilities. The Judicial Council's ability to make such a determination was impeded by Judge Adams's refusal to submit to a mental health examination. But curtailment of Judge Adams's docket is not supported by the record as it exists at this time given the lack of evidence related to Judge Adams's ability to discharge his adjudicative duties. We cannot rule out the appropriateness of such a sanction should sufficient evidence establish Judge Adams's incapacity, but we cannot base a sanction on the assumption his behavior in connection with court administrative matters would likewise adversely affect his adjudicative responsibilities.

### 4.  Retention of Jurisdiction

Finally, Judge Adams challenges the Judicial Council's Order that "[t]he Special Investigating Committee shall maintain jurisdiction for two years to ensure that Judge Adams

does not engage in additional inappropriate behavior involving magistrate judges, whether in his official functions or otherwise." Jud. Council Order 29. We affirm the Judicial Council's Order retaining jurisdiction over this matter for a reasonable period of time, not to exceed two years, to ensure Judge Adams is fully capable of discharging the duties of the judicial office.

Following a finding of misconduct or disability, a judicial council is empowered to take any necessary "remedial action to ensure the effective and expeditious administration of the business of the courts." R. 20(b)(1)(D). Here, having affirmed the Judicial Council's finding of misconduct based on Judge Adams's refusal to cooperate with the Special Committee's request that he undergo a mental health examination with a psychiatrist selected by the Special Committee, and concurring in the reasonableness and necessity of the Judicial Council's Order that Judge Adams submit to such an examination, we also support the retention of jurisdiction by the Special Committee for a reasonable period of time, not to exceed two years, to ensure Judge Adams's ability to discharge the duties of office as a federal district court judge. This will allow the Special Committee to conduct whatever further investigation is deemed necessary and appropriate to determine Judge Adams's ability to discharge his judicial duties.[19]

## D. Future Actions

In this matter of first impression under the Judicial Conduct and Disability Act and the Rules for Judicial-Conduct and Judicial-Disability Proceedings, we reject Judge Adams's constitutional and statutory challenges to the Judicial Council's finding that he committed

---

[19] The Judicial Council's implementation of our Decision, including the requirement that Judge Adams undergo a mental health examination and any other investigation deemed necessary and appropriate to determine Judge Adams's ability to discharge his judicial duties, does not constitute an expansion of the Special Committee's investigation under Rule 13(a) and Rule 15(a)(1)(B) absent the discovery of evidence demonstrating that Judge Adams "may have engaged in misconduct or has a disability that is beyond the scope of the complaint," as expanded on May 27 and December 9, 2014.

misconduct and directing him to undergo a mental health examination. For the reasons discussed, the Act and the Rules authorized the Special Committee's request that Judge Adams submit to such an examination, the Special Committee was justified in making the request based on its findings concerning Judge Adams's behavior, and Judge Adams's objections to the examination do not justify his failure to cooperate in the investigation.

Having rejected Judge Adams's objections, we anticipate that Judge Adams will expeditiously comply with the Judicial Council's Order, as affirmed by this Committee, that he submit to a mental health examination by a psychiatrist selected by the Special Committee. This examination should seek evidence as to whether Judge Adams is able to discharge the duties of a federal district court judge, which necessarily includes his adjudicative duties. Once the examination is completed, the Judicial Council should consider the results, along with any records or other examination results submitted by Judge Adams, to determine whether additional action by the Judicial Council is appropriate. In addition to its consideration of any examination results, the Special Committee may conduct further investigation into Judge Adams's conduct on the bench, including interviews with litigants, lawyers, and court staff, as part of its investigation into Judge Adams's ability to discharge his adjudicative duties as a federal district court judge.

As we have noted, failure to cooperate with an investigation under the Act and the Rules is cognizable misconduct. His objections having now been ruled on and having been rejected by this Committee, should Judge Adams refuse to submit to the mental health examination ordered by the Judicial Council and affirmed by this Committee, sanctions for Judge Adams's continued failure to cooperate—including the prohibition of the assignment of new cases on a temporary basis for a time certain—may be warranted subject to the Judicial Council's sound discretion. 28 U.S.C. § 354(a)(2); R. 20(b)(1)(D).

## CONCLUSION

For the above explicated reasons, we deny in part and grant in part Judge Adams's Petition for Review. We affirm the Sixth Circuit Judicial Council's finding that Judge Adams's actions related to and involving the Show Cause Order, as well as his actions to impede the court's oversight of other internal administrative matters, constituted misconduct and the Judicial Council's public reprimand of Judge Adams for this conduct. We also affirm the Judicial Council's finding that Judge Adams's refusal to cooperate with the Special Committee's request that he undergo a mental health examination by a psychiatrist selected by the Special Committee constituted misconduct.

We conclude that the Judicial Council and the Special Committee had a reasonable basis for requesting that Judge Adams undergo a mental health examination, and in so deciding, acted within their lawful discretion. Thus, we affirm the Judicial Council's Order directing that Judge Adams undergo such an examination and any necessary treatment that may be prescribed. Because the Judicial Council did not include in its Order any specific findings regarding whether Judge Adams's conduct has adversely affected his ability to discharge the adjudicative duties of his office, we vacate the portion of the Judicial Council's Order that prohibits the assignment of new cases to Judge Adams for two years and transfers Judge Adams's current cases to other judges. We affirm the Judicial Council's Order that the Special Committee retain jurisdiction for a reasonable period of time, not to exceed two years, to ensure Judge Adams's ability to discharge the duties of office as a federal district court judge.

For these reasons, we deny in part and grant in part Judge Adams's Petition for Review.

# RECEIVED

FEB 22 2016

**OFFICE OF THE
CIRCUIT EXECUTIVE**

No. 06-13-90009

## JUDICIAL COUNCIL
## OF THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| **In re Complaint of Judicial Misconduct** | ) ) ) | ORDER AND MEMORANDUM |

BEFORE:   COLE, Chief Circuit Judge; BOGGS, BATCHELDER, GIBBONS, ROGERS, GRIFFIN, KETHLEDGE, WHITE, STRANCH, and DONALD, Circuit Judges; ROSEN, MCKINLEY, CALDWELL, VARLAN, BREEN, JONKER, and SHARP, Chief District Judges.[1]

Four complainants filed a Complaint of Judicial Misconduct against Judge John R. Adams of the United States District Court for the Northern District of Ohio. The Complaint alleges that Judge Adams committed misconduct by issuing a Show Cause Order to a magistrate judge on February 1, 2013. A Special Investigating Committee ("SIC") was formed to review the Complaint. During the course of this review, other facts came to light that led to an expansion of the investigation. The investigation was first expanded to determine whether Judge Adams suffers from a mental or emotional disability that renders him unable to discharge the duties of his office. The investigation was later expanded to determine whether Judge Adams

---

[1] Julia S. Gibbons and Bernice B. Donald, Circuit Judges, and Karen K. Caldwell, Chief District Judge, were excused from participating in the Council's September 10, 2015, meeting to consider this matter. They have, however, reviewed the written record and concur in this Order and Memorandum. Edmund A. Sargus, Chief District Judge, recused himself from this matter. Solomon Oliver, Jr., Chief District Judge, participated in deliberations but did not vote on the disposition.

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

committed misconduct by refusing to cooperate with the SIC's investigation into his mental and emotional health.

The SIC prepared a detailed and thorough Report of its investigation. After reviewing the Report and Judge Adams's response, the Judicial Council of the Sixth Circuit concludes that Judge Adams committed misconduct through both his issuance of the Show Cause Order and his refusal to cooperate with the investigation. The Council is unable to determine whether Judge Adams suffers from a mental or emotional disability.

This Order and Memorandum first describes the initiation of these proceedings and the steps taken by the SIC in its investigation. Next, it summarizes the factual findings and legal conclusions contained in the SIC's Report. Finally, it provides the Council's findings and remedial actions.

## I. The Investigation

On Friday, February 1, 2013, Judge Adams issued a Show Cause Order requiring one of the district's magistrate judges to show cause by 4:00 p.m. on February 4, 2013, the following Monday, why he should not be held in contempt or otherwise sanctioned for failing to comply with Judge Adams's scheduling order in a Social Security case. Although Judge Adams ultimately did not hold the magistrate judge in contempt, Judge Adams also refused to vacate the Show Cause Order or strike it from the docket despite a unanimous request from the other judges of the district who were concerned with its effects on the magistrate judge and the administration of justice in the district.

On February 15, 2013, four complainants—all district judges—filed a Complaint of Judicial Misconduct. The Complaint alleges that Judge Adams's issuance of the Show Cause Order, in combination with other ongoing disruptive behavior directed at the judges of the

- 2 -

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

district, constituted "conduct prejudicial to the effective and expeditious administration of the business of the courts." 28 U.S.C. § 351; Rule 3(h).[2] Judge Adams responded to the Complaint with two letters to then-Chief Circuit Judge Batchelder in which he denied the allegations, argued that his actions were lawful, and accused the complainants of conducting a "smear campaign." Judge Batchelder recused herself from acting as chief judge in the matter, and Judge Boggs was designated to act in her stead. *See* Rule 25(f).

On April 8, 2013, after reviewing the Complaint, Judge Boggs activated the Council's SIC to investigate the matter.[3] 28 U.S.C. § 353(a); Rule 11(f). Judge Boggs notified Judge Adams of the activation of the SIC and provided him with information regarding his rights in the investigation. *See* 28 U.S.C. § 353(a)(3); Rules 11(g)(1), 15(a)(1)(A).

Judge Boggs twice expanded the scope of the investigation in response to requests from the SIC. *See* Rule 13(a). On May 27, 2014, Judge Boggs directed the SIC to investigate potential mental and emotional disabilities from which Judge Adams might be suffering. *See* Rule 3(e). On December 9, 2014, Judge Boggs directed the SIC to investigate whether Judge Adams's non-cooperation with the SIC's investigation into his potential disability itself constituted misconduct. *See* Rule 3(h). Judge Adams was notified of each of these expansions. Rule 15(a)(1)(B).

---

[2] Throughout this Order and Memorandum, the Rules for Judicial-Conduct and Judicial-Disability Proceedings will be cited simply as "Rule." The Sixth Circuit has promulgated additional Rules Governing Complaints of Judicial Misconduct or Disability, which will be cited as "Sixth Circuit Rule."

[3] Members of the SIC are District Judge Curtis L. Collier, Chair; Circuit Judges Danny J. Boggs, Eric L. Clay, and John M. Rogers; and District Judges Paul L. Maloney and Thomas B. Russell. *See* Rule 12; Sixth Circuit Rule 9. The SIC retained the law firm of Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP to assist in the investigation and resolution of this matter. *See* Rule 13(c).

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

Accordingly, the SIC investigated three ultimate issues arising from the complaint: misconduct from issuing the Show Cause Order, potential disability, and misconduct from non-cooperation. In carrying out its investigation, the SIC interviewed fourteen witnesses from May 2013 to August 2013. Among those interviewed were the four complainants and Judge Adams. Two of the witnesses were interviewed specifically at Judge Adams's request. *See* Rule 15(a)(2). The SIC also reviewed documents obtained from the complainants, Judge Adams, the various witnesses, and publicly available sources. After the investigation was expanded in May 2014 to consider Judge Adams's mental and emotional health, the SIC retained the services of a forensic psychiatrist for the purpose of providing an opinion as to whether Judge Adams might be suffering from a mental or emotional disability.

Judge Adams twice requested the transfer of this matter to the judicial council of another circuit, first in March 2015, and again in April 2015. Rule 26. Chief Judge Cole denied both requests, finding that this matter presented no "exceptional circumstances" that warranted transferring the proceeding.

Following the initial evidence-gathering period, the SIC held a fact-finding hearing from April 20 to 22, 2015. *See* Rule 14. Judge Adams's counsel worked with the SIC to draft special rules for the hearing. Judge Adams was provided formal notice of the hearing and a copy of the final rules in February 2015. In the weeks before the hearing, the SIC disclosed to Judge Adams all potential exhibits and the prior recorded statements of all witnesses to be called at the hearing, as well as summaries of additional expected testimony for all witnesses expected to testify. Rule 15(a)(1)(C). Judge Adams made similar disclosures. The SIC also granted Judge Adams's request for certain witness subpoenas, although it rejected some others as unnecessary and overly broad. *See* 28 U.S.C. §§ 332(d)(1), 356; Rule 15(c).

- 4 -

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

Eleven witnesses testified at the hearing. Judge Adams ultimately elected not to call any of his subpoenaed witnesses at the hearing, but two of the witnesses who testified were called by the SIC at Judge Adams's request. All witnesses were subject to examination by the SIC's counsel, Judge Adams's counsel, and members of the SIC. Rules 14, 15(c), 15(f). The SIC also received hundreds of documents into evidence, including interview transcripts and witness statements submitted by Judge Adams. Judge Adams sought to introduce the testimony of a psychiatrist who apparently had recently conducted a mental-health evaluation of him. But because Judge Adams refused to produce any of the records underlying his psychiatrist's evaluation, the SIC excluded Judge Adams's psychiatrist from testifying. The SIC's forensic psychiatrist also did not testify at the hearing; instead, the parties agreed to have the SIC's forensic psychiatrist provide an affidavit stipulating as to the content of his testimony, and for Judge Adams to make written objections to that stipulated testimony. At the conclusion of the hearing, the SIC's counsel and Judge Adams's counsel offered oral argument. Rule 15(d). Both the SIC and Judge Adams submitted post-hearing briefs and recommended actions. *Id.* Judge Adams also submitted proposed findings of fact.

Throughout the investigation, the SIC also negotiated with Judge Adams and his counsel in an attempt to reach a mutually agreeable conciliation plan that would resolve the Complaint without requiring action by the Judicial Council. The discussions began in the fall of 2013 and continued through the winter of 2015. While some progress was made early on, the negotiations were ultimately unsuccessful.

On July 10, 2015, the SIC issued its unanimous Report to the Council. 28 U.S.C. § 353(c); Rule 17. Judge Adams was provided with a copy of the Report. Rule 15(b). The

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

Report related the factual findings of the SIC's investigation and its conclusions on legal issues raised by the investigation.

Based on this evidence and analysis, the Report made findings on the three ultimate issues raised by the Complaint, as expanded in scope. The Report recommended that the Council take certain "necessary and appropriate action" to resolve this matter. 28 U.S.C. § 353(c); Rule 20(b)(1)(D).

On September 10, 2015, the Council conducted a meeting to consider the Complaint. Prior to the meeting, Judge Adams submitted a written response to the Report to the Council. Rule 20(a). At the meeting, Judge Adams's counsel presented oral argument contesting the findings and recommendations set forth in the Report. *Id.*

## II.  Factual Findings of the Special Investigating Committee

The SIC's Report contains detailed factual findings drawn from its fact-gathering process. Those factual findings are summarized below and are reorganized for the sake of brevity. First, this Order and Memorandum describes the Report's findings regarding Judge Adams's withdrawal from the court starting in 2008, his mistreatment of other judges on the court, and his attempts to undermine the administration of court business. Second, this Order and Memorandum summarizes the Report's findings regarding the circumstances surrounding the Show Cause Order. Finally, this Order and Memorandum summarizes the SIC's findings with respect to Judge Adams's refusal to cooperate in the SIC's investigation into his mental and emotional health.

To reach these factual findings, the SIC had to resolve issues of credibility when conflicting testimony or evidence appeared in the record. Those credibility determinations are addressed below where relevant to explaining the Report's factual findings.

- 6 -

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

## A. Withdrawal from the Court, Mistreatment of Colleagues, and Undermining the Administration of Court Business

Judge Adams was confirmed to the United States District Court for the Northern District of Ohio in 2003. His chambers are located in Akron, Ohio. By all accounts, from 2003 to 2008 he was a collegial and involved member of the court, participating in court governance and socializing with his colleagues.

In 2008, however, Judge Adams's behavior changed sharply. The catalyst for this change seems to have been the selection of a new magistrate judge who would reside in the Akron courthouse. Judge Adams preferred one candidate for the position and believed that the other district judges would defer to his choice because he was the most-senior active judge in Akron. The district judges ultimately preferred another candidate, though, and selected that candidate by majority vote. From then on, Judge Adams ceased interacting collegially with other members of the court and ceased virtually all involvement in court administrative matters.

### 1. Refusal to Interact with Other District Judges

Judge Adams has ceased all social interactions with members of the court aside from one judge with whom he apparently maintains friendly relations. Further amplifying his reclusiveness, Judge Adams has generally forbidden his staff from interacting with others in the courthouse.

Judge Adams has rebuffed his colleagues' efforts to engage him. For example, when one district judge greeted Judge Adams at an event for federal judges in Washington, D.C., in 2010, Judge Adams ignored his colleague and walked away. Although Judge Adams claims he merely did not see the judge, the SIC found this explanation not credible.

Also in 2010, Judge Adams refused to allow another district judge and his staff—who were visiting from out of town—to even enter his chambers to introduce themselves. The

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

visiting judge had sent Judge Adams an email advising him of the visit and asking if he might stop by so that his staff could meet Judge Adams's staff. Instead of accepting this social nicety, Judge Adams sent a harsh email to the visiting judge, telling him, "Bluntly-----your [sic] not welcome in my chambers. Please do not knock on my door to avoid the embarrassment of being turned away. Lastly please spare me the condescending lecture on collegiality etc."

### 2. Mistreatment of Magistrate Judges

Judge Adams has repeatedly expressed a general hostility towards and contempt for the court's magistrate judges. The Show Cause Order, which is discussed in detail in Section II.B.2 below, is only the most glaring example of Judge Adams's hostility toward all magistrate judges.

After the appointment of Akron's new magistrate judge in 2008, Judge Adams refused to interact with that judge or assign that judge any work from his docket. Despite numerous attempts by the magistrate judge to initiate contact, Judge Adams refused to meet. Judge Adams also refused to allow the magistrate judge to use Akron's ceremonial courtroom for the judge's investiture ceremony, instead relegating the judge to a smaller courtroom. Judge Adams was the only member of the court who did not attend the magistrate judge's investiture ceremony.

Judge Adams has been generally unwilling to communicate with any of the court's magistrate judges since 2008. Instead, he requires that all communications go through his staff. Several magistrate judges noted that this inability to contact Judge Adams directly, and Judge Adams's hostility to those magistrate judges who do try to contact him, have negatively impacted their ability to work on his cases.

When another magistrate judge was selected to serve in Akron in 2011, Judge Adams flatly refused the magistrate judge's invitation to meet. Instead, he sent the judge a terse email explaining that he typically does not refer work from his cases to magistrate judges. With

- 8 -

respect to Social Security cases—which by local rule are automatically referred to magistrate judges—he stated that, "[g]iven the magistrates extremely limited caseloads," he "expect[ed] prompt decisions." Judge Adams concluded with a parting shot at the magistrate judges: "[H]opefully your work ethic will exceed that of your predecessors here in Akron as well as that of the remaining magistrates in the District." To date, this has been Judge Adams's only direct communication with this magistrate judge, despite sharing a courthouse.

Judge Adams has described the Northern District of Ohio's magistrate judges as having "meager" caseloads and has criticized other district judges for allowing Social Security cases to "languish[]" on magistrate judges' dockets. In correspondence to another district judge, he asked, "[t]o whom do these Magistrates answer for their performance? Do you or any of your colleagues provide any oversight?"

As described in more detail in Section II.B.1 below, Judge Adams's hostility toward the magistrate judges boiled over in 2012 during a dispute regarding his scheduling order for Social Security cases. In that instance, two magistrate judges wrote Judge Adams letters explaining why their need to balance work on all the cases on their dockets meant that they would require extensions on Judge Adams's deadline in particular cases. In response, Judge Adams voiced his opinion that magistrate judges, as Article I judges, do not deserve the same autonomy to manage their workloads as Article III judges. Judge Adams later criticized the district's chief judge for failing to "discipline" these two magistrate judges for what he viewed as the "disrespectful" and "defiant" attitudes expressed in their letters.

### 3. Withdrawal from Court Governance

Since the 2008 magistrate judge selection, Judge Adams has also refused to participate in any court administration or governance. Judge Adams withdrew from the three court committees

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

on which he served. Judge Adams has not attended a regular judges' meeting or committee meeting since then.

Only a few times since 2008 has Judge Adams participated in court governance matters. During a 2011 judges' meeting to select a candidate to fill the open magistrate position in Akron, Judge Adams appeared by telephone. But when Judge Adams's turn to speak came he declined the invitation, stated that he did not think his views would make much difference, and then hung up. In 2012, when the court was considering adopting a new rule regarding the processing of Social Security cases (explained in more detail in Section II.B.1 below), Judge Adams communicated his views on the issue via a written letter rather than attend the meeting.[4]

Despite this general withdrawal, in 2009 Judge Adams voiced his objection to the chief judge's selection of another judge to chair the Akron courthouse security committee, even though Judge Adams was more senior. When the chief judge responded to Judge Adams's concerns by asking the rest of the court to notify him of any opposition to the appointment, nobody responded.

Over the years, other judges have suggested to Judge Adams that he should participate in court governance and join one of the court's administrative committees. Judge Adams has refused or ignored these suggestions. During this investigation, Judge Adams denied that any judges had reached out to him, but testimony from other judges, verified by written documents, refutes his claims. Put simply, Judge Adams has rebuffed his colleagues' efforts to engage him at every turn. Judge Adams claims that his withdrawal from court governance is due to the other

---

[4] Judge Adams also spoke on the phone with another district judge about this issue when it was first raised in 2011, but refused that judge's invitation to attend a court meeting where he could present his views to the entire court.

- 10 -

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

judges "routinely ignor[ing]" or "disregard[ing]" his views, but the evidence simply shows normal give-and-take among judges regarding the administration of the court.

At best, Judge Adams has occasionally interacted with a few colleagues regarding matters that personally interest him (particularly with respect to the scheduling of Social Security cases), and has served his turns in the court's "miscellaneous judge" rotation. Judge Adams has also argued that various other activities—such as teaching at a local law school, speaking at United States Sentencing Commission conferences, and sitting by designation on the Sixth Circuit—show that he has participated in court governance, even though all of these activities are external to the court. Judge Adams conceded in his testimony that it would be difficult for the court to function if every judge were to conduct himself as he has.

### 4. Undermining the Administration of Court Business

Instead of actively participating in court governance, Judge Adams has routinely attempted to undermine his colleagues as they administer the court's business.

These attempts started immediately after the 2008 magistrate judge selection process. Judge Adams preferred another candidate with whom he had practiced law before becoming a judge. After the selection process was completed, Judge Adams's preferred candidate wrote an inflammatory letter to several judges, senators, and members of the House of Representatives, complaining about the internal workings of the court's selection process. He sent a copy of this letter to a reporter from the *Cleveland Plain Dealer*. Although Judge Adams denies it, the SIC concluded that Judge Adams was most likely the source of the candidate's information about the confidential internal workings of the magistrate judge selection process.

In 2010, the district judges met and voted to request authorization to fill a soon-to-be vacant magistrate judge position. Rather than participating in that meeting, Judge Adams wrote

- 11 -

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

directly to the Chair of the Judicial Conference's Committee on the Administration of the

Magistrate Judges' System, complaining that filling the position was "neither necessary, nor

fiscally responsible." When the district's chief judge wrote to defend the court's request, Judge

Adams accused the chief judge of making demeaning personal attacks against him, distorting the

facts, and generally depriving Judge Adams of "the rights and privileges due to a District Court

Judge." Judge Adams further argued that this was "a reflection of how [the chief judge] has

conducted himself during his tenure as Chief Judge of this District."

The documents and witnesses, however, do not support Judge Adams's description of the

chief judge's actions. In his interview with the SIC, Judge Adams was unable either to identify

any falsehoods in the chief judge's letter or to explain coherently why he felt the chief judge had

been hostile towards him. The only concrete incident Judge Adams could identify was his not

being appointed to the security committee for the Akron courthouse in 2009. Judge Adams

suggested in his testimony that his reference to "rights and privileges due to a District Court

Judge" was meant to refer generally to the other district judges not agreeing with him on court

governance matters. But the evidence in the record merely shows that Judge Adams was on the

losing end of several internal discussions among the district judges, not that he was intentionally

marginalized.

Judge Adams's practice of appealing to outside authorities to challenge court business

decisions continued for years. When the court decided to purchase several iPads for its judges in

2011, Judge Adams wrote the Committee on Audits and Administrative Office Accountability of

the Administrative Office of the United States Courts, complaining that this purchase constituted

"waste and/or mismanagement of funds." And in 2012, Judge Adams again complained to the

- 12 -

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

same Committee, this time about reimbursement given to judges who traveled to Toledo to attend the unveiling of a senior district judge's portrait.

Judge Adams's opposition to these routine business decisions has required the court to devote unnecessary additional time and resources to justifying simple matters that could have more easily been handled internally. Judge Adams did not even give notice of the foregoing objections to his colleagues. In his correspondence with the Committee, Judge Adams questioned the motives of his colleagues in seeking approval for these business decisions.

Various members of the court have encouraged Judge Adams to take a more active role in court governance in order to avoid these problems. For example, after the iPad incident, Judge Adams was offered a seat on the court's IT Committee, where he could address his concerns. Judge Adams, however, never responded to the offer, instead preferring to continue taking his concerns to outside authorities rather than to his colleagues on the court.

This behavior renders the administration of business in the Northern District of Ohio less efficient and leaves Judge Adams's colleagues constantly apprehensive that he will challenge their decisions and actions.

**B. Show Cause Order**

The triggering incident for the instant investigation was Judge Adams's decision to issue a Show Cause Order to a magistrate judge in February 2013. Although Judge Adams's other behavior is useful to contextualize the Show Cause Order, the focus of the investigation has always been the Show Cause Order and its effects on the administration of business in the Northern District of Ohio.

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

## 1. Judge Adams's Scheduling Order

In the Northern District of Ohio, cases seeking review of Social Security determinations are assigned to district judges but are then automatically referred to magistrate judges. In 2011, Judge Adams began issuing a standard scheduling order in all Social Security cases that required the magistrate judge assigned to the case to file a Report and Recommendation ("R&R") within 270 days of the filing of the complaint. If the deadline could not be met, Judge Adams required an interim R&R to be filed 30 days before the expiration of this period. Other judges in the district found this deadline to be unreasonable, given that briefing in these cases typically is not completed until 240 days after the filing of the complaint.

Judge Adams argues that the deadline is reasonable. He blames the magistrate judges for not being able to meet his schedule because, in many cases, they grant what he considers to be unwarranted extensions to the parties.

In 2012, two magistrate judges sent Judge Adams timely letters, each about a particular case, explaining that "other matters and responsibilities, including [their] consent docket[s] and referrals from other district judges" would prevent them from completing R&Rs before the 270-day deadline, and accordingly requested extensions. Judge Adams responded by criticizing the magistrate judges for failing to provide "specific reasons" why they could not meet the 270-day deadline. He added: "If you continue to assert that other cases have become ripe for decision at an earlier date, please provide the specifics of those cases, including case numbers and the dates those matters became ripe for decision." He directed them to respond within seven days.

The magistrate judges responded, noting that "the timeliness of social security cases is dependent on the management of an entire docket." They explained that magistrate judges must

- 14 -

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

"balance workloads in a manner that is fair to all of the litigants and district court judges who refer cases."

Judge Adams wrote back, arguing that their explanations contained "several misstatements and omissions." He wrote, "First, you begin by indicating that you are an 'independent judicial officer.' You are not. Magistrate Judges are subordinate judicial officers." He continued:

> You take great pains to note that you work for the Court as a whole and not simply one Article III Judge. In so doing, you effectively establish a system in which you answer to no one. Your assertion that you cannot satisfy my deadline because of responsibilities to other Article III Judges is a response that you can provide to any inquiry from any Article III Judge. Instead, in matters on my docket, you are answerable solely to me, not the Court as a whole. The same would [be] true for any of my Article III colleagues.

Judge Adams's letter further disputed the magistrate judges' claim that they had an obligation to manage their workloads in a manner that was fair to all litigants and district judges. "Again," he wrote, "you misplace your role by effectively elevating yourself to equal footing with Article III Judges." The magistrate judges, he wrote, had identified no authority "for simply deciding the rest of [their] docket [was] sufficient reason to ignore [his] order." He stated that their caseloads were "far from overwhelming" and that Social Security cases "rarely raise novel legal theories." He concluded that it is not the decision of the magistrate judges as to what cases should take priority on their dockets; rather, they are bound to obey his scheduling orders.

Later in 2012, the court adopted Local Rule 16.3.1 to respond to Judge Adams's scheduling order. Local Rule 16.3.1, which became effective January 1, 2013, directs that a magistrate judge "should issue a[n R&R] within [285] days of the filing of the answer and transcript" in a Social Security case. In response, Judge Adams modified his scheduling order to

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

reflect this new deadline, but made the deadline for the R&R mandatory even though the text of the rule is permissive.

### 2.  The Show Cause Order

On May 3, 2012, a Social Security case was assigned to Judge Adams and automatically referred to a magistrate judge for a R&R.  Judge Adams issued his standard scheduling order. As this case arose prior to the adoption of Local Rule 16.3.1, the scheduling order required the magistrate judge to file his R&R within 270 days of the filing of the complaint.  This would have made the R&R due on January 28, 2013.  The magistrate judge's chambers, however, incorrectly calculated the due date to be February 24, 2013.  Thus, the R&R was not issued on January 28, 2013.  Until this incident, this magistrate judge had never before missed one of Judge Adams's deadlines.

On Friday, February 1, 2013, Judge Adams learned that the magistrate judge had filed neither the R&R nor an interim R&R explaining the delay.  Consistent with his pattern of refusing to communicate with magistrate judges, Judge Adams took no steps, either personally or through his staff, to ask the magistrate judge why the R&R was late.  Instead, that same day, Judge Adams issued an order to the magistrate judge to show cause by 4:00 p.m. on Monday, February 4, 2013, why he should not be held in contempt for missing the deadline.  Judge Adams did not attempt to give any notice of the Show Cause Order to the magistrate judge other than by filing it on the docket.

The magistrate judge learned about the Show Cause Order on Saturday, February 2, 2013.  The magistrate judge immediately began working to complete the R&R, a task that would typically take several days.  The magistrate judge emailed Judge Adams that evening to take responsibility for the clerical mistake that had occurred in his chambers.

- 16 -

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

On Monday, February 4, 2013, Judge Adams's law clerk called the magistrate judge to tell him that Judge Adams accepted his explanation for missing the deadline. Later that day, Judge Adams issued another order noting the clerical error, and for this reason found the Show Cause Order to be "satisfied."

On February 5, 2013, the district's chief judge sent Judge Adams a letter on behalf of the other district judges requesting that Judge Adams declare the Show Cause Order null and void and that he strike both orders from the docket.

Judge Adams refused the request to strike the orders from the docket. In a response letter, Judge Adams complained that the magistrate judges had treated his scheduling orders with "disdain and noncompliance." He criticized the chief judge for failing to "discipline" the two magistrate judges who, in 2012, had "disrespectful[ly]" and "defiant[ly]" suggested that their need to manage other cases on their dockets was a valid reason not to comply with the scheduling orders in Judge Adams's Social Security cases. Apparently not recognizing the harm the Show Cause Order could cause, Judge Adams stated that he was "somewhat unclear on what damage was done to [the magistrate judge's] reputation," since "[a] simple review of the docket by anyone would reveal that he had not complied with my scheduling order." Judge Adams argued that keeping the Show Cause Order public was necessary to prevent a "misimpression" that Judge Adams had failed to enforce his own scheduling order. Judge Adams concluded by criticizing how long some of the magistrate judge's Social Security cases had been pending. He continued: "As such, perhaps my show cause [order] was precisely the message that needed to be sent. Further, given the history of defiance of the Magistrate Judges, I can think of nothing other than the threat of contempt that would be sufficient to compel compliance with my scheduling order."

- 17 -

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

Regardless of whether Judge Adams had the legal authority to issue the Show Cause Order,[5] the Show Cause Order has caused substantial internal strife within the court. It has harmed the morale of the magistrate judges, and diminished the trust between magistrate judges and district judges. As a result of this incident, magistrate judges in the Northern District of Ohio have had to prioritize Judge Adams's Social Security cases above all other cases on their dockets for fear of provoking Judge Adams's ire. This has harmed other district judges' ability to supervise and generally work with the magistrate judges, and has hindered the overall administration of the court.

The SIC also found that it cannot take seriously Judge Adams's assurances, given during his interview with the SIC, that he will not issue similar show cause orders in the future. Judge Adams claimed in August 2012 correspondence to another judge that concerns about the prospect of contempt proceedings for failing to meet his Social Security deadlines were "unfounded," but he nonetheless issued the Show Cause Order only five months later. In his defense to this Complaint, Judge Adams has largely relied on the argument that he had "ample authority" to issue the Show Cause Order and that the Show Cause Order was necessary to make the magistrate judges comply with his scheduling orders. Judge Adams continues to issue scheduling orders in Social Security cases that include mandatory deadlines, despite the permissive language of Local Rule 16.3.1.

Judge Adams does not appear to appreciate the harm the Show Cause Order caused. Judge Adams acknowledged that he owes an apology to the magistrate judge for this incident,

---

[5] The Council takes no position on the legality of the Show Cause Order. The SIC's Report goes to great lengths to explain that the problems generated by the Show Cause Order do not depend on its merits. Rather, the fact that the Show Cause Order was issued at all shows extremely poor judgment on Judge Adams's part. This conclusion is discussed in more detail below in Section III.A.

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

but he had not yet actually apologized at the time of the Council's September 10, 2015, meeting.

Although Judge Adams now recognizes issuing the Show Cause Order was unwarranted, he

continues to assert that issuing a show cause order to a magistrate judge is a proper means by

which to affirm his authority and maintain control over his docket. Even though the Show Cause

Order has demonstrably harmed working relationships among judges in the district, Judge

Adams argued in his post-hearing brief that the Show Cause Order was "intended to promote the

effective and expeditious administration of the business of the courts, not prejudice it." Judge

Adams has further argued that there is no evidence that the Show Cause Order interfered with the

court's business, and that the Show Cause Order has actually made the court more efficient by

speeding up the completion of his Social Security cases.

While the Show Cause Order is the most concrete example of Judge Adams's

mistreatment of the district's magistrate judges, it is far from an isolated incident. As discussed

above in Section II.A.2, Judge Adams has persistently treated magistrate judges with disdain and

disrespect. The Show Cause Order seems to have been motivated at least in part by Judge

Adams's general animus toward the magistrate judges of the district, and his desire to punish

them for what he viewed as their "defiant" attitudes towards him.

## C. Non-Cooperation with the Investigation

The evidence gathered by the SIC during its investigation into the Show Cause Order led

the SIC to be concerned that "a reasonable person [would have] cause to question whether Judge

Adams has a [mental or emotional] disability." Specifically, the evidence suggested that Judge

Adams may have a disability that "(1) prevents him from maintaining a professional relationship

with his colleagues, (2) prevents him from shouldering his responsibilities as a member of the

District Court, and (3) causes him to make unfounded and destructive attacks against his

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

colleagues." The SIC concluded that this evidence gave it a "reasonable basis" to expand its investigation to include these issues.

The Report also highlights two "troubling" incidents that, while not directly related to Judge Adams's duties as a federal judge, "deepen[ed] the [SIC]'s concern about how Judge Adams's mental and emotional state might affect the administration of judicial business." In the first incident, the SIC found by clear and convincing evidence that Judge Adams had "bumped" a magistrate judge hard on a running path near the Akron courthouse and then sprinted away without apologizing or seeing if the judge needed assistance. Judge Adams denies he was the person who bumped the magistrate judge, but the SIC found his denial not to be credible. In the second incident, Judge Adams reacted to an intern accidentally parking in his space by blocking the intern's car with his own and ordering court security personnel to ticket or tow the intern's car, even though security officers believed such punitive measures were not warranted for an innocent and easily corrected mistake.

On May 27, 2014, in response to a request from the SIC, Judge Boggs directed the SIC to investigate whether Judge Adams might have an emotional or mental issue that amounts to a disability. The SIC notified Judge Adams before seeking permission for this expansion, and then gave a copy of Judge Boggs's decision to Judge Adams. *See* Rule 15(a)(1).

In order to conduct its investigation into these issues, the SIC retained the services of a forensic psychiatrist. The SIC requested that the forensic psychiatrist "perform the necessary evaluations of Judge Adams that would allow [him] to reach an opinion as to [Judge Adams's] emotional and mental state," and to "provide a report of [his] findings to the [SIC]." To aid this evaluation, in August 2014 the SIC asked Judge Adams to provide any records available to him pertaining to any mental or emotional health treatment or testing he had previously undergone.

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

The SIC also asked Judge Adams to submit to psychological testing by another doctor, the results of which would be used by the forensic psychiatrist in his mental-health evaluation.

Judge Adams refused to provide the requested documents or undergo the requested psychological testing. In a September 24, 2014, letter, Judge Adams's counsel argued that the SIC had not adequately specified the reasons it believed Judge Adams might have a disability, and thus complained that the notice to Judge Adams was inadequate. Judge Adams's counsel also accused the SIC of improperly "tak[ing] on a prosecutorial role." The letter concluded by asserting "that a compelled mental health examination is a very intrusive investigative technique and should only be utilized with the support of a full and complete record."

The SIC responded by outlining the steps it had taken to notify Judge Adams of this issue, and explained that it viewed his refusal to cooperate as itself potential misconduct. Nevertheless, Judge Adams still refused the SIC's requests.

In light of Judge Adams's refusal to submit to a mental-health examination, the SIC's forensic psychiatrist could not render an expert opinion or diagnosis regarding Judge Adams's mental or emotional state. But based on the materials the SIC provided to him, the forensic psychiatrist concluded that there is "a reasonable basis for concern as to Judge Adams'[s] mental or emotional state. The data available so far do not suggest a mental state of psychotic proportions, but do suggest significant personality traits that may have contributed to the current concerns." Judge Adams has objected to this conclusion.

On December 9, 2014, in response to another request from the SIC, Judge Boggs directed the SIC to investigate whether Judge Adams's refusal to participate in the mental-health evaluation itself constituted misconduct. After receiving notice of this expansion of the

- 21 -

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

investigation, Judge Adams continued to refuse to undergo testing by a SIC-retained expert, and refused to provide the SIC with records it requested.

At the SIC's April 20–22, 2015, hearing, however, Judge Adams sought to introduce testimony from his own psychiatrist who had purportedly conducted an evaluation of Judge Adams's mental health. The SIC excluded the psychiatrist's testimony from the hearing, as Judge Adams refused to disclose any of the underlying reports, testing materials, or other documents relating to the evaluation.

### III.    Legal Conclusions of the Special Investigating Committee

In addition to its factual findings, the SIC's Report also makes three conclusions on legal issues. First, that the merits-related exception to the misconduct definition does not apply in this case. Second, that the SIC's request for Judge Adams to undergo a mental-health evaluation did not violate Judge Adams's Fourth Amendment rights. Third, that Judge Adams received adequate notice during these proceedings to satisfy due process.

### A. The Merits-Related Exception

Judge Adams argues that the Complaint in this case attacks the merits of the Show Cause Order. Cognizable judicial misconduct includes "conduct prejudicial to the effective and expeditious administration of the business of the courts." 28 U.S.C. § 351; Rule 3(h). However, cognizable misconduct does not include "an allegation that is directly related to the merits of a decision or procedural ruling." Rule 3(h)(3)(A); *see also* 28 U.S.C. § 352(b)(1). A review of the relevant rules, statutes, and precedent authorities—including the "Breyer Committee Report," 239 F.R.D. 116 (2006), and publicly available decisions from other disciplinary proceedings—convinced the SIC that the Complaint in this case is not subject to the merits-related exception.

- 22 -

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

First, before referring this matter to the SIC, Judge Boggs reviewed the Complaint. That he did not dismiss it reflects his decision that it did not fall within the merits-related exception. *See* Rule 11(c)(1)(B). Second, the SIC concluded that the magistrate judge's potential to appeal the Show Cause Order was neither an effective nor realistic avenue for relief, and did not excuse Judge Adams's misconduct in this case. *See* Commentary to Rule 3(h). Third, the harms flowing from the Show Cause Order were prejudicial to the effective and expeditious administration of the business of the court.

Finally, the SIC concluded that the allegations of the Complaint do not "directly" relate to the merits of the Show Cause Order, or attempt to collaterally attack its substance or correctness. Instead, "the Complaint focuses on Judge Adams's hostile treatment of his fellow judicial officers and the severe damage brought about by that treatment rather than the legal correctness of his [S]how [C]ause [O]rder. Whether the [S]how [C]ause [O]rder was legally correct or not does not affect the analysis at all." The prejudicial impact of the Show Cause Order on the administration of the business of the court and Judge Adams's inability or refusal to recognize that harm are the issues here, not his legal authority to issue the Show Cause Order.

"Any allegation that calls into question the correctness of an official action of a judge— *without more*—is merits-related." Commentary to Rule 3 (emphasis added). The SIC concluded that, "[h]ere, there is 'more.'" As such, the SIC concluded that the merits-related exception does not apply in this case.

## B. Fourth Amendment Challenge to Mental-Health Examination

Judge Adams argues that he was justified in refusing to submit to the SIC's requested mental-health evaluation because such an examination would violate his rights under the Fourth

- 23 -

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

Amendment. The SIC's Report concludes that even if a compelled mental-health evaluation is a search for Fourth Amendment purposes, the SIC's request was reasonable.

There is an exception to the normal warrant and probable cause requirements where "a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement." *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989). One such special governmental need is for psychiatric or medical testing of government employees. In such cases, the individual's privacy interests are balanced against the nature of the intrusion and the Government's interests. *Int'l Union v. Winters*, 385 F.3d 1003, 1009–13 (6th Cir. 2004).

Here, the SIC found this balance clearly tipped in favor of requiring Judge Adams to undergo a mental-health evaluation. Judge Adams undoubtedly has a valid privacy interest in his mental health. A mental-health evaluation would intrude on this interest to a nontrivial degree.[6] However, the SIC concluded that "the judiciary unquestionably ha[s] an interest in ensuring that judges are of sound mental health" in order to ensure that federal judges are able to carry out their constitutional functions.

Balancing these interests, the SIC concluded that the request that Judge Adams undergo a mental-health evaluation was reasonable. Its initial investigation raised certain "red flags." Because the SIC did not have the expertise to evaluate Judge Adams's mental condition, the SIC concluded it needed an independent expert to help it perform its investigation. *See* Rule 13(a). The SIC's request was specifically tailored to address issues that arose during the investigation, and the results were to be kept confidential. Under these circumstances, the SIC concluded that

---

[6] Notably, Judge Adams was willing to undergo psychological testing, just not by a doctor retained by the SIC. Judge Adams retained his own doctors to evaluate his health and attempted to introduce the conclusion of one psychiatrist—though not the underlying results of the tests— at the SIC's fact-finding hearing. This undercut any argument Judge Adams made about the unwarranted intrusion on his privacy from undergoing such an evaluation.

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

its request "was reasonable and comported with the Fourth Amendment. Judge Adams's refusal to submit to the evaluation was not justified on that basis."

## C. Due Process Challenge to the Investigation

Judge Adams argues that he did not receive proper notice of the Complaint because it was ambiguous with respect to the "charges against him." Judge Adams also argues that he did not receive adequate notice of the expansion of the investigation because certain internal communications between the SIC and Judge Boggs regarding the request for expansion were not provided to Judge Adams at the time of the communication.

Rule 15 entitles Judge Adams to notice of three things: (1) "the appointment of a special committee under Rule 11(f);" (2) "the expansion of the scope of an investigation under Rule 13(a);" and (3) "any hearing under Rule 14, including its purposes, the names of any witnesses the committee intends to call, and the text of any statements that have been taken from those witnesses." The SIC concluded that Judge Adams received all the notice he was due under Rule 15. The Circuit Executive sent Judge Adams a copy of the Complaint and all its attachments; that Judge Adams sent two letters to Judge Batchelder in response demonstrates that he understood the nature of the allegations. Judge Boggs sent a letter to Judge Adams on April 8, 2013, notifying him that the SIC was being activated. Judge Boggs also sent Judge Adams copies of his two decisions expanding the scope of the investigation—first on May 27, 2014, and again on December 9, 2014. Finally, Judge Adams was given notice of the SIC's April 2015 hearing, copies of all witness statements, exhibits the SIC sought to introduce, and summaries of the testimony that the SIC intended to elicit, all according to a schedule agreed upon by Judge Adams's counsel.

- 25 -

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

Judge Adams also argues that the notice he received was constitutionally insufficient because the allegations in the Complaint were unduly vague. Due process requires the government to give "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

The SIC explained in numerous communications with Judge Adams and his counsel that the initial focus of the investigation was the Show Cause Order, even if the SIC also sought other information to help it reach its ultimate determination. As the SIC succinctly explained at the beginning of its August 23, 2013, interview with Judge Adams, "[t]he focus of [the] investigation is the show cause order you issued . . . on February 1st, 2013[,] and the events that lead [sic] up to that order. . . . There's a lot of other material in the complaint that might constitute allegations of your pattern of conduct, background information to the show cause order, or extraneous material, but the immediate reason for the complaint was the show cause order." The SIC investigated the context and history in which the Show Cause Order was issued and its effect on the court, but concluded in its Report that its focus was made clear to Judge Adams throughout the investigation.

Judge Adams also argues that he did not receive notice of internal communications between the SIC and Judge Boggs and thus was confused as to the nature of the mental or emotional issue that concerned the SIC. But before bringing its concerns to Judge Boggs, the SIC had numerous discussions with Judge Adams and his counsel about these issues. The SIC concluded that the Rules do not entitle Judge Adams to receive internal communications between the SIC and Judge Boggs.

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

### IV.    Disposition

At the September 10, 2015, Sixth Circuit Judicial Council meeting, the members unanimously determined the Special Investigating Committee's Report and the underlying record provided an adequate basis for deciding the merits of the Complaint. *See* Rule 20(c), (d).

After due consideration of these materials, the Sixth Circuit Judicial Council **FINDS** the following:

1. Judge Adams's February 1, 2013, issuance of the Show Cause Order under the circumstances presented here was "conduct prejudicial to the effective and expeditious administration of the business of the courts," because it had prejudicial effects on the District Court as a whole; had prejudicial effects on the ways in which the magistrate judges of the Northern District of Ohio performed their work generally; and had prejudicial effects on the magistrate judge it targeted. *See* Rule 3(h)(1).

2. The Judicial Council cannot determine whether Judge Adams has a "temporary or permanent condition" that renders him "unable to discharge the duties" of his office, because Judge Adams refused to undergo an evaluation by the forensic psychiatrist the Special Investigating Committee retained. *See* Rule 3(e).

3. Judge Adams committed misconduct by refusing to cooperate with the Special Investigating Committee's request that he undergo a mental-health evaluation with a psychiatrist selected by the Special Investigating Committee, as it prejudiced the effective and expeditious investigation of this matter, which is an integral part of the business of the courts. *See* Rule 3(h)(1).

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

Given these findings, and having considered the Special Investigating Committee's recommendations, the Sixth Circuit Judicial Council **ORDERS** the following:

1. The Judicial Council of the Sixth Circuit hereby PUBLICLY REPRIMANDS Judge Adams for his February 1, 2013, issuance of the Show Cause Order to a magistrate judge. 28 U.S.C. § 354(a)(2)(A)(iii); Rule 20(b)(1)(D)(i). This conduct was prejudicial to the effective and expeditious administration of the business of the United States District Court for the Northern District of Ohio. This behavior was outside the scope of normal, acceptable behavior expected within the judiciary. Specifically:

   a. The Show Cause Order was personally demeaning to the magistrate judge it targeted and was an unwarranted use of the court's contempt power. The Show Cause Order has caused the court's magistrate judges to prioritize Judge Adams's cases over other matters on their dockets. As a result, magistrate judges decline to grant reasonable briefing extensions rather than exercise their own judgment as to the management of their dockets, based on a fear that Judge Adams will threaten them with contempt.

   b. The Show Cause Order was demeaning and embarrassing to the court's magistrate judges and affected their morale. Its broader effect was to interfere with the effective and efficient administration of the business of the court by harming the relationships between district judges and magistrate judges, eroding the trust that is important to the functioning of any court.

   c. Moreover, Judge Adams's decision to place the Show Cause Order on the docket was prejudicial to the conduct of the court's business, given the Show

- 28 -

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

Cause Order's tendency to lend discredit to the magistrate judge it targeted and to the court as a whole. It was also prejudicial to the ability of the district judges to have their matters fairly prioritized by the magistrate judges, and to the ability of the district judges to oversee the work of the magistrate judges.

**d.** The Judicial Council directs that no such order be issued by Judge Adams with respect to the work of any of the court's judges.

2. Sufficient evidence exists to merit further investigation into whether Judge Adams suffers from a mental or emotional disability that renders him unable to discharge the duties of his office. Accordingly, no new cases shall be assigned to Judge Adams for a period of two years, and his present docket shall be transferred to other judges. 28 U.S.C. § 354(a)(2)(A)(i); Rule 20(b)(1)(D)(ii). This action is necessary to protect the public and the judiciary from the possibility of Judge Adams engaging in inappropriate or embarrassing behavior while the investigation continues.

3. The Special Investigating Committee shall maintain jurisdiction for two years to ensure that Judge Adams does not engage in additional inappropriate behavior involving magistrate judges, whether in his official functions or otherwise. 28 U.S.C. § 353(c); Rules 1, 13(a).

4. Judge Adams shall undergo a mental-health evaluation by a psychiatrist selected by the Special Investigating Committee. The psychiatrist shall be provided with any material from the Special Investigating Committee and Judge Adams that the psychiatrist deems appropriate within six months of the date of this Order. Any report(s) prepared by the psychiatrist shall be made available for the Judicial

No. 06-13-90009
*In re Complaint of Judicial Misconduct*

Council's confidential review.  28 U.S.C. § 353(c); Rules 1, 13(a), 20(c); Sixth Circuit Rule 14(b).

5. Judge Adams shall submit to any treatment or counseling deemed necessary by the psychiatrist.

6. Should Judge Adams submit to a mental-health evaluation and it demonstrates that he does not suffer from a disability that renders him unable to discharge the duties of his office, or if he receives treatment after the evaluation that remedies any disability, the Judicial Council may suspend the Order that no new cases be assigned to him for two years.  Judge Adams would nevertheless remain subject to the Special Investigating Committee's continued jurisdiction for the remainder of the two years, as set forth in Order No. 3.  The Judicial Council shall retain jurisdiction to order further remedies depending on the results of the evaluation.

7. Should Judge Adams refuse to undergo a mental-health evaluation by a psychiatrist chosen by the Special Investigating Committee, the Judicial Council intends to request that Judge Adams voluntarily retire, waiving the ordinary length-of-service requirements.  28 U.S.C. § 354(a)(2)(B)(ii); Rule 20(b)(1)(D)(v).

*Judge Adams has a right to petition the Committee on Judicial Conduct and Disability of the Judicial Conference of the United States for a review of this Order and Memorandum.  Rules 20(f), 21(b).  This Order and Memorandum shall be made public 64 days after its filing, provided that no petition for review is filed before then.  Rules 22(c), 24.*

Dated:  February 22, 2016