**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THE HON. JOHN R. ADAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-1894 (ABJ) |
| | ) | |
| THE JUDICIAL COUNCIL OF THE | ) | |
| SIXTH CIRCUIT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS; REQUEST
FOR ORAL HEARING**

Paul J. Orfanedes
D.C. Bar No. 429716
Robert D. Popper
D.C. Bar No. 1023592
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, DC 20024
Telephone: (202) 646-5172
porfanedes@judicialwatch.org
rpopper@judicialwach.org

July 10, 2018                    *Counsel for Plaintiff*

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...............................................................................................1

II.   FACTUAL BACKGROUND ..............................................................................4

III.  ARGUMENT .....................................................................................................9

      A.   Plaintiff's *Ultra Vires* Claim (Count II).............................................9

      B.   Plaintiff's Unconstitutional Vagueness Claim (Counts I and III).........14

           1.   Section 353(c) is unconstitutionally vague ................................15

           2.   The Act's "disability" provision is unconstitutionally vague ...................16

      C.   Plaintiff's Fourth Amendment Claim (Count IV)...................................20

           1.   Judges' privacy expectations ....................................................22

           2.   The governmental interest.........................................................24

           3.   Warrants and individualized suspicion are not impracticable ..................26

           4.   Pre-compliance review..............................................................29

           5.   Facial vs. as-applied.................................................................32

      D.   Plaintiff's Separation of Powers Claim (Count VII)..............................33

      E.   Plaintiff's As-Applied Constitutional Claims (Counts II, V, and VI) .................36

           1.   *McBryde* is no longer good law ...............................................37

           2.   There is no jurisdictional bar to Plaintiff's *ultra vires*
                claim (Count II)........................................................................38

           3.   *McBryde* does not bar jurisdiction over Plaintiff's Fourth
                and Fifth Amendment claims (Counts V and VI)......................40

           4.   In the alternative, *McBryde* was wrongly decided....................42

IV.   CONCLUSION .................................................................................................45

i

TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                  <u>Page</u>

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967).........................................................................................41

*\*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
    321 F.3d 1166 (D.C. Cir. 2003) ...................................................................39

*\*Amgen Inc. v. Smith*,
    357 F.3d 103 (D.C. Cir. 2004) .....................................................................39

*Arnett v. Kennedy*,
    416 U.S. 134 (1974).......................................................................................15

*\*Birchfield v. North Dakota*,
    136 S. Ct. 2160 (2016)..................................................................................28

*Bowsher v. Synar*,
    478 U.S. 714 (1986)  ..............................................................................33, 34

*Califano v. Sanders*,
    430 U.S. 99 (1977).........................................................................................44

*Camara v. Municipal Court*,
    387 U.S. 523 (1967).......................................................................................26

*\*City of Los Angeles v. Patel*,
    135 S. Ct. 2443 (2015)............................................................................21, 30

*\*Chamber of Commerce v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) .....................................................................39

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991).........................................................................................10

*\*Chandler v. Judicial Council of Tenth Circuit*,
    398 U.S. 74 (1970)..............................................................................11, 33, 44

*Cuozzo Speed Techs., LLC v. Lee*,
    136 S. Ct. 2131 (2016)..................................................................................38

*\*Dart v. United States*,
    848 F.2d 217 (D.C. Cir. 1988) .....................................................................39

*Douglas v. New York State Adirondack Park Agency,*
 895 F. Supp.2d 321 (N.D.N.Y. 2012) ............................................................22

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
 485 U.S. 568 (1988) .....................................................................................12

*E.I. Du Pont de Nemours & Co. v. Train,*
 430 U.S. 112 (1977) .....................................................................................39

*Ferguson v. City of Charleston,*
 532 U.S. 67 (2001) ...................................................................................25, 33

*Free Enter. Fund. v. Pub. Co. Accounting Oversight Bd.,*
 561 U.S. 47 (2010) .......................................................................................33

*Grayned v. City of Rockford,*
 408 U.S. 104 (1972) .....................................................................................14

*Griffin v. Wisconsin,*
 483 U.S. 868 (1987) .....................................................................................24

*\*Griffith v. Fed. Labor Relations Auth.,*
 842 F.2d 487 (D.C. Cir. 1988) .......................................................................41

*Hastings v. Judicial Conference of U.S.,*
 829 F.2d 91 (D.C. Cir. 1987) .........................................................................20

*Hoffman Estates v. Flipside, Hoffman Estates,*
 455 U.S. 489 (1982) .................................................................................14, 18

*Ill. Publ. Telecoms Ass'n v. Fed. Commc'n Comm'n,*
 752 F.3d 1018 (D.C. Cir. 2014) .....................................................................12

*In re Complaint of Judicial Misconduct,*
 570 F.3d 1144 (9th Cir. 2009) .......................................................................13

*In re Petition to Inspect & Copy Grand Jury Materials,*
 576 F. Supp. 1275 (S.D. Fla. 1983) ...............................................................13

*INS v. Chadha,*
 462 U.S. 919 (1983) .....................................................................................34

*Johnson v. Robison,*
 415 U.S. 361 (1974) .....................................................................................44

*Johnson v. United States,
    135 S. Ct. 2551 (2015) ........................................................................................14, 15

Katz v. United States,
    389 U.S. 347 (1967) ....................................................................................................21

Knox Cnty. Educ. Assoc. v. Knox Cnty. Bd. of Educ.,
    158 F.3d 361 (6th Cir. 1998) .................................................................................22, 24

Kolbe v. Hogan,
    813 F.3d 160 (4th Cir. 2016) .......................................................................................15

Larsen v. U.S. Navy,
    346 F. Supp.2d 122 (D.D.C. 2004) .............................................................................35

Lewis v. Gov't of the Dist. of Columbia,
    161 F. Supp.3d 15 (D.D.C. 2015) ...............................................................................22

*Marshall v. Barlow's, Inc.,
    436 U.S. 307 (1978) ...............................................................................................27, 28

Maryland v. King,
    133 S. Ct. 1958 (2013) ................................................................................................22

McBryde v. Comm. to Review Circuit Council Conduct & Disability
    Orders of the Judicial Conf. of U.S.,
    264 F.3d 52 (D.C. Cir. 2001) .............................................................................. passim

McBryde v. Comm. to Review Circuit Council Conduct & Disability
    Orders of the Judicial Conf.,
    278 F.3d 29 (D.C. Cir. 2002) .......................................................................................42

Miami Free Zone Corp. v. Foreign Trade Zones Bd., Dep't of Commerce,
    803 F. Supp. 442 (D.D.C. 1992) .................................................................................38

*Nat'l Fedn. of Fed. Emps.–IAM v. Vilsack,
    681 F.3d 483 (D.C. Cir. 2012) .....................................................................................22

Nat'l Labor Relations Bd. v. SW Gen., Inc.
    137 S. Ct. 929 (2017) ..................................................................................................13

Nat'l Petrochemical Refiners Ass'n v. Environmental Protection Agency,
    630 F.3d 145 (D.C. Cir. 2010) .....................................................................................44

*Nat'l Treasury Emps. Union v. Von Raab,
    489 U.S. 656 (1989) ....................................................................................................22

*New Jersey v. T.L.O.*,
    469 U.S. 325 (1985).................................................................................22, 27

*O'Connor v. Ortega*,
    480 U.S. 709 (1987)................................................................... *passim*

*Olmstead v. United States*,
    277 U.S. 438 (1928)................................................................................21

*PHH Corp. v. Consumer Fin. Prot. Bureau*,
    Case No. 15-1177, slip op. (D.C. Cir. Jan. 31, 2018) .......................................32

*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995) ....................................33

*\*Ralls Corp. v. Comm. on Foreign Inv.*,
    758 F.3d 296 (D.C. Cir. 2014).............................................................41, 42

*Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*,
    926 F. Supp.2d 71 (D.D.C. 2013) ..........................................................29

*\*Ralpho v. Bell*,
    569 F.2d 607 (D.C. Cir. 1977) ...........................................................41, 44

*Samson v. California*,
    547 U.S. 843 (2006)...............................................................................24

*Sessions v. Dimaya*,
    No. 15-1498 (U.S. April 17, 2018) ..............................................................14

*South Dakota v. Opperman*,
    428 U.S. 364 (1976)...............................................................................25

*\*Ungar v. Smith*,
    667 F.2d 188 (D.C. Cir. 1981) ...........................................................41, 42

*United States v. Choi*,
    818 F. Supp.2d 79 (D.D.C. 2011) ..............................................................5

*U.S. Telecom Ass'n v. FCC*,
    825 F.3d 674 (D.C. Cir. 2016) ..................................................................15

*Weinberger v. Salfi*,
    422 U.S. 749 (1975)...............................................................................44

Constitutional Provision

U.S. Const. art. I, § 2 .................................................................................................34

U.S. Const. art I, § 3 ..................................................................................................34

U.S. Const. art III, § 1 ...............................................................................................34

Statues, Rules, and Regulations

28 U.S.C. § 137 ........................................................................................................11

28 U.S.C. § 332 ........................................................................................................11

28 U.S.C. § 332(c) ....................................................................................................11

28 U.S.C. § 332(d) ....................................................................................................12

28 U.S.C. § 332(d)(1) ..........................................................................................11, 12

28 U.S.C. § 332(d)(4) ...............................................................................................11

28 U.S.C. § 332(e) ....................................................................................................11

28 U.S.C. § 332(g) ....................................................................................................11

28 U.S.C. § 351(a) ..............................................................................14, 16, 17, 19

28 U.S.C. § 353(c) ........................................................................................ *passim*

28 U.S.C. § 354(a)(2) ...............................................................................................34

28 U.S.C. § 354(a)(2)(A) ..........................................................................................25

28 U.S.C. § 354(a)(2)(B)(i) ................................................................................16, 25

28 U.S.C. § 354(b)(2)(A) ..........................................................................................25

28 U.S.C. § 355(b) ....................................................................................................25

28 U.S.C. § 356(a) ..............................................................................................12, 13

28 U.S.C. § 357(c) ........................................................................................36, 40, 44

28 U.S.C. § 358(b)(1) ...............................................................................................41

28 U.S.C. § 358(b)(2) ...........................................................................................41

28 U.S.C. § 360(a)(3) .............................................................................................1

28 U.S.C. § 372(b) ...............................................................................................25

28 U.S.C. § 372(c)(1) ...........................................................................................40

29 C.F.R. § 1630.2(n) ...........................................................................................18

42 U.S.C. § 12102(1)(A) .......................................................................................18

42 U.S.C. § 12102(2) ............................................................................................18

42 U.S.C. § 12111(8) ............................................................................................18

42 U.S.C. § 12112(a) ............................................................................................18

FED. R. CIV. P. 35(a)(2)(A) ....................................................................................31

FED. R. CIV. P. 35(a)(2)(B) ....................................................................................31

RULES FOR JUDICIAL-CONDUCT AND JUDICIAL-DISABILITY
        PROCEEDINGS R. 3(e) (2015) ........................................................................17

RULES GOVERNING COMPLAINTS OF JUDICIAL MISCONDUCT OR
        DISABILITY R. 1(b) (2007) ...........................................................................17

21st Century Department of Justice Appropriations Authorization Act,
        Pub. L. No. 107-273, Div. C, Title I, Subtitle C, § 11044,
        116 Stat. 1758 (Nov. 2, 2002) ....................................................................37


Miscellaneous

American Academy of Psychiatry and the Law, *Practice Guideline
        for the Forensic Evaluation of Psychiatric Disability*,
        Vol. 36, No. 4 (2008 Supplement) ...............................................................23

American Psychiatric Association, *Practice Guideline for Psychiatric
        Evaluation of Adults*, Section III (2d ed.) ....................................................23

*Disability backlog tops 1M; thousands die on waitlist* (Sept. 17, 2017),
        https://www.cbsnews.com/news/social-security-disability-
        backlog-tops-1-million-thousands-die-on-waitlist..........................................4

FEDERALIST NO. 47 (J. Cooke ed. 1961) ...................................................................32

FEDERALIST NO. 51 (J. Madison) ...........................................................................31

Jonah Gelbach and David Marcus, *Crushed*, Judicature, Autumn 2017 ........................................4

Brie Zeltner, *Wait for a Social Security disability decision drags on months - and years - for many Ohioans* (Dec. 17, 2017), https://www.cleveland.com/ healthfit/index.ssf/2017/12/wait_for_a_social_security_dis.html ......................................4

Plaintiff, by counsel, respectfully submits this memorandum of points and authorities in opposition to Defendants' motion to dismiss.

## I.       INTRODUCTION.

In the history of the United States, no sitting federal judge has ever been compelled to undergo an involuntary psychiatric examination on the order of a judicial council.   Such an order was issued in this case, and Defendants found Plaintiff committed misconduct by objecting to it.[1]

Ordering an individual to undergo a psychiatric examination raises a host of medical, personal privacy, and constitutional issues.   Ordering an Article III judge to undergo a psychiatric examination raises all these same issues, plus others concerning separation of powers and judicial independence.   Defendants claim this astonishing power even though no rule, statute, or constitutional provision expressly grants it and no court has addressed it.   Defendants argue their authority is *inherent* in the general statutory language outlining the scope of a special committee's investigation of a judicial complaint and in various constitutional provisions, including Congress' power to constitute inferior courts, the Necessary and Proper Clause, and Article III generally.

The test case they now pursue is singularly unsuited for their purpose.   At a hearing before the special committee convened to investigate the judicial complaint against Plaintiff, the complainants and their witnesses testified that Plaintiff handles his docket well and writes good opinions.   No evidence was presented to the contrary, and no evidence showed Plaintiff acts inappropriately towards litigants or lawyers.   There is no dispute that Plaintiff competently manages a full, busy, docket.   He recently presided over four, back-to-back trials, including a

---

[1]       A further order was issued June 27, 2018, but by statute is not yet public.   Plaintiff had not expected a further order and was unaware of its contents until it was issued.   Plaintiff is still assessing the order and its impact on this litigation.   Plaintiff is willing to submit the order under seal if the Court so desires, provided Defendants agree.   *See* 28 U.S.C. § 360(a)(3).

complex, weeks-long trial of an individual charged with conspiracy and attempting to provide

material support and resources to Islamic State and is about to preside over a fifth.[2]  Plaintiff's

decisions have been upheld on appeal on a multitude of occasions over the past several months,[3]

although he recently was reversed on a sentencing appeal and removed from the case in an opinion

written by a member of the special committee.[4]

The only evidence directly bearing on Plaintiff's mental health was proffered by Plaintiff.

Plaintiff voluntarily underwent a battery of psychological tests and a psychiatric examination by a

nationally renowned psychiatrist and expert on legal and ethical issues in medicine and psychiatry,

Paul S. Appelbaum, M.D. of Columbia University, and offered to have Dr. Appelbaum testify and

be cross-examined by the special committee and its attorneys at the hearing.  Earlier, Plaintiff

underwent a psychiatric examination by a local psychiatrist and offered his report and written

witness statement to the special committee.  Both doctors concluded Plaintiff did not suffer from

---

[2]     *See*, *e.g*., *United States v. Erick Jamal Hendricks*, Case No. 1:16-cr-0265 (N.D. Ohio); *United States v. Jamel A. Smith*, Case No. 5:17-cr-0091 (N.D. Ohio); *United States v. Sergio Gardea*, 5:17-cr-0366 (N.D. Ohio); *AudiaTechnia, Inc. v. United States*, Case No. 5:16-cv-2052; and *United States v. Janice Shufford*, Case No. 5:17-cr-0454 (commences July 16, 2018).

[3]     *See United States v. Robinson*, 2018 U.S. App. LEXIS 15335 (6th Cir. June 7, 2018); *United States v. Trejo*, 2018 U.S. App. LEXIS 8219 (6th Cir. April 2, 2018); *United States v. Bartoli*, 2018 U.S. App. LEXIS 6541 (6th Cir. March 16, 2018); *Cook v. Chief, U.S. Marshal*, 2018 U.S. App. LEXIS 6075 (6th Cir. March 9, 2018); *United States v. Francis,* 2018 U.S. App. LEXIS 2783 (6th Cir. Feb. 2, 2018); *Stimmel v. Sessions*, 879 F.3d 198 (6th Cir. 2018); *B.R. v. McGivern*, 2017 U.S. App. LEXIS 22032 (6th Cir. Nov. 1, 2017).

[4]     *See United States v. Cota Luna*, 2018 U.S. App. LEXIS 14772 (6th Cir. June 4, 2018). The *Cota Luna* decision was the second time in the course of the special committee's investigation that Plaintiff has been removed from a case.  Both panels included this same member, who also appeared particularly adverse to Plaintiff during the special committee's April 2015 fact-finding hearing.  Plaintiff had never previously been removed from a case and had no prior discipline or even had another complaint filed against him in his more than ten years as a judicial officer. Three days after his removal from the *Cota Luna* matter, Plaintiff was affirmed in a published decision by a panel that had no involvement with the special committee proceedings.  *See United States v. Robinson*, *supra*.

any temporary or permanent condition rendering him unable to discharge the duties of his office or any diagnosable mental disorder.   Plaintiff's proffers of both doctors' testimony were rejected. Although charged with uncovering the truth, the special committee chose not to hear evidence that Plaintiff's mental health is sound.

Defendants try to justify the order based almost entirely on lay testimony about Plaintiff's relationship with *other judges* outside the courtroom.   The standard they use, found in no statute, suggests federal judges risk compelled psychiatric examinations if they do not attend administrative meetings, complain internally about court governance, wasteful spending and employee abuse, are perceived as mavericks, or are just not liked by other judges.   Such an outcome cannot be consistent with judicial independence or the Constitution.   Defendants rely extensively on *McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of the Judicial Conf. of U.S.*, 264 F.3d 54 (D.C. Cir. 2001), which held that the Court lacked jurisdiction over a Texas federal judge's as-applied constitutional challenges to a judicial council order issued under the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980 (the "Act"). As set forth below, that statute has since been amended and *McBryde* is no longer good law.   Even as written, *McBryde* does not bar Plaintiff's claims.

Defendants suggest this case "involves the Federal Judiciary's authority, as an independent and coequal branch of government, to keep its own house in order by conducting its own investigations of misconduct and disability involving federal judges."   They claim Plaintiff's lawsuit "attempts to circumvent this comprehensive statutory scheme."   Defs' Mem. at 1 (internal quotations omitted).   In fact, Defendants are attempting an enormous, non-statutory expansion of judicial council power.   They seek to avoid judicial review of this power grab by arguing –

erroneously – that the Court lacks jurisdiction to hear it.   It is Plaintiff, not Defendants, who seeks to uphold the constitutional balance between judicial independence and judicial accountability.

## II.    FACTUAL BACKGROUND.

Plaintiff has served as a federal judge in the Northern District of Ohio since 2003. Compl., ¶ 8.   He was nominated by President George W. Bush on January 7, 2003 and confirmed by the Senate on February 10, 2013.   *Id.*   He received his commission two days later.   *Id.*   His chambers are in Akron, Ohio.   *Id.*

The increase in the number of Social Security disability appeals and the inordinate delays in processing them have long been concerns of Plaintiff.[5]   Compl., ¶ 10.   In February 2013, Plaintiff issued a show cause order asking a magistrate judge to explain his failure to issue a timely decision in a Social Security appeal that had been pending for five-and-a-half years.   *Id.*, ¶ 13. The next business day, the magistrate indicated that the deadline had been miscalculated. Plaintiff deemed the order satisfied and sealed the filings the same day.   *Id.*   The particular events transpiring during that 48-hour period five years ago have no further relevance to the issues involved in this motion.

That same month, four judges in the Northern District filed a judicial complaint against Plaintiff.   *Id.*, ¶ 14.   The complaint claimed Plaintiff's issuance of the show cause order was

---

[5]       Plaintiff's concerns continue to date to be recognized by publications across the country.   *See, e.g.*, Jonah Gelbach and David Marcus, *Crushed*, Judicature, Autumn 2017, at 65; *Disability backlog tops 1M; thousands die on waitlist* (Sept. 17, 2017), https://www.cbsnews. com/news/social-security-disability-backlog-tops-1-million-thousands-die-on-waitlist; Brie Zeltner, *Wait for a Social Security disability decision drags on months - and years - for many Ohioans* (Dec. 17, 2017), https://www.cleveland.com/healthfit/index.ssf/2017/12/wait_for_a_ social_security_dis.html.

without authority and an abuse of discretion.   *Id.*[6]   It also claimed that he had a "strained

relationship" with other judges and had "withdrawn from . . . the governance and social life of the

court."   *Id.*   A special committee was appointed to investigate the complaint, and Plaintiff

cooperated fully with it, submitting an answer and appearing for an interview in August 2013.

*Id.*, ¶¶ 16-17.   He tried to resolve the complaint informally, offering to withdraw the sealed order

and to attend judges' meetings.   *Id.*, ¶ 17.

In the Fall of 2013, the special committee demanded Plaintiff undergo a psychiatric

examination.   It identified no specific reason for the examination.   *Id.*, ¶ 18.[7]   Despite his

good-faith objections, Plaintiff tried to accommodate the special committee.   *Id.*, ¶ 19.   In

November 2013, he allowed a local, board-certified psychiatrist to examine him, and in January

2014 he submitted a report of the examination to the special Committee.   The report concluded

that Plaintiff did not suffer from any diagnosable mental disorder.   *Id.*

---

[6]        Neither Defendants nor the special committee ever found the show cause order was
unlawful or without legal authority, as opposed to unwise or inappropriate.   *Id.*, ¶ 54.   This Court
has found that the All Writs Act permits district courts to issue writs of mandamus to magistrate
judges when a district court sits in an appellate capacity vis a vis the magistrate judge.   *United
States v. Choi*, 818 F. Supp.2d 79, 87 (D.D.C. 2011).

[7]        Citing the Judicial Council's order, Defendants contend that "[i]n the course of its
investigation, the Special Committee encountered evidence that led its members to be concerned
that 'a reasonable person [would have] cause to question whether Judge Adams has a [mental or
emotional] disability.'"   Defs' Mem. at 10.   Defendants' contention arguably conflicts with
Plaintiff's allegation that the special committee identified no specific reason for its demand.
Citing external materials to try to refute allegations in the Complaint is improper.   *Gee v.
Pacheco*, 627 F.3d 1178, 1187 (10th Cir. 2010) ("even assuming . . . the district court did not err
initially in reviewing" materials outside the complaint, "the court improperly relied on them to
refute [plaintiff's] factual assertions"); *Swoboda v. Dubach*, 992 F.2d 286, 290 (10th Cir. 1993)
("In determining whether a plaintiff has stated a claim, the district court may not look to . . . any
other pleading outside the complaint itself, to refute facts specifically pled by a plaintiff, or to
resolve factual disputes.").   If this were a motion for summary judgment, Plaintiff would have
much to say in response to this and Defendants' many other citations to the order.   Because it is a
motion to dismiss, he should not have to dispute such factual matters.

The special committee rejected the report and insisted Plaintiff undergo its examination. *Id.*, ¶¶ 20, 22.   Plaintiff agreed to do so if certain basic conditions were met, such as being told the reasons for the examination and having input into the selection of the mental health professional, the extent of the examination, and the materials provided to the examiner.   The special committee rejected every condition.   *Id.*, ¶ 20.   It informed Plaintiff that unless he agreed to a psychiatric examination without condition, by an unnamed psychiatrist selected entirely at the special committee's discretion and without being told the reason for the examination, its investigation would be expanded to include whether Plaintiff suffered from a disability and an examination would be compelled.   *Id.*, ¶ 21.

In May 2014 the special committee carried out its threat.   The investigation was expanded to include whether Plaintiff suffers from a mental disability.   *Id.*, ¶ 23.   In September 2014, the special committee demanded Plaintiff travel thirty miles from his chambers to undergo three hours of psychological testing as the initial part of an examination to be conducted by an as-of-yet unidentified psychiatrist.   Plaintiff again objected.   *Id.*, ¶ 25.   In December 2014, the investigation was expanded a second time to include whether Plaintiff committed misconduct by declining to undergo the examination.   *Id.*, ¶ 26.

A hearing on the expanded investigation was scheduled for April 20-22, 2015.   *Id.*, ¶ 29. Before the hearing, Plaintiff underwent a second psychiatric examination by a nationally-renowned psychiatrist and expert on legal and ethical issues in psychiatry.   The examination included extensive psychological testing performed by a preeminent psychologist. The result was a second conclusion that Plaintiff does not suffer from a mental disability.   *Id.*, ¶ 30

The April 2015 hearing was anything but investigative.   It was adversarial, if not accusatorial and antagonistic towards Judge Adams.   It also was unfair.   *Id.*, ¶ 32; *see* ¶¶ 33-43.

The special committee refused to hear the *live testimony* of and cross-examine the nationally-renowned psychiatrist who examined Judge Adams, along with all witness statements, reports, and summaries Judge Adams offered concerning his mental condition.   *Id.*, ¶ 37.   The special committee also declared it would "ignore any statements made by Judge Adams or any statements made by [counsel] that are suggestive that some mental health professional has suggested that there is not a serious psychological or mental issue with him."   *Id.*

None of the evidence the special committee accepted suggested that Plaintiff cannot maintain a full docket or issue rulings.   To the contrary, the testimony from the complainants and their witnesses was that "[t]hat's not involved here," that Plaintiff's "handling of his docket has been appropriate," and that he is "a very bright judge" who "writes very good opinions."   *Id.*, ¶ 43. No evidence suggested Plaintiff had been inappropriate to litigants or lawyers (let alone that he terrorized the local bar like the judge in *McBryde*).

The special committee created its own, extra-statutory definition of a federal judge's duties, and, on the first day of the hearing, declared that it would use this definition to assess relevance.   According to the special committee, these duties include "maintaining a professional relationship" with colleagues, "shouldering [] responsibilities as a member of th[e] court," and refraining from "making unfounded and destructive attacks" on colleagues.   *Id.*, ¶ 34.

In July 2015, the special committee issued its report and recommendations to the Judicial Council, finding Plaintiff committed misconduct by issuing the February 2013 show cause order and declining to undergo the psychiatric examination when ordered to do so.   *Id.*, ¶ 44.   It recommended Plaintiff be publicly reprimanded, assigned no new cases for two years, and have his current docket transferred to other judges.   *Id.*   The committee found it could not determine whether Plaintiff suffers from a disability.   It recommended he be ordered to undergo a

psychiatric examination by a psychiatrist selected by the committee, adding that he should be ordered to "submit to any treatment or counseling deemed necessary by the psychiatrist."   *Id.* Finally, it asserted that Plaintiff should be asked to voluntarily retire if he continues to resist another psychiatric examination.   *Id.*

In February 2016, the Judicial Council largely adopted the special committee's recommendations.   Complaint, ¶ 46.   It added the condition that the special committee "shall maintain jurisdiction for two years to ensure that Judge Adams does not engage in additional inappropriate behavior involving magistrate judges, whether in his official functions or otherwise."   *Id.*, ¶ 48.   And it ordered that no show cause order may "be issued by Judge Adams with respect to the work of any of the court's judges," notwithstanding the fact that the order itself had never been found unlawful.   *Id.*, ¶ 54.

Plaintiff timely petitioned for review by Defendant Committee on Judicial Conduct and Disability of the Judicial Conference of the United States (the "Review Committee").   The Review Committee vacated the Judicial Council's order that no new cases be assigned to Plaintiff for two years and that his present docket be transferred, because the "Judicial Council did not include in its Order any specific findings regarding whether Judge Adams's conduct has adversely affected his ability to discharge the adjudicative duties."   *Id.*, ¶ 51.   It did not question the basic legality of such a remedy, however, finding that, while "curtailment of Judge Adams's docket is not supported by the record as it exists at this time . . . [w]e cannot rule out the appropriateness of such a sanction should sufficient evidence establish Judge Adams's incapacity."   *Id.*

The Review Committee upheld the Judicial Council's order that Plaintiff undergo a psychiatric examination by a psychiatrist selected by the special committee.   *Id.*, ¶ 50.   It also ordered him to "submit to any treatment or counseling deemed necessary."   *Id.*   It directed the

special committee to "retain jurisdiction" for up to two years to "ensure Judge Adams's ability to discharge the duties of office as a federal district court judge."   *Id.*, ¶ 53.   It also authorized the special committee to "conduct further investigation into Judge Adams's conduct on the bench," a subject not previously reviewed by special committee.   *Id.*, ¶ 55.

## III.   ARGUMENT.

Plaintiff's lawsuit challenges the Judicial Council's action on multiple grounds.   In Counts I, II, III, and IV, Plaintiff challenges the authority of judicial councils to order judges to submit to psychiatric examinations generally on the grounds such orders are *ultra vires* and violate the Fourth and Fifth Amendments to the U.S. Constitution.   In Counts V and VI, Plaintiff challenges the particular order entered against him.   In Count VII, he challenges the limitations the Judicial Council imposed on his ability to continue to serve as a judge – obviously to coerce him to undergo the psychiatric examination – on the grounds that these measures violate separation of powers.   The Complaint alleges multiple, plausible bases on which he is entitled to relief.   His lawsuit should proceed, and the motion to dismiss should be denied.

### A.   Plaintiff's *Ultra Vires* Claim (Count II).

With little if any analysis, Defendants claim judicial councils and special committees have statutory and constitutional authority to order Article III judges to undergo psychiatric examinations.   They invoke section 353(c) of the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980 ("the Act") which provides that a special committee "shall conduct an investigation as extensive as it considers necessary."   Defs' Mem. at 36 (*citing* 28 U.S.C. § 353(c)).   "Whatever the outer limits of a special committee's investigatory authority under that provision," they assert, "[a] mental health evaluation falls squarely within that authority."   *Id.* But whether judicial councils and their special committees have authority to compel psychiatric

examinations is the question, not the answer, and section 353(c) plainly refers to the scope of a special committee's investigation, not the tools available to it.

Defendants also assert that judicial councils and special committees "necessarily possess the authority to request" judges to undergo mental health examinations if a reasonable basis exists for concluding that a judge "might" suffer from a disability.   Defs' Mem. at 36-7.   Again, however, the question is not whether a judicial council or special committee can *request* a judge to undergo a psychiatric examination; it is whether they can *compel* one.   Defendants' assertion that they can rests on little more than the bald statement that judicial councils and special committees have such authority because they say so.

Defendants' invocation of *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) is particularly inapt.   Defs' Mem. at 38 (*citing*, *Chambers*, 501 U.S. at 58 (Scalia, J., dissenting)).   At issue in *Chambers w*as whether Article III courts have inherent authority to discipline attorneys who appear before them.   *Chambers*, 501 U.S. at 43-44.   The Court answered this question affirmatively, finding that, as an independent and coequal branch of government, the judiciary derives authority from the Constitution to "do what courts have traditionally done in order to accomplish their assigned tasks."   *Id.* at 58 (Scalia, J., dissenting).   The case did not address the authority to compel judges to undergo psychiatric examinations, and Defendants make no claim that the federal judiciary has traditionally exercised such power.   If anything, the opposite is true.

Regardless, the inherent authority of the judiciary resides in the Judicial Branch, not the judicial councils.   The councils are not the repository of the Judicial Branch's constitutional power.   They were created by Congress in 1938 to help administer the courts.   They possess only the authority Congress gave them, as limited by the separation of powers doctrine, the Fourth and Fifth amendments, and other constitutional restrictions.   This includes administrative tasks such

as deciding on the division of business in a district court if the district court's judges are unable to agree, reviewing district courts' local rules, receiving, preparing, and submitting reports, and hiring a circuit executive.   28 U.S.C. §§ 137, 332(c), (d)(4), (e), and (g).

The Supreme Court addressed the councils' authority in *Chandler v. Judicial Council of Tenth Circuit*, 398 U.S. 74 (1970), a case that asked whether Congress could "vest in the Judicial Council power to enforce reasonable standards as to when and where court shall be held, how long a case may be delayed in decision, whether a given case is to be tried, and many other routine matters."   *Id.* at 84.   Ordering a judge to undergo a psychiatric examination and any treatment recommended as a result is hardly a "routine matter[]."   At issue in *Chandler* was a district court judge's handling of his docket and whether a judicial council, using its authority under what is now section 332(d)(1), could reassign his cases to other judges and direct that no new cases be assigned to him.[8]   In deciding that it need not rule on the propriety of the council's actions, the Court emphasized the limited authority Congress had vested in the councils:

> We find nothing in the legislative history to suggest that the Judicial Council was intended to be anything other than an administrative body functioning in a very limited area in a narrow sense as a 'board of directors' for the circuit . . . we find no indication that Congress intended to or did vest traditional judicial powers in the Councils.

*Id.* at 86, n.7.   The Court distinguished the councils from courts of law, finding that "the action of the Judicial Council here complained of has few of the characteristics of traditional judicial action and much of what we think of as administrative action."   *Id.* at 88 n.10.   It also distinguished "administrative directives" of the councils from judicial acts or decisions, questioning whether

---

[8]      *Chandler* also found that, "[s]tanding alone, § 332 is not a model of clarity in terms of the scope of the judicial councils' powers or the procedures to give effect to" its provisions.   *Id.* at 85. n.6.   It declared, "Legislative clarification of enforcement provisions of this statute and definition of review of Council orders are called for."   *Id.*

council directives could ever be appealable in a traditional judicial sense.   *Id.* at 85, n.6 & 86. Not being courts of law, the councils neither possess nor exercise the inherent power of the Judicial Branch.   Defendants must look elsewhere for authority to order judges to undergo psychiatric examinations and treatment.

Section 353(c) says nothing about compelled psychiatric examinations.   In fact, it says nothing about orders of any kind.   It merely states that a special committee "shall conduct an investigation as extensive as it considers necessary."   28 U.S.C. § 353(c).   The provision plainly refers to the scope of a special committee's investigation, not any particular investigative method or tool.[9]   Reading section 353(c) to authorize a particular investigative method or tool, especially something as personally invasive and constitutionally suspect as a compelled psychiatric examination of a sitting federal judge, runs afoul of multiple canons of statutory construction, including that courts should not read into a statute provisions Congress did not supply (*Ill. Publ. Telecoms Ass'n v. Fed. Commc'n Comm'n*, 752 F.3d 1018, 1023 (D.C. Cir. 2014)), and the doctrine of constitutional avoidance.   *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

By contrast, section 356(a) expressly authorizes special committees to issue subpoenas. "In conducting any investigation under this chapter, the judicial council, or special committee . . . shall have full subpoena powers as provided in section 332(d)."[10]   28 U.S.C. § 356(a).   Special committees' subpoena power no doubt includes the power to subpoena medical records.

---

[9]      Defendants themselves repeatedly refer to a psychiatric examination as an investigatory tool.   Defs' Mem. at 23, 27, and 34.

[10]      In addition to giving councils authority to issue "orders," which term is not defined, the provision authorizes councils to "hold hearings, to take sworn testimony, and to issue subpoenas and subpoenas duces tecum."   28 U.S.C. § 332(d)(1).

Subpoenaing such records obviously is very different from compelling psychiatric examinations and mandating any recommended treatment.[11]   It may even be far less personally invasive. Defendants ignore section 356(a), however, most likely because it is inconsistent with their assertion that section 353 authorizes investigative tools beyond the subpoena power expressly referenced in section 356(a).   Thus, reading section 353 or the Act generally to authorize compelled psychiatric examinations also runs afoul of the well-known interpretative cannon that the expression of one thing excludes another.   *See*, *e.g.*, *Nat'l Labor Relations Bd. v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017).

If Congress had intended to authorize compelled psychiatric examinations or other highly intrusive medical testing of judges, it surely would have done so expressly.   The issue is too important and has too many significant ramifications for judges' medical privacy, judicial independence, and separation of powers to infer such authority from generic language about the scope of a special committee's investigation.   Moreover, the Act was carefully crafted to balance accountability and preserve judicial independence.   *See*, *e.g.*, *In re Complaint of Judicial Misconduct*, 570 F.3d 1144, 1145 (9th Cir. 2009).   Because Congress did not expressly grant authority to compel psychiatric examinations *and* crafted the Act carefully to balance accountability and preserve judicial independence, it is fair to conclude Congress did not intend to authorize the broad, personally invasive, and constitutionally suspect power Defendants claim. Judicial councils and their special committees do not have authority to order Article III judges to undergo compelled psychiatric examinations.   Such orders are *ultra vires*.

---

[11]      Subpoenaing records also is not materially different from petitioning to inspect grand jury materials, which is what the special committee investigating then-Judge Alcee L. Hastings sought in *In re Petition to Inspect & Copy Grand Jury Material*, 576 F. Supp. 1275 (S.D. Fla. 1983), after Hastings was acquitted of federal bribery charges.

B.      Plaintiff's Unconstitutional Vagueness Claims (Counts I and III).

"Vague laws invite arbitrary power . . . leaving the people in the dark about what the law demands and allowing prosecutors and courts to make it up."   *Sessions v. Dimaya*, No. 15-1498, slip. op at 1 (U.S. April 17, 2018) (Gorsuch, J., concurring).   Rooted in the Fifth Amendment's due process clause, the doctrine applies in two circumstances.   First, it applies when a law is so vague it fails to give ordinary persons fair notice of the conduct being punished or regulated.   *See*, *e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).   Second, it applies when a law is so standardless it invites arbitrary enforcement.   *Id.*   The first application focuses on the person subject to the law.   The second focuses on the official(s) enforcing the law.   Plaintiff brings both types of vagueness challenges to two provisions of the Act.   He brings a vagueness challenge to section 353(c) as an alternative to his *ultra vires* challenge.   He also brings a vagueness challenge to the "disability" provision of section 351(a).

While Defendants cite *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982) for the proposition that, to survive a motion to dismiss on vagueness grounds, a plaintiff must plausibly allege that a challenged statute "is impermissibly vague in *all* of its applications," that assertion is not correct.   Defs' Mem. at 28.   In *Johnson v. United States*, 135 S. Ct. 2551, 2560-61 (2015), the Court noted, "[A]lthough statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp."   *Johnson* serves as a case in point.   In *Johnson*, the Court declared unconstitutionally vague a criminal sentencing provision it previously upheld in two different applications, as had various courts of appeal.   *Id.* at 2559-60, 2563.   Obviously, a provision need not be impermissibly vague in *all* its applications to run afoul of the Due Process clause.   Lower courts

have just begun applying *Johnson*.   *See, e.g.*, *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 735-36 (D.C. Cir. 2016); *Kolbe v. Hogan*, 813 F.3d 160, 190-91 (4th Cir. 2016).

      1.    <u>Section 353(c) is unconstitutionally vague.</u>

The Act's provision purportedly authorizing a special committee to "conduct an investigation as extensive as it considers necessary" is literally boundless.   28 U.S.C. § 353(c).   It sets no limits whatsoever on special committees' or judicial councils' investigative authority. Special committees and, correspondingly, judicial councils, can do anything they unilaterally deem necessary in carrying out an investigation.   Under section 353(c), a special committee could demand a judge provide a blood or DNA sample, require the production of a judge's financial or tax records, or even search a judge's chambers or residence.   Defendants identify no limiting principle restricting a special committee's or judicial council's authority.   They cannot even point to a limitation as thin as the "efficiency of the service" standard considered in *Arnett v. Kennedy*, 416 U.S. 134, 159-60 (1974).   The provision combines unbridled, arbitrary enforcement authority with a complete absence of notice to judges of what investigative demands can be made of them under threat of a failure to cooperate charge.

Defendants' argument that section 353(c) does not regulate conduct completely ignores vagueness challenges where laws are so standardless they invite arbitrary enforcement. Defendants do not even attempt to argue that the provision is not subject to an "arbitrary enforcement" vagueness challenge.   It plainly is.   It relates directly to the scope of a special committee's investigative authority and therefore directly implicates application and enforcement of the law.   Defendant's argument also ignores the manner in which section 353(c) was used against Plaintiff.   Defendants invoked the provision to demand Plaintiff undergo a psychiatric examination, then found Plaintiff committed misconduct by refusing to do so – a quintessential,

conduct-based determination.   The misconduct finding cannot be divorced from the provision.   It defined the alleged offense and was used to regulate Plaintiff's conduct.   Without it, Plaintiff could not have been found to have committed misconduct.   Because the provision was used to regulate Plaintiff's conduct, it is well within the type of provisions subject to vagueness challenges.   Plaintiff has amply pled a claim that section 353(c) is unconstitutionally vague.

2.   <u>The Act's "disability" provision is unconstitutionally vague</u>.

The Act contains two references to judicial disability.   The first authorizes anyone to file a complaint alleging a judge is "unable to discharge all the duties of office by reason of mental or physical disability."   28 U.S.C. § 351(a).   The second authorizes a judicial council to certify a judge as disabled.   *Id.* at § 354(a)(2)(B)(i).   The Act is otherwise silent on judicial disabilities.   It neither defines the term "disability" nor identifies "the duties of office," and, aside from the certification provision, says nothing about the fate of a judge found to be disabled.

Defendants' argument that section 351(a) is not subject to vagueness challenges because it concerns status, not conduct, lacks merit.   The purported distinction between status and conduct is dubious at best, and Defendants do not even attempt to identify where conduct ends and status begins.   Discharging the "duties of office" obviously refers to conduct, not status, and having notice of the relevant duties is essential to avoid or defend against a complaint of judicial disability.   Defendants do not even attempt to argue that section 351(a) is subject to an "arbitrary enforcement" challenge.   The provision plainly relates to the consideration and investigation of disability complaints.   It is readily capable of being analyzed to determine whether it vests arbitrary enforcement authority in the judicial officials who consider and investigate such complaints.   Defendants concede the point by not even trying to refute it.

- 16 -

As with section 353(c), Defendants fail to offer any definitions or limiting construction of section 351(a)'s disability provision.   They focus only on the term "disability" and ignore the corresponding "duties of office."   The two go hand in hand.   Determining whether a person is unable to perform a duty "by reason of physical or mental disability" requires an analysis of both the physical or mental condition that gives rise to the alleged disability and the duty at issue. Diabetes, for example, is a common physical condition.   A firefighter may suffer from diabetes, but be perfectly able to perform his or her duties.   By contrast, a person in a wheelchair may not be able to work as a firefighter, but may be perfectly able to perform work that is not as physically demanding.   Not every physical or mental condition constitutes a disability, and whether a person has a disability cannot be separated from his or her job duties.   Having well-defined terms and comprehensive statutory scheme for addressing claims of disability is vital for both the individual alleged to be disabled and the persons or entities charged with adjudicating the claim.   This is especially true where the individual is a judge and judicial independence and separation of powers is such a significant concern.

Secondary materials do not make up for the Act's silence.   The Judicial Conference rules provide only three, unenlightening examples of disabilities:   substance abuse, the inability to stay awake during court proceedings, and impairment of cognitive abilities that renders the judge unable to function effectively.   RULES FOR JUDICIAL-CONDUCT AND JUDICIAL-DISABILITY PROCEEDINGS R. 3(e) (2015).   The Sixth Circuit Judicial Council's rules state only that a mental or physical disability "may include temporary conditions as well as permanent disability."   RULES GOVERNING COMPLAINTS OF JUDICIAL MISCONDUCT OR DISABILITY R. 1(b) (2007).   Neither set of rules defines the "duties of office."

The law has greater tolerance for imprecision where the consequences are less severe. *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498 (1982).   Little imprecision should be tolerated in the context of judicial disabilities, as the threat to judicial independence arising from unwarranted, abusive, or retaliatory investigations is substantial.   *Id.* at 499.   A "more stringent" vagueness test should apply.   *Id.*   As scienter is not an element of a disability analysis, a scienter requirement does not mitigate the vagueness of the Act's disability provision. *Id.*   Given the lack of any definitions in the Act, the lack of any meaningful secondary materials, and the absence of any meaningful scheme for addressing claims of judicial disability, judges lack fair notice of how to conform their conduct to the requirement of the law, and special committees and judicial councils are afforded entirely arbitrary authority to pursue disability complaints against their colleagues.   The Act's disability provision is unconstitutionally vague.

Comparing the Act to the Americans with Disabilities Act ("ADA") highlights the Act's constitutional infirmity.   The ADA makes it unlawful for an employer to "discriminate against a qualified individual" on the basis of a disability.   42 U.S.C. § 12112(a).   A "qualified individual" is someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position."   *Id.* § 12111(8).   The term "disability" is expressly defined to include "a physical or mental impairment that substantially limits one or more major life activities."   *Id.* § 12102(1)(A).   The term "major life activities" is defined as well.   *Id.* § 12102(2).   The Equal Employment Opportunity Commission, which is charged with enforcing the ADA, has issued regulations about what constitutes an "essential function."   29 C.F.R. § 1630.2(n).   In short, the ADA sets forth a comprehensive scheme that defines its major terms, provides notice to persons and entities bound by its provisions, and protects against arbitrary enforcement.   No such scheme governs the Act, leaving Article III judges unable to conform

themselves to the requirements of the law and giving arbitrary enforcement authority to judicial councils and their special committees.

The charges against Plaintiff are a case in point.   The duties allegedly at issue are: (1) "maintaining a professional relationship" with colleagues; (2) "shouldering [] responsibilities as a member of th[e] court;" and (3) refraining from "making unfounded and destructive attacks" on colleagues.   Compl., ¶ 34.   The legal origin of these alleged duties is unknown.   The special committee charged with investigating Plaintiff appears to have made them up, and Plaintiff had no notice of them until the April 2015 hearing.   *Id.*   Plaintiff could not have even had notice he could be subject to a disability complaint for allegedly failing to carry out these purported duties until that late date.[12]   The alleged disability at issue has *never* been identified.   *Id.* at ¶ 34.   All Defendants rely on is the special committee's paid expert's statement that there is "a reasonable basis for concern as to [Plaintiff's] mental or emotional state" and that "significant personality traits" "may have contributed to the current concerns."   *Id.* at ¶ 28.   No reference is made to whether personality traits could even constitute a "disability" under the Act or whether or how they could affect an Article III judge's ability to carry out his or her undefined "duties of office."   Section 351(a)'s vagueness prevented Plaintiff from having proper notice and enabled the special committee and the Judicial Council to enforce the provision against him arbitrarily.

\*     \*     \*

Defendants' claim that Plaintiff failed to "preserve" his vagueness argument also lacks merit.   It is not properly before the Court on a motion to dismiss because it is a factual matter

---

[12]     No claim was raised that Plaintiff does not or cannot maintain a full docket of cases or is unable to make rulings.   Compl. at ¶ 43.   The testimony at the April 2015 hearing showed Plaintiff's "handling of his docket has been appropriate," he is "a very bright judge," and he "writes very good opinions."   *Id.*

outside the four corners of the complaint.   Defendants also provide no support for the claim.   In

addition, Plaintiff has repeatedly and consistently challenged on multiple grounds, including

vagueness, the legal and factual bases for any concern that he suffers from an unidentified and

never described disability allegedly affecting his ability to carry out "duties of office" that have no

relation to his ability to decide cases or manage his docket.   *See*, *e.g.*, *In re John R. Adams*,

Judicial Complaint No. 06-13-900009, Judge John R. Adams' Proposed Findings of Fact at 34-39

(6th Cir. Jud. Council May 15, 2015); *In re John R. Adams*, Judicial Complaint No. 06-13-900009,

Judge John R. Adams Post-Hearing Brief at 17-28, 35-39 (6th Cir. Jud. Council May 15, 2015); *In*

*re Complaint of Judicial Misconduct*, No. 17-01, Petition for Review at 1, 10-13, 18-22, 23-26

(Comm. on Judicial Conduct and Disability April 4, 2016).   Plaintiff also has repeatedly and

consistently challenged whether he can be subjected to a compelled psychiatric examination under

section 353(c).   *Id.*   These issues are not new.   They bear no similarity to Judge Hastings' effort,

after years of judicial council proceedings and litigation in multiple courts to raise the entirely new

claim that the misconduct complaint filed against him after his acquittal on federal bribery charges

unconstitutionally reduced his compensation.   *Hastings v. Judicial Conference of U.S.*, 829 F.2d

91, 103 (D.C. Cir. 1987).   Defendants' exhaustion argument fails.

       C.     Plaintiff's Fourth Amendment Claim (Count IV).

Defendants do not contest that they are government actors or that compelled psychiatric

examinations are protected by the Fourth Amendment.   Obviously, the Fourth Amendment limits

judicial councils' authority to order compelled psychiatric examinations and any recommended

treatment, even if such orders are not *ultra vires* or the Act's investigative scope and disability

provisions are not unconstitutionally vague.   Defendants provide no convincing reason why a

warrant issued by a neutral and detached judicial officer, supported by evidence demonstrating

probable cause to believe a judge suffers from an identifiable mental disability and describing with particularity the examination to be undertaken, is not constitutionally required.   Defendants also provide no framework for analyzing the Fourth Amendment issues raised by compelled psychiatric examinations.   They do not argue any of the well-established exceptions to the warrant requirement apply.   Their argument is little more than a tautology – if a special committee determines that a compelled psychiatric examination is warranted, then its reasonable and the Fourth Amendment is satisfied.

The Fourth Amendment protects "expectations of privacy" (*see Katz v. United States*, 389 U.S. 347 (1967)) – the individual's legitimate expectation that in certain places and at certain times he has "the right to be let alone – the most comprehensive of rights and the right most valued by civilized men."   *Olmstead v. United States*, 277 U.S. 438, 278 (1928) (Brandeis, J., dissenting). The Supreme Court "has repeatedly held that searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions."   *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2542 (2015) (internal citations and quotations omitted).   These include consent, plain view, searches incident to arrest, automobile search, border searches, stop and frisk, exigent circumstances, and special needs searches.

The special needs exception arises when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable."   *Patel*, 135 S. Ct. at 2542.   The Fourth Amendment analysis in a "special needs" context does not devolve into a free-form balancing test, as Defendants imply.   Rather, the Court must "determine whether it is impracticable to require a warrant or some level of individualized suspicion in the particular context," balancing the individual's privacy expectation against the government's asserted

interest.  *Nat'l Fedn. of Fed. Emps.- IAM v. Vilsack*, 681 F.3d 483, 489 (D.C. Cir. 2012) (*quoting Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665-66 (1989)).   Because the analysis required by the special needs exception is fact-specific, special needs cases are more appropriately decided on summary judgment than on a motion to dismiss.  *Lewis v. Gov't of the Dist. of Columbia*, 161 F. Supp.3d 15, 25 (D.D.C. 2015) (Boasberg, J.) (*citing Douglas v. New York State Adirondack Park Agency*, 895 F. Supp.2d 321, 353 (N.D.N.Y. 2012)).   Defendants fail to identify any facts showing why, when a judicial council or special committee seeks to compel a psychiatric examination of a judge, it would be impracticable to seek a warrant based on probable cause from a neutral, detached judicial official.

1.   Judges' privacy expectations.

A compelled psychiatric examination is a far greater intrusion on personal privacy than typical "special needs" searches such as drug tests (urinalysis), alcohol tests (breathalyzers), or DNA tests (buccal swabs).   Such searches are minimally invasive and often completed in seconds.   *See, e.g., Maryland v. King*, 133 S. Ct. 1958, 1969 (2013); *Knox Cnty. Educ. Assoc. v. Knox Cnty. Bd. of Educ.*, 158 F.3d 361, 380-81 (6th Cir. 1998).   They also cannot be fairly compared to a government supervisor's search of an employee's office or work space or a school principal's search of a student's purse.   *O'Connor v. Ortega*, 480 U.S. 709 (1987) (plurality); *New Jersey v. T.L.O.*, 469 U.S. 325 (1985).   Although the contours of the psychiatric examination demanded of Plaintiff have never been identified – we know only that it includes an interview of unspecified scope and duration and approximately three hours of unidentified psychological testing[13] – standard psychiatric examinations typically involve both a comprehensive personal

---

[13]   Plaintiff was asked to provide medical records, but had none to provide.

interview, a battery of psychological and neuropsychological tests, and a review of the subject's medical records.   American Academy of Psychiatry and the Law, *Practice Guideline for the Forensic Evaluation of Psychiatric Disability*, Vol. 36, No. 4 (2008 Supplement) ("AAPL Guideline"), at S15 (*citing* American Psychiatric Association, *Practice Guideline for Psychiatric Evaluation of Adults*, Section III (2d ed.)).

The interview component includes a review of systems, physical examination, and a mental status examination.   *Id.*   It also often includes:   (1) general medical history, including past hospitalizations, medical procedures, treatments and medications; (2) psychiatric history; (3) family medical and psychiatric history; (4) history of alcohol and substance abuse; (5) high-risk behaviors; (6) developmental, psychosocial, and sociocultural history; (7) family history, personal relationships, and community ties; (8) sexual history, including sexual abuse, sexual orientation, and sexual practices; (9) educational background; (10) occupational and military history; (11) legal history; and (12) religious and spiritual beliefs.   *Id.*   It also may include basic laboratory tests, including complete blood count, blood chemistries, and urinalysis.   *Id.*

The psychological and neuropsychological testing component may include personality tests such as the 567-question Minnesota Multiphasic Personality Inventory-2, cognitive tests such as the Wechsler Adult Intelligence Scale-III, and comprehensive neurological tests such as the Halstead-Reitan Battery or the Luria-Nebraska Battery.   AAPL Guideline at S17.   The various components of a psychiatric examination are, individually and collectively, a far greater intrusion on personal privacy than a simple urinalysis, breathalyzer, or cheek swab.   They also demand an amount of time measured in hours, not seconds.

Significantly, judges are not merely employees of the United States government. *O'Connor*, 480 U.S. at 717 ("The employee's expectation of privacy must be assessed in the

context of the employment relation.").   They are principal officers of the United States, appointed

by the President with the advice and consent of the Senate.   *Weiss v. United States*, 510 U.S. 163,

191 (1994) (Souter, J., concurring).   Their unique status affords them lifetime tenure,

compensation that cannot be diminished, and other significant protections intended to preserve

judicial independence.   They are in no way comparable to the more than 2 million federal

employees, whose privacy interests in their place of work, "while not insubstantial, are far less

than those found at home or in some other contexts."   *O'Connor*, 480 U.S. at 725.

It also cannot be said that judges work in a highly regulated environment such that their

expectations of privacy are reduced by their employment status.   They are not police officers,

train operators, or nuclear power plant workers or work in other, recognized "safety-sensitive

positions."   *Knox Cnty. Educ. Assoc.*, 158 F.3d at 377.   They obviously are not similarly situated

to parolees, probationers, or any other persons with substantially reduced expectations of privacy.

*King*, *supra*; *Samson v. California*, 547 U.S. 843 (2006); *Griffin v. Wisconsin*, 483 U.S. 868

(1987).   As no rule, regulation, statute, or policy expressly authorizes compelled psychiatric

examinations or other medical evaluations of judges, their expectations of medical privacy are no

less than those of private individuals.   The financial disclosure requirements and ethical

restrictions imposed on judges do not bear on judges' medical privacy.   They are qualitatively

different from the medical privacy issues raised by compelled psychiatric examinations.   They do

not reduce judges' medical privacy expectations in any way.

2.       The governmental interest.

Defendants do not identify any governmental interest in compelling psychiatric

examinations of judges, much less one that justifies deviating from the usual warrant and probable

cause requirement.   Whatever interest might exist, it is not the generalized, public health or safety

interest typically invoked in special needs cases.   "In other special needs cases, we have tolerated suspension of the Fourth Amendment's warrant or probable cause requirement in part because there was no law enforcement purpose behind the searches in those cases, and there was little, if any, entanglement with law enforcement."   *Ferguson v. City of Charleston*, 532 U.S. 67, 79 n.15 (2001).   Singling out a particular judge for a psychiatric examination as part of a judicial conduct or disability investigation also is substantially different from requiring an entire class or random selection of employees in safety-sensitive positions to undergo drug or alcohol testing or requiring serious felony suspects to undergo DNA testing.   For such programmatic searches, the government or an employer carrying out a government mandate "does not make a discretionary determination to search based on a judgment that certain conditions are present."   *Von Raab*, 489 U.S. at 667.   They are routine, administrative matters for which "there are simply 'no special facts for a neutral magistrate to evaluate.'"   *Id.* (*quoting South Dakota v. Opperman*, 428 U.S. 364, 383 (1976) (Powell, J., concurring)).

By contrast, the immediate objective of a compelled psychiatric examination of a judge is to obtain evidence for use in an investigation, a quintessential law enforcement purpose even if not a criminal law enforcement purpose.   *Ferguson*, 532 U.S. at 82 (finding that "immediate objective" of drug testing of pregnant mothers seeking prenatal care at state hospital was law enforcement, not protection of the health of the mother and child).   A judicial misconduct or disability investigation has potentially very serious ramifications for the subject judge.   In the case of a misconduct investigation, the subject judge may be censured or reprimanded or prevented from hearing new cases on a temporary basis.   28 U.S.C. § 354(a)(2)(A).   It also may lead to impeachment.   *Id.* at §§ 354(b)(2)(A) and 355(b).   In the case of a disability investigation, it may lead to certification that the judge is disabled.   *Id.* at §§ 354(a)(2)(B)(i) and 372(b).   The

consequences of a judicial conduct or disability investigation may be far more significant to a judge than the consequences of a criminal conviction would be to a private individual, especially if the offense was minor.

Plaintiff does not minimize or diminish the governmental interest in the proper functioning of the judiciary, including having competent judges, or protecting public confidence in the judiciary.   Plaintiff takes both very seriously.   Complaint at ¶¶ 10-13.   But to the extent Defendants claim compelled psychiatric examinations are necessary to the proper functioning of the judiciary and to protect public confidence in the courts, other, competing interests exist as well. These obviously include preserving judicial independence and avoiding retaliation against independently-minded judges and other abuses that might easily result from the unchecked exercise of power.   These competing governmental interests weigh heavily in favor of requiring warrants, probable cause, or some other affirmative demonstration of constitutional reasonableness before a compelled psychiatric examination of an Article III judge may proceed.

3.      Warrants and individualized suspicion
        are not impracticable.

Considering the personal and governmental interests is only the means to the end of the special needs analysis, not the end of the analysis itself.   Its purpose is to determine whether, in the context of a judicial conduct or disability investigation, it is impractical to require a warrant or whether or to what extent some degree of individualized suspicion is necessary to render a search "reasonable."   Defendants fail on both fronts.

The Supreme Court has recognized that, in some circumstances, a warrant requirement may be unsuitable.   *O'Connor*, 480 U.S. at 720.   "In particular, a warrant requirement is not appropriate when 'the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search.'"   *Id.* (*quoting Camara v. Municipal Court*, 387 U.S. 523, 533 (1967)).

*O'Connor*, which, again, concerned the constitutionality of a supervisor's search of a government employee's office, was one such case.   The Court found, "[R]equiring an employer to obtain a warrant whenever the employer wished to enter an employee's office, desk, or file cabinets for a work-related purpose would seriously disrupt the routine conduct of business and would be unduly burdensome."   *Id.* at 722.   "Imposing unwieldy warrant procedures in such cases upon supervisors, who would otherwise have no reason to be familiar with such procedures, is simply unreasonable."   *Id.*   Likewise in *New Jersey v. T. L. O*, 469 U.S. 325 (1985), the Court concluded that the warrant requirement was not suitable to the school environment because such a requirement would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools.   By contrast, in *Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978), the Court explored the burdens a warrant requirement would impose on the Occupational Safety and Health Act regulatory scheme at issue in that case and held that warrants would not impose serious burdens on the inspection system or the courts, would not prevent inspections necessary to enforce the statute, and would not make them less effective.

Defendants do not even attempt to argue that adhering to the warrant requirement would substantially burden judicial conduct or disability investigations or disrupt the business of the courts generally.   Defendants also do not argue that requiring a warrant would frustrate the purpose of a psychiatric examination.   There are no exigencies or need for surprise.   Subject judges are unlikely to flee, and any evidence of a disability is unlikely to disappear or be lost.   The judicial disability investigation process obviously is very different from the disciplinary needs of a school or office environment.   The number request for warrants is not likely to be substantial as the number of investigations is not substantial.   According to reports compiled by the Administrative Office of the U.S. Courts ("AO") and available on AO's websites, only four

complaints were referred to special committees in each of the 12-month periods ending September 30 for the years 2012, 2014, 2015, and 2016.[14]   *See* Tables S-22, "Report of Complaints Commenced and Action Taken Under Authority of 28 U.S.C. 351-364," available at http://www.uscourts.gov/statistics-reports/caseload-statistics-data-tables?tn=S-22&pn=All&t= All&m%5Bvalue%5D%5Bmonth%5D=&y%5Bvalue%5D%5Byear%5D=&=Apply (visited March 21, 2018).   Only two complaints were referred to special committees in the 12-month period ending September 20, 2013, and no special committee was appointed in the 12-month period ending September 30, 2011.[15]   *Id.*   As a result, requesting and obtaining a warrant in a judicial conduct or disability investigation would not be unduly burdensome.   Given the significant intrusion on a judge's privacy and the implications of certifying a judge to be disabled or finding he or she committed misconduct by objecting to a compelled psychiatric examination, adhering to the warrant requirement is not unreasonable.

If anything, a warrant would benefit the process.   Search warrants protect privacy in two main ways.   *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2181 (2016).   First, they ensure a search is not carried out unless a neutral and detached judicial official makes an independent determination that there is probable cause to believe material, relevant evidence will be found.   *Id.* Second, the existence of a warrant limits the intrusion on privacy by specifying the scope of the search.   *Id.*   Warrants "advise the owners of the scope and objects of the search beyond which limits the inspector is not expected to proceed."   *Barlow's Inc.*, 436 U.S. at 323.   Ultimately, they aim to protect against "devolv[ing] almost unbridled discretion upon executive and administrative

---

[14]   The data does not differentiate between judicial conduct and disability complaints.

[15]   Eighteen complaints were referred to special committees in the 12-month period ending September 30, 2017, but fourteen of these are from a single proceeding involving 14 judges in the Fourth Circuit.

officers, particularly those in the field, as to when to search and whom to search." *Id.*   A warrant in the judicial disability context would at least provide the subject judge with the protection of having identified limits placed on the scope and extent of an examination.

The Supreme Court has adopted standards less than probable cause where "a careful balancing of governmental and privacy interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause."   *O'Connor*, 480 U.S. at 722 (*quoting T. L. O.*, 469 U.S. at 341).   "We have concluded, for example, that the appropriate standard for administrative searches is not probable cause in its traditional meaning." *Id.* at 723.   "Instead, an administrative warrant can be obtained if there is a showing that reasonable legislative or administrative standards for conducting an inspection are satisfied."   *Id.* (*citing Barlow's, Inc.*, 436 U.S. at 320; *Camara v. Municipal Court*, 387 U.S. 523, 538 (1967)). As Plaintiff has demonstrated, there are no legislative or administrative standards for conducting compelled psychiatric examinations of judges.   The Review Committee itself has acknowledged that the matter is a question of first impression.   Compl., ¶ 50.   As Plaintiff has also demonstrated, the privacy interests are substantial.   If not probable cause, then at least reasonable suspicion that an Article III judge suffers from an impairment limiting his or her ability to discharge the essential duties of office must be demonstrated in order to satisfy the Fourth Amendment's constitutional reasonableness requirement.   No such reasonable suspicion exists here.   *Cf.*, Compl., ¶ 28.

    4.    Pre-compliance review.

Yet another factor must be taken into account in assessing the constitutional reasonableness of warrantless psychiatric examinations of Article III judges – the opportunity for pre-compliance review.   The Supreme Court has held that, "absent consent, exigent

circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain pre-compliance review before a neutral decisionmaker." *Patel*, 135 S. Ct. at 2452.   In *Patel*, the plaintiff challenged a city ordinance requiring hotel operators to make their guest registries available to the police on demand.   The ordinance also penalized operators who declined to turn over their registries without affording them any opportunity for pre-compliance review.   In striking down the ordinance as facially invalid, the Court saw "no reason why this minimal requirement is inapplicable here."   *Patel*, 135 S. Ct. at 2452.   "Absent an opportunity for pre-compliance review, the ordinance creates an intolerable risk that searches authorized by it will exceed statutory limits, or be used as a pretext to harass hotel operators and their guests."   *Id.* at 2452-53.   The Court in *Patel* compared the ordinance to an administrative subpoena that a hotel operator could move to quash.   "A neutral decisionmaker. . . would then review the subpoenaed party's objections before deciding whether the subpoena is enforceable."   *Id.* at 2453.   "To be clear, we hold only that a hotel operator must be afforded an *opportunity* to have a neutral decisionmaker review an officer's demand to search the registry before he or she faces penalties for failing to comply."   *Id.*

Like in *Patel*, the compelled psychiatric examination of a judge in a judicial conduct and disability investigation arises in an administrative context, but has a punitive component.   Refusal to undergo the examination can result in a finding of misconduct, as occurred in Plaintiff's case.   Like the plaintiffs in *Patel*, Plaintiff had no opportunity to challenge the search before a neutral decisionmaker.   Nor does any judge who objects to undergoing a warrantless, compelled examination.   In *Patel*, the absence of that opportunity rendered the warrantless search unreasonable under the Fourth Amendment.   The outcome should be no different here.   If anything, the need for pre-compliance review is even more compelling in the context of

warrantless, compelled psychiatric examinations of judges because Defendants claim inherent authority to compel psychiatric examinations.   No statutory framework or procedure protections limit or constrain when a psychiatric examination might be demanded.   Whether and when to demand an examination, as well as the scope of the examination, is left entirely up to the special committee exercising unwritten, allegedly inherent power.   To punish a judge who objects without affording him or her the opportunity for review before a neutral and detached judicial officer is not constitutionally reasonable.

Defendants' citation to Rule 35 of the Federal Rules of Civil Procedure – which requires a determination by a neutral and detached judicial officer before a compelled psychiatric examination takes place – confirms Plaintiff's point.   Rule 35 authorizes examinations and established procedures for determining when they are appropriate and how they should be carried out.   Under the rule, the district court judge presiding over a case determines whether the examination proceeds, not the party demanding the examination.   In addition, a request for an examination must be made "only on motion for good cause and on notice to all parties and the party to be examined," who are afforded the opportunity to object or oppose without risking sanction or punishment.   FED. R. CIV. P. 35(a)(2)(A).   If the court determines good cause has been shown, then the order authorizing the examination "must specify the time, place, manner, conditions, and scope of the examination, as well as the person or persons who will perform it." FED. R. CIV. P. 35(a)(2)(B).   There are appellate rights as well.

Here, Defendants claim inherent authority to compel examinations, and no statute or rule guides or limits their claimed authority.   They make the rules.   Defendants, not a neutral intermediary, determine when to require an examination and unilaterally define the scope and parameters of the examination.   They execute the rules.   Defendants also consider any objection,

- 31 -

and, at least according to Defendants, there is no appeal.   They are the legislature, the executive, and the judiciary – the very definition of tyranny.   *PHH Corp. v. Consumer Fin. Prot. Bureau*, Case No. 15-1177, slip. op. at 33 (D.C. Cir. Jan. 31, 2018) (Henderson, J, dissenting) (*quoting* FEDERALIST NO. 47 at 324) (J. Cooke ed., 1961)).   Noncompliance is misconduct.   Defendants' compelled psychiatric examinations could not be any more different from Rule 35.

Defendants' claim that a warrant issued by a magistrate would offer less protection misses the point.   Special Committees, chief judges, and judicial councils are not neutral, detached observers making independent judgments about whether the evidence supports requiring a psychiatric examination and defining the parameters and scope of any examination to be undertaken.   Special Committees and judicial councils are stakeholders – the equivalent of law enforcement officials ferreting out crime.   They are not acting in a judicial capacity.   The number of levels of review also is irrelevant if those levels are not neutral and independent, especially when no statute or rule specifies when and under what circumstances an examination can be required and inherent authority to compel examinations is claimed by the entities providing review.   The absence of any pre-compliance review and punishment of noncompliance as misconduct only heightens the constitution infirmity.   *Patel*, *supra.*   And, again, according to Defendants, no independent judicial review is ever available.

5.    Facial vs. as-applied.

Finally, Plaintiff's challenge to compelled examinations of Article III judges in judicial conduct and disability investigations, without a warrant, showing of probable cause, or other demonstration of constitutional reasonableness, is a quintessential facial challenge.   This particular claim does not challenge what Defendants did to Plaintiff, but instead challenges the constitutionality of such searches in general.   It is no different in this regard than the facial

challenges claims brought in *Chandler*, *Ferguson*, *McNeely*, *Patel*, and other successful cases.   In challenging Plaintiff's facial challenge, Defendants frame the issue as a false choice.   The issue is not whether it is ever reasonable under any circumstances to require an Article III judge to undergo a compelled psychiatric examination.   Rather, the issue is whether the Fourth Amendment requires a warrant and probable cause or some other degree of constitutionally reasonable, individualized suspicion for such searches to be lawful.   It plainly does, and Defendants' assertion that Plaintiff has not brought a proper facial challenge is without merit.

    D.    <u>Plaintiff's Separation of Powers Claim (Count VII).</u>

The Framers of the Constitution believed that the "separate and distinct exercise of the different powers of government" was "essential to the preservation of liberty."   THE FEDERALIST No. 51 (J. Madison).   To establish "the necessary partition of power among the several departments, as laid down in the Constitution," the "interior structure of the government" was designed so that the different branches "keep[] each other in their proper places."   *Id.*

> The Framers created a structure in which "[a] dependence on the people" would be the "primary controul on the government."   THE FEDERALIST No. 51, at 349 (J. Madison).   That dependence is maintained, not just by "parchment barriers," *id.*, No. 48, at 333 (same), but by letting "[a]mbition . . . counteract ambition," giving each branch "the necessary constitutional means, and personal motives, to resist encroachments of the others," *id.*, No. 51, at 349.

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 501 (2010).   Consistent with these principles, the Supreme Court has rigorously enforced constitutional provisions ensuring the separation of powers.   *See id.* at 495 (statute "withdraw[ing] from the President any decision on whether [] good cause exists" to remove an official intrudes on vested executive power); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218-19 (1995) (statute requiring courts to reopen previously entered final judgments violated power vested in the judiciary to decide cases); *Bowsher v. Synar*, 478 U.S. 714, 722-23 (1986) (statute delegating executive power to an official

removable by Congress violated provisions regarding appointment and impeachment); *INS v. Chadha*, 462 U.S. 919, 951 (1983) (statute allowing one-house to veto immigration decisions violated Article I requirements of bicameral action and presentment).

The Constitution guarantees that federal judges "shall hold their Offices during good Behaviour," and shall receive "a Compensation, which shall not be diminished during their Continuance in Office."   U.S. Const. art. III, § 1.   The impeachment power is reserved to the House of Representatives and the Senate.   *Id.*, art. I, §§ 2, 3.

In addition to ordering Plaintiff to submit to a compelled psychiatric examination and "any treatment or counseling deemed necessary," the Review Committee directed the special committee to "retain jurisdiction" for up to two years to "ensure Judge Adams's ability to discharge the duties of office as a federal district court judge."   Compl. ¶ 53.   It also authorized the special committee to conduct unspecified "further investigation into Judge Adams's conduct on the bench," although this conduct had not been impugned.   *Id.*, ¶ 55.   And it ordered Plaintiff to refrain from issuing a kind of order that has not been found to be unlawful and that other judges might issue.   *Id.*, ¶ 54.   While the Review Committee found "curtailment of Judge Adams's docket is not supported by the record as it exists at this time," it accepted the legality and propriety of that step "should sufficient evidence establish Judge Adams's incapacity."   *Id.*, ¶ 51.

These sanctions, separately and in combination, amount to a diminishment of Plaintiff's authority as an Article III judge.   They go beyond the sanctions set forth in Act, which only expressly references censuring or reprimanding a judge, ordering that no further cases be assigned to the judge on a temporary basis, certifying the judge as disabled, and asking the judge to voluntarily retire.   28 U.S.C. § 354(a)(2).   They also are, and are

meant to be, humiliating.   The free hand given to the special committee to *generally* oversee Plaintiff's discharge of his constitutionally vested authority, and to *generally* investigate his conduct, is not now, and never has been, endured by any federal judge.   In effect, the order subjects Plaintiff to regular, on-going monitoring by the special committee, which limits his judicial independence.   He alone among federal judges is put in the position of having to consider, when he makes a decision, how that decision might be perceived by the special committee and the Judicial Council.   The contrast between the sanctions in the order and the sanctions referenced in the Act could not be starker.   None of the sanctions in the Act work a diminution of judicial authority.   The sanctions in the order plainly diminish Plaintiff's authority.   If the power to issue these unprecedented sanctions was authorized by the Act, it is unconstitutional.   If this power was not authorized by the Act, Defendants acted without authority.

Defendants' response that Plaintiff "has *not* been removed from office; he continues to serve as an Article III district judge" (Defs' Mem. at 38) is glib.   Plaintiff is not claiming he was improperly removed in violation of Title VII.   He is a duly appointed federal judge, and the various sanctions imposed against him raise the serious constitutional issues described herein.   Nor does the fact that removal of his docket is merely threatened (*id.* at 39) mean this particular threat cannot serve as the basis of a claim for prospective relief.   *See Larsen v. U.S. Navy*, 346 F. Supp. 2d 122, 133 (D.D.C. 2004) (plaintiff had adequately pled a likelihood of future injury under the "lenient pleading standard" that applies to motions to dismiss).

Finally, Defendants' argument that Plaintiff's separation of powers claim is barred as an as-applied challenge is incorrect.   Defs' Mem. at 24.   First, Plaintiff maintains that

the remedies ordered against him could not be ordered against *any* federal judge.   Second, as discussed below, the Act has been amended so as to reverse *McBryde's* conclusion that as-applied claims cannot be heard in federal court.

> E.   Plaintiff's As-Applied Constitutional Claims (Counts II, V, and VI).

Citing *McBryde*, Defendants argue that a purported "no review" provision in section 357(c) takes away the Court's jurisdiction to decide Plaintiff's as-applied constitutional claims. This argument is wrong for several reasons.

First, *McBryde* is no longer good law.   A 2002 amendment to the Act makes clear that Congress never intended to preclude as-applied constitutional challenges to judicial council decisions.   Defendants ignore the 2002 amendment and fail to challenge Plaintiff's as-applied claims on any other grounds.   They clearly state claims upon which relief can be granted.

Second, though Plaintiff's *ultra vires* claim is facial, jurisdiction to review an as-applied, *ultra vires* claim can exist even where a statute precludes review of other types of as-applied challenges.   *McBryde* did not dispute this principle.

Third, Defendants misread *McBryde* notwithstanding the 2002 amendment.   *McBryde* did not hold that the Act's "no-review" provision bars all as-applied constitutional claims.   Rather, the Court looked at the four as-applied claims brought by the district court judge in *McBryde* and determined those particular, poorly formed claims were jurisdictionally barred.   It also did not hold that judicial review is never available to challenge the constitutionality of an allegedly unlawful search or seizure or the denial of procedural protections.

Finally, Plaintiff maintains in the alternative that *McBryde* was wrongly decided in that Congress did not intend to preclude review of as-applied constitutional challenges to the Act.

1.      *McBryde* is no longer good law.

In 2002, Congress passed an appropriations bill for the U.S. Department of Justice that

added the following severability clause to the Act:

> If any provision of this subtitle, an amendment made by this subtitle, or *the*
> *application of such provision or amendment to any person or circumstance is held*
> *to be unconstitutional*, the remainder of this subtitle, the amendments made by this
> subtitle, and the application of the provisions of such to any person or circumstance
> shall not be affected thereby.

21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107-273, Div.

C, Title I, Subtitle C, § 11044, 116 Stat. 1758, 1856 (Nov. 2, 2002) (emphasis added).[16]   The

amendment expressly provides for the possibility that an "application" of the Act will be held

unconstitutional.   Judicial councils do not have authority to declare laws unconstitutional.   Nor

does the Judicial Conference or the Review Committee.   Only Article III courts can declare laws

unconstitutional.   The severability clause plainly shows Congress expected federal courts to hear

as-applied constitutional challenges under the Act.   Otherwise, it would have had no reason to

enact the clause it enacted.   The clause refutes any claim Congress intended to withdraw

jurisdiction to hear as-applied constitutional challenges under the Act.

The Court could not have found Congress intended to bar as-applied constitutional

challenges if the severability clause had been enacted before *McBryde* was decided.   More to the

point, the fact that the severability clause was added after *McBryde* means the case is no longer

---

[16]      The severability clause appears in the "Historical and Statutory Notes" for section 351.
The "Historical and Statutory Notes" of every other section of the Act contains the following:

> If any provision of this section or the application of such provision or amendment
> to any person or circumstance is held to be unconstitutional, the remainder of this
> section and the application of the provisions of such to any person or circumstance
> shall not be affected thereby, see section 1104 of Pub. L. 107-273, set out as a note
> under 28 U.S.C.A. § 351.

good law.   The Supreme Court applies a "'strong presumption' in favor of judicial review."
*Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2140 (2016) (citation omitted).   Overcoming
this presumption requires "'clear and convincing' indications, drawn from 'specific language,'
'specific legislative history,' and 'inferences of intent drawn from the statutory scheme as a
whole,' that Congress intended to bar review."   *Id.* (citation omitted).   The severability clause
makes it impossible to find by "clear and convincing" evidence that Congress intended to bar
review.   Moreover, it is Defendants' obligation to identify such evidence.   *See Miami Free Zone
Corp. v. Foreign Trade Zones Bd., Dep't of Commerce*, 803 F. Supp. 442, 443 (D.D.C. 1992) (a
motion to dismiss asserting that a statute precludes judicial review "must be supported by 'clear
and convincing' evidence since general jurisdiction should be accepted absent a definite
congressional intent to preclude jurisdiction.").   They failed to do so.   Defendants cannot
overcome the strong presumption in favor of judicial review in light of the 2002 amendment, and,
because they raise no other challenge to the sufficiency of Counts II, IV, and VI, the motion to
dismiss these counts should be denied.

> 2.      There is no jurisdictional bar to Plaintiff's
> *ultra vires* claim (Count II).

Defendants err in arguing that Plaintiff's *ultra vires* claim is an as-applied challenge.   The
claim challenges judicial councils' authority to order compelled psychiatric examinations
generally.   If no such authority exists, then no judicial council can compel any judge to undergo
such an examination, a quintessential facial challenge.   Defendants also err in arguing that a
compelled psychiatric examination was at issue in *McBryde*.   The council in *McBryde* only used a
psychiatrist for advice; it did not pursue the issue of a compelled examination.   *McBryde*, 264
F.3d at 53, 59.   Plaintiff is aware of no case that even considered whether a judicial council has
authority to compel an Article III judge to undergo a psychiatric examination.   Defendants have

- 38 -

not identified one, and the Review Committee's decision acknowledges that question is one of first impression.   *See* Memorandum of Decision, *In re Complaint of Judicial Misconduct*, Case No. 17-01 at 38 (Comm. on Judicial Conduct and Disability Aug. 14, 2017).

Regardless, case law is clear that jurisdiction to consider *ultra vires* challenges is not barred by a "no-review" provision.   *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996); *Dart v. United* States, 848 F.2d 217, 224 (D.C. Cir. 1988).   Whether jurisdiction exists is intertwined with whether the challenged action is *ultra vires*, and a court must address the merits of the claim to determine whether the challenged action falls within the scope of the preclusion on judicial review.   *Amgen Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004).   Where a court finds an action is outside a statutory mandate, the court has jurisdiction.   *Id.* at 114 (*citing E.I. Du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 124-25 (1977)); *see also Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, 926 F. Supp.2d 71 (D.D.C. 2013) (Jackson, J.).[17]   For the reasons outlined in section IIIA, *supra*, compelling Plaintiff to undergo a psychiatric examination and requiring him to submit to any recommended treatment is plainly *ultra vires* whether analyzed as a facial or an as-applied claim.   Jurisdiction exists either way.

---

[17]      *McBryde* did not contravene any of these principles, nor did it hold that a district court could never have jurisdiction to consider an *ultra vires* challenge to a judicial council order. *McBryde* refused to consider two claims framed as challenges to a judicial council's statutory authority.   The first asserted that the council's order was not subject to the "no-review" provision because it was invalid.   Judge McBryde argued that the order was invalid because the council allegedly exceeded its statutory authority by expanding its investigation beyond the issues raised in the initial complaints.   264 F.3d at 63.   The Court rejected the claim, finding it was indistinguishable from a claim of simple legal error.   *Id.* at 63-64.   The second claim asserted "in the most general terms" that Judge McBryde had been sanctioned for the merits of his decisions. *Id.* at 64.   The Court found that dismissing a complaint for being merits-related was permissive, not mandatory.   *Id.*

3.    *McBryde* does not bar jurisdiction over Plaintiff's Fourth
      and Fifth Amendment claims (Counts V and VI).

Even if *McBryde* were still controlling, the Court nonetheless has jurisdiction over

Plaintiff's claims.   *McBryde* did not hold that courts lack jurisdiction to consider Fourth

Amendment challenges to particular searches and seizures.   Judge McBryde never brought such a

claim, and the *McBryde* court had no occasion to decide whether jurisdiction over such a claim

exists.   Judge McBryde asserted two distinct, as-applied constitutional claims:   (1) the chief

judge violated Judge McBryde's due process rights by failing to recuse himself; and (2) "the

*methods* used by the Judicial Council and Judicial Conference in imposing [] sanctions were

particularly invasive and therefore violated judicial independence."   *McBryde*, 264 F.3d at 58.

He also asserted two distinct, as-applied nonconstitutional claims: (1) the judicial council's order

was invalid because the investigation was widened improperly to encompass conduct not

mentioned in the initial complaints and (2) the judicial council and judicial conference improperly

sought to investigate and penalize him for the merits of his decisions and rulings.   *Id.* at 58-59.

The Court concluded that section 372(c)(1) barred all four claims.[18]   *Id.* at 59.

Nothing in *McBryde* or the text or legislative history of the Act indicates Congress

intended to deny judges a judicial forum for challenging the constitutionality of particular searches

or seizures.   Indeed, nothing in the text or legislative history indicates Congress intended to

authorize searches or seizures, especially compelled psychiatric examinations, in judicial conduct

or disability investigations.   If, during the course of an investigation, a judicial council ordered a

U.S. Marshal to search a judge's residence without a warrant or probable cause, would the subject

judge really have no resource other than an internal administrative review?   Would he or she be so

---

[18]      The provision has been recodified at 28 U.S.C. § 357(c).

powerless to vindicate this most basic constitutional right?   Not only must congressional limitations on jurisdiction be "clear and convincing," but this high standard must be applied rigorously when constitutional claims are at stake.   *Griffith v. Fed. Labor Relations Auth.*, 842 F.2d 487, 494 (D.C. Cir. 1988).   There certainly is no clear and convincing evidence of any such intent.   *Abbott Labs v. Gardner*, 387 U.S. 136, 141 (1967).   *McBryde* does not hold otherwise, at least with respect to Fourth Amendment claims challenging particular searches.

The same is true of Plaintiff's as-applied due process claim.   *McBryde* does not address whether a judge can be denied a judicial forum to vindicate the right to receive proper notice of misconduct or disability charges, to call medical and lay witnesses in his or her defense, or to have the type of non-adversarial, non-accusatory, investigative hearing provided by the very same statute that purportedly takes away the right to judicial review.   The Act expressly requires that "adequate prior notice of any investigation be given in writing" to the subject judge and that the subject judge be afforded the right to "present oral and documentary evidence."   28 U.S.C. §§ 358(b)(1) and (2); *see also* Judicial-Conduct and Judicial-Disability Proceeding Rule 15(a) and (c).   Since *McBryde*, the D.C. Circuit held that a similarly broad provision did not withdraw jurisdiction to consider a constitutional challenge to the process by which a determination was reached.   *Ralls Corp. v. Comm. on Foreign Inv.*, 758 F.3d 296, 311 (D.C. Cir. 2014) (*citing Ungar v. Smith*, 667 F.2d 188, 193-96 (D.C. Cir. 1981); *Ralpho v. Bell*, 569 F.2d 607, 620-22 (D.C. Cir. 1977).   Similarly, *McBryde* does not apply to Plaintiff's as-applied due process claim challenging the process by which the judicial council reached its decision.

4.      In the alternative, *McBryde* was wrongly decided.

It is now clear that, to the extent *McBryde* remains good law, it was wrongly decided.[19]

The D.C. Circuit has described *McBryde* as "*sui generis*" and since returned to its customary,

rigorous analysis of "no-review" clauses.   *Ralls Corp.*, 758 F.3d at 311.   Congress can only

withdraw federal courts' jurisdiction to hear facial and as-applied constitutional claims if it

demonstrates "the clearest evocation of congressional intent." *Id.* at 308-09 (*citing Ungar*, 667

F.3d at 193).   In *Ralls Corp.*, the Court acknowledged *McBryde* found such an intent even though

there was no express legislative history to this effect.   *Id.* at 311-12.   According to the Court in

*Ralls Corp.*, *McBryde* found the structure of the Act and the fact that Congress had rejected a

proposal to create an Article III court to review judicial council decisions sufficient evidence of

congressional intent:   "In *McBryde*, we were certain that the Congress intended to preclude our

review of McBryde's as-applied constitutional claims because the procedure it established

provided for review of such claims by Article III judges, making additional review by an Article III

court superfluous." *Id.* at 312.

Not only should *McBryde* be limited to the facts and claims asserted in that case, but a legal

challenge in an Article III court is not superfluous.   As Judge Tatel pointed out in his dissent,

decisions of Article III courts are reviewable on certiorari to the U.S. Supreme Court, but decisions

of judicial councils and the Review Committee are not, "a distinction of particular importance

given the constitutional interests at stake here." *McBryde*, 264 F.3d at 75 (Tatel, J., dissenting).

---

[19]      Plaintiff appreciates that the Court is bound to follow circuit precedent absent contrary
authority from an *en banc* court or the Supreme Court.   *Brewster v. Comm'r*, 607 F.2d 1369, 1379
(D.C. Cir. 1979).   Plaintiff believes good faith, if not compelling, grounds exists to challenge
*McBryde*'s holding and raises the issue to preserve it.   These grounds include the reasons
identified by Judge Tatel in his dissent.   *McBryde*, 264 F.3d at 73-76; *see also McBryde v. Comm.
to Review Circuit Conduct & Disability Orders of the Judicial Conf. of the United States*, 278 F.3d
29, 29-30 (D.C. Cir. 2002) (Tatel, J., dissenting from denial of petition for rehearing en banc).

Congress certainly did not demonstrate by clear and convincing evidence that it intended for judicial councils or the Review Committee, not the U.S. Supreme Court, to have the final say on such weighty questions as whether and under what circumstances an Article III judge can be compelled to undergo a psychiatric examination and submit to any recommended treatment. Nothing in the text or legislative history of the Act demonstrates any such intent, and *McBryde* did not decide unique questions.

It also is unpersuasive to conclude, as the *McBryde* court did, that because Congress rejected a senate proposal to create a new Article III court to review judicial council decisions that it intended to withdraw jurisdiction of existing Article III courts to hear as-applied constitutional challenges to such decisions. *McBryde*, 264 F.3d at 60-63. Congress could just as easily have determined that the administrative appeal process established by the Act was preferable to creating a new Article III court because the federal courts remained open to hear facial and as-applied constitutional challenges. The administrative appeal process created by the Act is no substitute for an adversarial proceeding in an Article III court, with its well-developed rules of civil procedure and evidence, neutral factfinders, and other truth-discovering devices and protections. The two are fundamentally different. They are not redundant or superfluous. There is no clear and convincing evidence that, because Congress created an administrative review process for judicial council decisions, it necessarily intended to deprive Article III courts of jurisdiction to decide as-applied constitution challenges to those decisions when an actual case or controversy exists.[20]

---

[20]     Because the Act does not create legally protected rights, it is unlikely that disgruntled litigants or third-party complainants would have standing to challenge judicial council or review committee decisions.

"Indeed, Congress knows how to preclude review of constitutional claims when it wants to."  *McBryde*, 264 F.3d at 73 (Tatel, J, dissenting).   The 1980 statute was enacted after multiple U.S. Supreme Court and D.C. Circuit decisions holding that statutory bars to judicial review of constitutional claims will be upheld only if there is clear and convincing evidence that Congress so intended.  *Califano v. Sanders*, 430 U.S. 99, 109 (1977); *Weinberger v. Salfi*, 422 U.S. 749, 762 (1975); *Johnson v. Robison*, 415 U.S. 361, 373-74 (1974); *Ralpho*, 569 F.2d at 619-20.   Congress presumably was aware of these decisions when it passed the Act.  *See Nat'l Petrochemical Refiners Ass'n. v. Environmental Protection Agency*, 630 F.3d 145, 155 (D.C. Cir. 2010).   That it did not include any express reference in the Act's text or legislative history to withdrawing Article III courts' jurisdiction to hear facial or as-applied constitutional challenges is evidence that it did *not* intend to preclude such claims.   There certainly is no clear and convincing evidence to the contrary.

A more likely explanation is that Congress was responding to the Supreme Court's decision in *Chandler*, which went to great lengths to avoid deciding whether judicial council orders are administrative, *i.e.*, not a "judicial act or decision by a judicial tribunal," and therefore not subject to appellate review.  *Chandler*, 398 U.S. at 86 & n.7; *see also id.* at 88, n.10.   Without an underlying case or controversy, judicial council action cannot be reviewed by an Article III court.   Calling judicial council action an order or determination does not make it a judicial act by an Article III court.   There is no "judicial" action from which an appeal can be taken or review sought.   Far from withdrawing Article III courts' jurisdiction to decide cases and controversy arising from judicial council decisions, Congress' enactment of section 357(c) only confirmed that no appellate jurisdiction lies from judicial council orders or determinations.   To hold otherwise, as *McBryde* did, is erroneous.

**IV.     CONCLUSION.**

For the foregoing reasons, Plaintiff respectfully requests that the motion to dismiss be

denied.

## **REQUEST FOR ORAL HEARING**

Plaintiff respectfully requests an oral hearing pursuant to LCvR 7(f).

Dated:   July 10, 2018                                      Respectfully submitted,

                                                                          JUDICIAL WATCH, INC.

                                                                          */s/ Paul J. Orfanedes*
                                                                          Paul J. Orfanedes
                                                                          D.C. Bar No. 429716

                                                                          */s/ Robert D. Popper*
                                                                          Robert D. Popper
                                                                          D.C. Bar No. 1023592
                                                                          425 Third Street SW, Suite 800
                                                                          Washington, DC 20024
                                                                          Telephone: (202) 646-5172
                                                                          porfanedes@judicialwatch.org
                                                                          rpopper@judicialwach.org

                                                                          *Counsel for Plaintiff*