## **EXHIBIT 1**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THE HON. JOHN R. ADAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-1894 (ABJ) |
| | ) | |
| THE JUDICIAL COUNCIL OF THE | ) | |
| SIXTH CIRCUIT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**AMENDED COMPLAINT**

Plaintiff, The Honorable John R. Adams, brings this action for declaratory relief against

Defendants Judicial Council of the Sixth Circuit and the Committee on Judicial Conduct and

Disability of the Judicial Conference of the United States.   As grounds therefor, Plaintiff alleges

as follows:

**JURISDICTION AND VENUE**

1.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

**PARTIES**

3.      Plaintiff John R. Adams is a federal judge of the U.S. District Court for the

Northern District of Ohio.   The Northern District of Ohio lies within the territorial jurisdiction

of the U.S. Court of Appeals for the Sixth Circuit ("Sixth Circuit").

4.      Defendant Judicial Council of the Sixth Circuit ("Judicial Council") oversees the

administration of the federal courts in the Sixth Circuit, including receiving and reviewing

reports by special committees charged with investigating complaints of judicial misconduct

and/or disability filed under the Judicial Conduct and Disability Act of 1980, 28 U.S.C. §§ 351-364 ("the Act").   The Judicial Council derives its authority from sections 332 and 352-354 of the Act and Rules 18-20 of the Rules for Judicial-Conduct and Judicial-Disability Proceedings.

5.       Defendant Committee on Judicial Conduct and Disability of the Judicial Conference of the United States ("the Review Committee") is a standing committee established by the Judicial Conference of the United States ("the Judicial Conference") to review orders and actions of the Judicial Councils of the U.S. Circuit Courts of Appeal regarding complaints against judges and judicial discipline under the Act.   The Review Committee derives its authority from sections 331 and 357 of the Act, and from Rule 21 of the Rules for Judicial-Conduct and Judicial-Disability Proceedings.

## STATEMENT OF FACTS

6.       On January 2, 2013, Judge Adams was nominated by President George W. Bush to a judgeship on the United States District Court for the Northern District of Ohio ("the District Court").   He was confirmed by the United States Senate on February 10, 2003 and received his commission on February 12, 2003.   Judge Adams' chambers are in Akron, Ohio.

7.       At all relevant times, Judge Adams has been and is in sound physical and mental health.   He competently manages a full docket of cases and has sat by designation on the Sixth Circuit on numerous occasions, including on at least 24 occasions since 2012 and at least 77 occasions since approximately July 2008.

8.       The District Court has seen a dramatic increase in Social Security disability appeals during Judge Adams' tenure.   Claimants seeking Social Security benefits have been plagued by long delays at every step of the disability application process, and the District Court took no steps to address the problem.   Because the District Court automatically assigns Social

Security disability appeals to magistrate judges for a recommended decision, Judge Adams

attempted to address these delays by creating deadlines for magistrates – first informally and

later by the issuance of scheduling orders, as permitted under the District Court's rules.   Unlike

other judges on the District Court, Judge Adams typically does not assign other duties to the

magistrate judges.   He asked only that the magistrate judges timely address the appeals of Social

Security disability applicants.   The magistrate judges resisted Judge Adams' efforts to require

timely decisions, preferring no deadlines at all.   Due to Judge Adams' efforts, the Court

subsequently set goals for decisions in Social Security disability appeals.

9.      Judge Adams also firmly believes that, like all employees of the federal

government, judges should be good stewards of taxpayer dollars.   He spoke out numerous times

about the District Court's wasteful and inefficient use of resources.   For example, he spoke out

about the fact that the District Court was spending thousands of dollars to purchase iPads for

judges and other court staff while simultaneously threatening cutbacks and furloughs for

essential staff, such as probation officers.   He questioned the need for a magistrate judge in

Akron, a position costing hundreds of thousands of dollars annually.   He also questioned

reimbursing judges for travel expenses incurred attending ceremonial portrait unveilings of their

colleagues.

10.     Judge Adams' concerns regarding the use of court resources and finances were

ignored.   While Judge Adams believes court governance is important, he concluded that his

participation in formal court governance was not useful or productive because his views on

governance were routinely cast aside.   He still provided his views on topics he felt deserved his

attention, however, and also remained involved in the legal community by participating in the

United States Sentencing Commission's Annual National Seminar and teaching at the University

of Akron School of Law.   He continues to serve routinely as the District Court's miscellaneous judge and presides over naturalization ceremonies.

11.     On February 1, 2013, Judge Adams issued a show cause order asking a U.S. Magistrate Judge to explain why a timely decision had not been issued in a Social Security appeal assigned to Judge Adams.   The timeliness of decisions in such cases had been a recurrent problem, and, as a result, Judge Adams' standing order in Social Security appeals included deadlines for magistrates.   In this particular case, the claimant had waited nearly 5 and 1/2 years for a final administrative decision.   When the magistrate explained the next business day that the deadline had been miscalculated, Judge Adams deemed the order satisfied and sealed both the order and response.   The magistrate faced no further consequences.   The matter arose, was resolved, and placed under seal within two court days.   Because the case was a Social Security appeal, the show cause order and response were not available to the public even before they were sealed.

12.     On or about February 15, 2013, four judges of the District Court filed a judicial complaint against Judge Adams.   The complaint alleged that Judge Adams lacked authority to issue the show cause order and further alleged that the order constituted "an extreme, unwarranted, and unjustified abuse of judicial discretion."   The complaint also alleged that Judge Adams had a "strained relationship with the other judges of the court" and had "withdrawn from participation in the governance and social life of the Court."   The complaint did not attribute the show cause order or alleged strained relationship and withdrawal to any alleged disability or other condition.

13.     Sixth Circuit Chief Judge Alice M. Batchelder recused herself from the complaint, on information and belief because her daughter had clerked for Judge Adams.   On

February 22, 2013, Acting Chief Judge Danny J. Boggs appointed a special committee ("the Special Committee") to investigate the complaint.

14.     Judge Adams filed a timely response to the complaint in March 2013.   He did not deny issuing the show cause order but explained why he had done so and how he quickly discharged the order and placed both the order and response under seal.   He also addressed the complainants' concerns about his relationship with his colleagues and limited involvement in court governance.

15.     At the Special Committee's request, Judge Adams appeared for an interview and answered the Special Committee's questions in August 2013.   He attempted to resolve the complaint informally by offering to withdraw the then-sealed order and related filings and by agreeing to attend judges' meetings and any court committee meetings to which the District Court's chief judge might appoint him, among other measures.

16.     In the Fall of 2013, the Special Committee demanded Judge Adams undergo a psychiatric evaluation as part of its investigation.   The Special Committee identified no specific reason for the request.

17.     Judge Adams objected in good faith to the demand, but nonetheless tried to accommodate the Special Committee.   In November 2013, he voluntarily underwent an examination by a local, board certified psychiatrist and submitted a report of the examination to the Special Committee in January 2014.   The report concluded that Judge Adams did not suffer from any diagnosable mental disorder.

18.     When the Special Committee persisted, Judge Adams agreed to undergo a further examination provided certain reasonable conditions were met.   These included being provided specific information about the reasons for the examination and having input into the selection of

the mental health professional chosen to perform the examination and the parameters of the examination.   It also included agreed-upon limitations on any materials provided to the mental health professional selected to perform the examination.   The Special Committee rejected every one of Judge Adams' conditions.

19.     In January and again in February 2014, the Special Committee advised Judge Adams that, if he continued to object to undergoing a psychiatric examination, it would seek to expand the scope of its investigation to include whether he suffered from a disability and would order him to submit to an examination.

20.     Judge Adams continued to object the Special Committee's examination.   Not only did the Special Committee refuse to identify any specific reason for demanding the examination, but it also refused to allow Judge Adams any input into the scope of the examination or the materials provided to the mental health professional selected to perform the examination.   The Special Committee also rejected the report of the examination Judge Adams underwent voluntarily in November 2013.

21.     On May 24, 2014, the Special Committee made good on its threat.   It asked Judge Boggs to expand the scope of the investigation to include whether Judge Adams suffers from a mental disability.   Judge Boggs granted the Special Committee's request on May 27, 2014.

22.     In August 2014, the Special Committee directed Judge Adams to provide "[a]ll records pertaining to any mental or emotional health treatment, counseling, evaluation or diagnosis . . . This includes all such records, through the present, including those compiled by counselors, primary care physicians, or others" and "all records regarding any psychotropic medications (such as mood stabilizers, anti-depressants, or tranquilizers)."   Judge Adams

objected to the demand, citing personal and medical privacy.   He subsequently advised the Special Committee that he had no such records.

23.     In September 2014, the Special Committee directed Judge Adams to travel approximately thirty miles from his Akron, Ohio chambers to undergo a three-hour battery of psychological tests as part of an examination to be performed by an unidentified forensic psychiatrist.   Judge Adams objected again, citing, among other objections, medical privacy, the Special Committee's refusal to provide the basis for demanding an examination, and the report of the examination Judge Adams underwent voluntarily, which concluded that he did not suffer from any diagnosable mental disorder.

24.     On December 5, 2014, the Special Committee asked Judge Boggs to expand the scope of the Special Committee's investigation a second time to include whether Judge Adams committed misconduct by declining to undergo the psychiatric examination demanded by the Special Committee.   Judge Boggs granted the Special Committee's request on December 9, 2014.

25.     It was not until Judge Boggs expanded the scope of the Special Committee's investigation a second time that Judge Adams was provided the identity of the psychiatrist engaged by the Special Committee to perform the examination.   The psychiatrist, Dr. Philip J. Resnick, was well-known to Judge Adams as Judge Adams had appointed Dr. Resnick to serve as an expert in at least one case pending before him.   Dr. Resnick also frequently served as a court-appointed expert in the District Court.

26.     Unbeknownst to Judge Adams, Dr. Resnick had opined in a November 11, 2014 letter to the Special Committee that materials provided to him by the Special Committee "suggest significant personality traits . . . may have contributed to the current concerns" about

Judge Adams.   Dr. Resnick's letter did not assert that there was any basis to suspect Judge

Adams suffered from a disability that rendered him "unable to discharge all of the duties of

office," and the Special Committee later stipulated that it never provided Dr. Resnick with the

report of the examination Judge Adams underwent voluntarily in November 2013.

27.     A hearing on the complaint against Judge Adams, as subsequently expanded, was

scheduled for April 20-22, 2015.

28.     In the interim, Judge Adams voluntarily underwent a second psychiatric

examination, performed by a nationally-renowned psychiatrist and leading expert on legal and

ethical issues in medicine and psychiatry.   As part of this second examination, Judge Adams

also underwent extensive psychological testing performed by a preeminent psychologist.   This

second, voluntary examination also concluded that Judge Adams did not suffer from a temporary

or permanent condition rendering him unable to discharge the duties of his office.

29.     Under both the Act and the governing rules, Judge Adams had the right to proper

notice of the charges against him, to call witnesses at any hearing, and to request the issuance of

subpoenas.   Both the Act and the governing rules also required the Special Committee's

proceedings to be investigative, not adversarial.

30.     The April 2015 hearing was anything but investigative.   It was adversarial, if not

accusatorial and antagonistic towards Judge Adams, and it was unfair.

31.     On the eve of the hearing, the Special Committee produced exhibits and witness

statements that sought to introduce new, previously undisclosed allegations from as many as five

and a half years earlier.   It also rejected all eleven pre-hearing document subpoenas and the

single witness subpoena Judge Adams had requested.

32.     The Special Committee never identified the "duties of office" allegedly at issue until after the April 2015 hearing began.   While Judge Adams' counsel was questioning a witness on the first day of the hearing, the Special Committee informed him that the relevant duties for purposes of the hearing were those referenced in the Special Committee's March 23, 2014 request to Judge Boggs to expand the scope of the investigation to include whether Judge Adams suffers from a mental disability.   The Special Committee had not provided Judge Adams with a copy of the March 23, 2014 request until exhibits and witness statements were exchanged on the eve of the hearing, and it did not inform Judge Adams at that time that the duties at issue were the duties cited in the request.   The alleged duties included: (a) "maintaining a professional relationship" with colleagues; (b) "shouldering [] responsibilities as a member of th[e] court;" and (c) refraining from "making unfounded and destructive attacks" on colleagues.   The Special Committee has never identified the alleged mental disability about which it purportedly is concerned.

33.     The Special Committee also excluded evidence from the two psychiatrists who examined Judge Adams and concluded that he does not suffer from any type of disability that renders him unable to discharge the duties of his office.   Judge Adams had submitted two witness statements and reports of examination from the local, board certified psychiatrist who had examined him initially in late 2013.   Judge Adams also submitted a summary of expected testimony and the 70-page *curriculum vitae* of the nationally renowned psychiatrist and leading expert on legal and ethical issues in medicine and psychiatry who examined him before the hearing.   Judge Adams intended for the nationally renowned psychiatrist and expert to testify and be cross-examined at the hearing.

34.     The witness statements and reports, witness summary, and *curriculum vitae* were submitted within the Special Committee's deadline for pre-hearing submissions, yet late in the day of the first day of the three-day hearing, the Special Committee demanded Judge Adams to provide, by 4:00 p.m. the following day, "information regarding any mental health evaluation Judge Adams may have received," including "any and all information, reports, notes, communications, drafts, authorizations, invoices, and other information, whether in digital form, computers, phones, or portable devices" of the two psychiatrists and "any other mental health experts that may have seen or treated Judge Adams at any time."   As a practical matter, the mid-hearing demand was impossible to satisfy.

35.     When Judge Adams did not produce the records, the Special Committee excluded the witness statements and reports, witness summary, and live testimony.   It even went so far as to state, "[T]he Committee will ignore any statements made by Judge Adams or any statements made by [counsel] that are suggestive that some mental health professional has suggested that there is not a serious psychological or mental issue with him."

36.     The conclusion of the local, board certified psychiatrist as set forth in the excluded, initial report, which was already known to the Special Committee because Judge Adams had produced it to the Special Committee in early 2014, was as follows:

> It is my opinion that Judge Adams does not suffer from a diagnosable mental disorder.   The Diagnostic and Statistical Manual of the American Psychiatric Association states that a disorder may not be diagnosed unless there is evidence of "clinically significant distress or impairment in social, occupational or other important areas of functioning." . . . [T]he behavior described in [the judicial complaint], while vexing to other members of the Court, does not constitute mental illness.

The second, later report concluded:

> [Judge Adams] shows no evidence of a disturbance in mood, and he says he is interested in pursuing a reconciliation process, but finds being compelled to

undergo psychological evaluation as unacceptable in the absence of demonstrated inability to perform assigned duties.   His cognition is intact and he is of high intelligence.   Insight and judgment are intact.

At this time, I do not feel that Judge Adams suffers from a psychiatric disorder. Some individuals' temperament may prove vexing to those around them and cause some degree of interpersonal estrangement but not be the result of mental illness.   Indeed, the very traits that prove irritating to others (a focus on rules, procedure, and precedent; an aloofness from others) are those that may be essential in an officer of the District Court.   These traits however, do not interfere with Judge Adams' reason, intellect, or grasp of reality and do not constitute mental illness.

37.     The excluded witness summary from the nationally renowned psychiatrist and expert on legal and ethical issues in medicine and psychiatry stated, to a reasonable degree of medical certainty, "Judge Adams does not suffer from a temporary or permanent condition rendering him unable to discharge the duties of his office" and "Judge Adams had principled reasons for declining to sit for psychological testing and psychiatric evaluation, as directed by the Special Committee."   On information and belief, he would have testified to this same effect had he not been excluded.

38.     The Special Committee also excluded on the same ground the witness statement of a personal friend of Judge Adams who also is a board certified psychiatrist.   The excluded statement asserted:

As a board certified psychiatrist, having known Judge Adams in many settings for greater than twelve years, I can say that I have never witnessed nor had reliable knowledge of any interaction that suggests Judge Adams has any psychological pathology.   I can say with confidence that there is no evidence of diagnosable DSM disorder.   There is no evidence that he has any form of temporary or permanent mental or emotional condition that renders him unable to perform the duties of his judicial office.

Exclusion of this particular witness statement was especially egregious because, as the witness had never formally evaluated or treated Judge Adams, there were no records to produce.   The witness could not have been excluded for any failure to produce records.

- 11 -

39.     Judge Adams also sought to introduce witness statements from more than thirty
individuals who have interacted with him on a daily basis for years, including court personnel
and attorneys who have appeared before him regularly, and the live testimony of at least one
judicial official.   The Special Committee threatened at the hearing that, if Judge Adams
submitted these individuals' witness statements or had them give live testimony, it would call an
unspecified number of unidentified witnesses to testify against Judge Adams in rebuttal.
Neither the identities of any such rebuttal witnesses nor the subject matter of their testimony had
been disclosed to Judge Adams before or after the April 2015 hearing or since.   Faced with the
Special Committee's threat, Judge Adams felt compelled not to call these additional witnesses.

40.     In addition, the Special Committee's questioning of its own witnesses at the April
2015 hearing was suggestive, often leading, and one-sided.   By contrast, its questioning of
Judge Adams was hostile and prosecutorial.   One member of the Special Committee even asked
whether impeachment should be considered.   The Special Committee's actions both before and
during the hearing were not those of a neutral investigator.

41.     Nonetheless, no claim or concern was made or raised at the April 2015 hearing
that Judge Adams did not or could not maintain a full docket of cases or is unable to make
rulings.   As one of the complainants acknowledged in his testimony at the hearing, "That's not
involved here . . . his handling of his docket has been appropriate."   Another judge testified that
Judge Adams is "a very bright judge.   He writes very good opinions."

42.     On July 10, 2015, the Special Committee issued its report and recommendations
to the Judicial Council.   It found Judge Adams committed misconduct by issuing the February 1,
2013 show cause order and by declining to undergo the psychiatric examination demanded by
the Special Committee.   The Special Committee also found it could not determine whether

- 12 -

Judge Adams suffers from a disability.   It recommended that Judge Adams be publicly reprimanded, be ordered to undergo a psychiatric examination by a psychiatrist selected by the Special Committee, not be assigned any new cases for period of two years, and have his entire docket of current cases transferred to other judges, among other sanctions.   It also ordered that Judge Adams submit to any treatment "deemed necessary by the psychiatrist."   It also asserted that, should Judge Adams continue to refuse to undergo a psychiatric examination, he be requested to voluntarily retire.

43.     On August 17, 2017, Judge Adams filed a timely response to the Special Committee's report and recommendations.   A hearing was held on September 10, 2015, at which Judge Adams appeared through counsel.

44.     On February 22, 2016, the Judicial Council issued an Order and Memorandum that largely adopted the Special Committee's recommendations.   If found Judge Adams committed misconduct by declining to undergo the Special Committee's examination, which it concluded "prejudiced the effective and expeditious investigation of this matter, which is an integral part of the business of the courts."   It ordered him to undergo the examination and that the results of the examination be made available to the Special Committee.   If further ordered that Judge Adams submit to any treatment deemed necessary by the Special Committee's psychiatrist.

45.     The Judicial Council also ordered that no new cases be assigned to Judge Adams for two years and that his present docket be transferred to other judges.   It declared that, should Judge Adams undergo the Special Committee's examination and it is determined he does not "suffer from a disability that renders him unable to discharge the duties of his office," the prohibition on the assignment of new cases might be suspended.   It also declared that, should

- 13 -

the examination find Judge Adams suffers from such a disability and he successfully undergoes

any recommended treatment, the new case ban might be suspended as well.   In either event, the

Special Committee would continue to have jurisdiction over Judge Adams the remainder of the

two years.

46.     The Judicial Council retained jurisdiction over Judge Adams "to order further

remedies depending on the results of the evaluation," and declared, "Should Judge Adams refuse

to undergo a mental-health evaluation by a psychiatrist chose by the Special Investigating

Committee, the Judicial Council intends to request Judge Adams voluntarily retire."

47.     On April 4, 2016, Judge Adams filed a timely petition for review of the Judicial

Council's February 22, 2016 Order and Memorandum.

48.     On August 14, 2017, the Review Committee largely upheld the Judicial Council's

Order and Memorandum.   It expressly affirmed the Judicial Council's finding that Judge Adams

committed misconduct by objecting to the psychiatric examination demanded by the Special

Committee, but acknowledged the issue was a question of first impression.   It also affirmed the

Judicial Council's order that Judge Adams undergo a psychiatric examination and submit to "any

necessary treatment that may be prescribed."   It even broadened the scope of the examination to

include Judge Adams's conduct on the bench and authorized interviews with litigants, lawyers,

and court staff.

49.     The Review Committee also affirmed the Judicial Council's retention of

jurisdiction over Judge Adams for two years "to ensure [his] ability to discharge the duties of

office as a federal district court judge."   Although it vacated the Judicial Counsel's order

banning the assignment of new cases to Judge Adams and transferring his docket to other judges,

the Review Committee declared that a new case ban may be warranted should Judge Adams

refuse to submit to the psychiatric examination ordered by the Judicial Council.

50.     Both the Judicial Council's February 22, 2016 Order and Memorandum and the

Review Committee's August 14, 2017 Memorandum of Decision were published on the Review

Committee's website, resulting in obviously unwanted, adverse news reports about Judge Adams

and harming Judge Adams' professional reputation.

51.     Plaintiff declined to undergo the psychiatric examination ordered by the Judicial

Council and affirmed by the Review Committee and, on September 14, 2017, filed this action.

52.     On June 27, 2018, the Judicial Council issued a second Order and Memorandum

declaring yet again that Judge Adams committed misconduct by refusing to undergo the

psychiatric examination demanded by the Special Committee.   The Judicial Council reiterated

that it previously ordered Judge Adams to undergo the Special Committee's psychiatric

examination and noted that the Review Committee affirmed both the misconduct finding and the

examination order.   It also noted that Judge Adams declined to comply with the examination.   It

continued, "[T]he Judicial Council, hopeful that Judge Adams can serve without any further

misconduct, imposes no further sanction at this time.   The Judicial Council will review the

matter in one year and will, if no further misconduct has occurred, dismiss the complaint."   The

order extended its jurisdiction over Judge Adams for a further year, until June 27, 2019.

53.     In the interim, the February 22, 2016 Order and Memorandum was used to

challenge Judge Adam's decisions and question his judicial competence.   One such individual, a

defendant in a criminal case over which Judge Adams had presided, filed a judicial complaint

against Judge Adams in which he quoted from the Judicial Council's decision, then asked:

"How is it that I had several hearings before Judge Adams in the early part of 2016 followed by a

Change of Plea Hearing on July 13, 2016 and a Sentencing Hearing on November 9, 2016?"
The complaint continues, "Given the fact that the [Special Committee] ordered Judge Adams to transfer his docket to another judge, I question his right to sit in judgment on my case.   I don't believe he had that right and what's more, I believe he is unstable."

54.     In addition, throughout the pendency of the Special Committee's investigation and the proceedings before the Judicial Council and Review Committee, members of the Special Committee who serve on the Sixth Circuit presided over appeals of Judge Adams's decisions. Rather than recuse themselves, these members put Judge Adams in the position of having to consider how his decisions might be perceived by the members, limiting his judicial independence.   In addition, on at least three occasions following the February 22, 2016 Order and Memorandum, Special Committee members removed Judge Adams from cases, adding to the cloud over him.   He previously had never been removed from a case.   Judge Adams had requested that the investigation be transferred to another judicial council to avoid such harms, but his request was denied.

55.     On June 27, 2019, the Judicial Council issued yet another Order, which concluded that "no further misconduct by Judge Adams has occurred."   The Judicial Council dismissed the complaint, but expressly left the earlier misconduct findings in place.   It terminated its jurisdiction over Judge Adams -- nearly 5 1/2 years after the case began -- and it noted that the order requiring Judge Adams undergo a psychiatric examination was "no longer in effect."

56.     At no point did the Judicial Council rescind, retract, vacate, or withdraw either the finding that Judge Adams committed misconduct by failing to undergo the psychiatric examination demanded by the Special Committee or the order requiring him to undergo the

examination.   Neither the misconduct finding nor the examination order have expired or will ever expire.

57.     Had the misconduct finding and examination order been retracted or vacated, Judge Adams could have and would have sought reimbursement for at least a portion of the significant expenses he incurred as a result of the investigation, including reimbursement of attorneys' fees, pursuant to 28 U.S.C. § 361.

58.     The Judicial Council's February 22, 2016 misconduct finding and examination order are publicly available on the Judicial Council's website, as is the Judicial Counsel's June 27, 2018 Order and Memorandum reiterating the misconduct finding and examination order. The Review Committee's August 14, 2017 Memorandum of Decision affirming the misconduct finding and examination order is publicly available on the United States Courts' website.

59.     The Wikipedia entry for Judge Adams includes the fact that both the Judicial Council and the Review Committee "ordered Adams to undergo a mental-health examination."

60.     Plaintiff fully intends to remain on the bench and has no plans to retire.

## COUNT I
### (Fifth Amendment – Unconstitutional Vagueness
### of the Act's Disability Provision)

61.     Plaintiff realleges paragraphs 1 through 60 as if fully stated herein.

62.     The Act's disability provision, 28 U.S.C. § 351(a), is unconstitutionally vague and violates the Due Process Clause of the Fifth Amendment because, *inter alia*, it fails to provide adequate notice of what constitutes a mental disability rendering a judge "unable to discharge all the duties of office" and lacks minimal enforcement guidelines identifying when an Article III judge may be subject to a disability investigation.

63.     Defendants' enforcement of the Act's unconstitutional disability provision against Plaintiff proximately caused Plaintiff to suffer substantial harm, including but not limited to direct injury to Plaintiff's reputation from Defendants' resulting misconduct finding and examination order.

64.     Plaintiff will continue to suffer substantial harm as a proximate result of Defendants' enforcement of the Act's unconstitutional disability provisions against him unless and until Defendants' misconduct finding and examination order are declared unlawful and vacated.

## COUNT II
### (*Ultra Vires*, Unconstitutional Examinations)

65.     Plaintiff realleges paragraphs 1 through 64 as if fully stated herein.

66.     Neither the Act nor the U.S. Constitution authorizes requiring an Article III judge to undergo a psychiatric examination in furtherance of an investigation into whether the judge suffers from a mental or physical disability that renders him unable to discharge all the duties of office.

67.     As Defendants had neither the statutory nor constitutional power to require Plaintiff to undergo a psychiatric examination, Defendants' misconduct finding was *ultra vires* and unconstitutional, as was Defendants' examination order.

68.     Defendants' *ultra vires* and unconstitutional misconduct finding and examination order proximately caused Plaintiff to suffer substantial harm, including but not limited to direct injury to Plaintiff's reputation.

69.     Plaintiff will continue to suffer substantial harm as a proximate result of Defendants' *ultra vires* and unconstitutional misconduct finding and examination order unless and until the finding and order are declared unlawful and vacated.

- 18 -

## COUNT III
### (Fifth Amendment – Unconstitutional Vagueness
of the Act's Investigative Authority)

70.     Plaintiff realleges paragraphs 1 through 69 as if fully stated herein.

71.     The Act's investigative authority provision, 28 U.S.C. § 353(c), is
unconstitutionally vague to the extent it purports to authorize psychiatric examinations of Article
III judges.   The provision, which authorizes a special committee to conduct an investigation "as
extensive as it considers necessary," lacks minimal enforcement guidelines identifying the
circumstances under which an Article III judge may be compelled to undergo a psychiatric
examination and vests virtually complete discretion in the hands of a special committee to
determine when an examination may be compelled.   Consequently, the Act violates the due
process protections of the Fifth Amendment and impermissibly intrudes on judicial
independence.

72.     Defendants' enforcement of the Act's unconstitutional investigative authority
provision against Plaintiff proximately caused Plaintiff to suffer substantial harm, including but
not limited to direct injury to Plaintiff's reputation from Defendants' resulting misconduct
finding and examination order.

73.     Plaintiff will continue to suffer substantial harm as a proximate result of
Defendants' unconstitutional misconduct finding and examination order unless and until the
finding and order are declared unlawful and vacated.

## COUNT IV
### (Fifth Amendment – As Applied Due Process Violation)

74.     Plaintiff realleges paragraphs 1 through 73 as if fully stated herein.

75.     Defendants' misconduct finding and examination order violated Plaintiff's Fifth
Amendment right to due process because, *inter alia*, (a) Plaintiff was not given proper notice of

the disability charges against him, including but not limited to notice of the duties of office he

allegedly was unable to perform and the identity of disability from which he allegedly suffered;

(b) Plaintiff was denied the right to call medical and lay witnesses at the April 2015 hearing; and

(c) the hearing was conducted as an adverse, accusatorial proceeding, if not a prosecution, not

the investigative proceeding required by the Act.

76.     Defendants' unconstitutional misconduct finding and examination order

proximately caused Plaintiff to suffer substantial harm, including but not limited to direct injury

to Plaintiff's reputation.

77.     Plaintiff will continue to suffer substantial harm as a proximate result of

Defendants' unconstitutional misconduct finding and examination order unless and until the

finding and order are declared unlawful and vacated.

WHEREFORE, Plaintiff respectfully requests that the Court:   (1) declare the Act's

disability and investigative authority provisions to be unconstitutional; (2) declare Defendants'

finding that Plaintiff committed misconduct by objecting in good faith to undergoing the

psychiatric examination demanded by the Special Committee to be unconstitutional, *ultra vires*,

and otherwise null and void; (3) declare Defendants' order that Plaintiff undergo the psychiatric

examination demanded by the Special Committee to be unconstitutional, *ultra vires*, and

otherwise null and void; (4) award Plaintiff reasonable attorney's fees and costs; and (5) grant

Plaintiff such other relief as the Court deems just and proper.

Dated: August 28, 2019

Respectfully submitted,

JUDICIAL WATCH, INC.

*/s/ Paul J. Orfanedes*
Paul J. Orfanedes
D.C. Bar No. 429716

*/s/ Robert D. Popper*
D.C. Bar No. 1023592
425 Third Street SW, Suite 800
Washington, DC   20024
Tel:    (202) 646-5172
Fax:    (202) 646-5199
Email: porfanedes@judicialwatch.org
         rpopper@judicialwatch.org

*Attorneys for Plaintiff*